Gregory P. Szewczyk
BALLARD SPAHR LLP
919 Third Avenue, 37th Floor
New York, NY 10022
Telephone: 212.223.0200
Facsimile: 212.223.1942
-and-
1225 17th Street, Suite 2300
Denver, CO  80202-5596
Telephone: 303.292.2400
Facsimile: 303.296.3956

*Attorneys for Plaintiff Newmont Mining Corporation*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                                            :
Newmont Mining Corporation,                                 :   Case No. _____
                                                            :
                              Plaintiff,                    :   **COMPLAINT**
                                                            :
              vs.                                           :
                                                            :
                                                            :
AngloGold Ashanti Limited, AngloGold Ashanti               :
North America, Inc., AngloGold Ashanti USA                  :
Incorporated, and Wayne M. Chancellor,                      :
                                                            :
                              Defendants.                   :
                                                            :
------------------------------------------------------------X

      Plaintiff Newmont Mining Corporation ("Newmont"), by and through

undersigned counsel, hereby files this Complaint against Defendants AngloGold Ashanti Limited

("AGA"), AngloGold Ashanti North America, Inc. ("AGA-NA"), AngloGold Ashanti USA

Incorporated ("AGA-USA") (together, the "AGA Defendants") and Wayne M. Chancellor, and

allege as follows upon information and belief:

1

## NATURE OF THE CASE

1.      AGA and Newmont are both in the gold mining industry.

2.      On June 8, 2015, Newmont and AGA entered into a stock purchase agreement whereby Newmont agreed to purchase from AGA 100% of the stock of Cripple Creek and Victor Gold Mining Company ("CC&V") for approximately $820 million.

3.      Because the due diligence period ended at the time of the June 8 signing, the agreement contained express covenants, representations and warranties that AGA would notify Newmont—in writing to a specified designee—of any matter or event that was material to the business, results of operations, or the mine that occurred prior to the August closing.

4.      An important component of the transaction was a newly commissioned gold mill, which, according to its nameplate capacity, would purportedly process 250 short tons of ore per hour.

5.      In June and July of 2015, AGA began experiencing increasingly severe problems with the mill that went far beyond mere commissioning issues and instead reflected serious design defects.

6.      In fact, in June and July 2015, CC&V's process manager drafted a formal memorandum that discussed in detail the myriad defects that prevented the mill from operating anywhere close to nameplate capacity—rendering the agreement's purchase price significantly over the actual value.  He did so with the knowledge and approval of CC&V management.

7.      However, rather than abide by its covenants, representations and warranties, AGA instead fraudulently induced Newmont to close the transaction at an inflated purchase price by:

   a.      Failing to disclose to Newmont the July 2015 memorandum;

2

b.   Failing to disclose to Newmont the problems discussed in the July 2015 memorandum;

c.   Refusing to allow Newmont access to the author of the July 2015 memorandum;

d.   Instructing the employees at the mill not to disclose to Newmont the nature and extent of the problems; and

e.   Failing to disclose to Newmont the fact that efforts to remedy structural defects—which required periodic evacuations of all personnel in the mill—had stalled and would be significantly more expensive than previously stated.

8.   Justifiably relying on AGA's covenants, representations and warranties, Newmont closed the transaction on August 3, 2015 at the inflated purchase price.

9.   Newmont now brings this action to recover the amounts it has spent fixing the undisclosed problems with the mill, the difference between the inflated purchase price and the actual value of CC&V stock, damages it has suffered because the mill has not performed at capacity, and the damages Newmont will suffer in the future.

## **PARTIES**

10.   Plaintiff Newmont Mining Corporation is a Delaware corporation with its principal place of business located at 6363 S. Fiddlers Green Circle #800, Greenwood Village, Colorado 80111.

11.   Defendant AngloGold Ashanti Limited is a South African public company with its headquarters located in Johannesburg, South Africa.

12.   Defendant AngloGold Ashanti North America Inc. is a Colorado corporation with its principal place of business located at 6300 South Syracuse Way, Suite 500, Centennial, Colorado 80111.  Upon information and belief, AGA-NA is a wholly owned subsidiary of AGA.

3

13.      Defendant AngloGold Ashanti USA Incorporated is a Delaware corporation with its principal place of business located at 7400 East Orchard Road, Suite 350, Englewood, Colorado 80111.  Upon information and belief, AGA-US is a wholly owned subsidiary of AGA.

14.      Defendant Wayne M. Chancellor is a citizen and resident of the State of Colorado.

## JURISDICTION AND VENUE

15.      This Court has original jurisdiction over Newmont's Third Cause of Action (Violation of § 10(b) of the 1934 Securities Act and Rule 10b-5) and Fourth Cause of Action (Violation of § 20(a) of the 1934 Securities Act and *Respondeat Superior*) pursuant to 28 U.S.C. § 1331.

16.      This Court can and should exercise supplemental jurisdiction over Newmont's state law claims against Defendants pursuant to 28 U.S.C. § 1367 because the state law claims and federal claim derive from a common nucleus of operative facts.

17.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391.  Venue is also proper in the Southern District of New York pursuant to Section 10.09 of the Stock Purchase Agreement (the "SPA").

## GENERAL ALLEGATIONS

*I.*      *CC&V, the Mine and the Mill.*

18.      The Cripple Creek & Victor Gold Mine, formerly and historically known as the Cresson Mine (the "Mine"), is located in Teller County, Colorado.

19.      Since 2008, AGA, through its subsidiaries, has owned 100% of CC&V, which operated the Mine.

4

20.     The Mine is an open pit operation, which recovers gold from the ore through both "heap leaching" and mill processing.

21.     Heap leaching is a mining process in which ore is stacked in large "leach pads" or mounds.  Sprinklers spray the leach pads with a leaching agent, such as cyanide, which slowly drains through the leach pad.  As the agent passes through the pad, the gold dissolves into the agent.  The gold-infused agent ultimately drains into a pool, where it is then collected for processing and recovery.  Heap leaching is typically used to recover gold from low-grade ore.

22.     As explained more fully below, mill processing involves cycling ore through a "process circuit," in which it is repeatedly ground and filtered.  Because of its high costs, mill processing is typically used to recover gold from high-grade ore.

23.     The modern era of the Mine began in 1995 with an expected mine life to approximately 2004, which was subsequently extended to 2013 as part of a mine life extension project.

24.     In 2012, CC&V proposed and the Colorado regulators approved a second mine life extension project (the "MLE2").

25.     The MLE2 involved the construction of a new mill processing plant, known as the High Grade Mill (the "Mill").

26.     The Mill treats high-grade ore through a process circuit reflected schematically below in the Mill Process Circuit Flow Chart contained in Figure 1.

Figure 1 – The Mill Process Circuit Flow Chart



27.     The first step in the Mill's process circuit is running the ore through a "rod mill," which grinds the ore in a revolving tank containing tumbling metal rods.

28.     After the rod mill, the ore is filtered in the "gravity circuit," which separates the ore based on how finely the particles are ground and sends it to:  (a) the "ball mill" for further grinding (which is then returned to the gravity circuit); (b) the "float tank"; or (c) if it is free gold, one of the "ADR" refineries (where the gold is processed and recovered).

29.     In the float tank, the ground ore (or "slurry") is mixed with chemicals that help separate the "gold bearing" slurry from the "tailings" slurry.  The gold bearing slurry is sent to the "regrind" circuit, while the tailings slurry is sent through a filter press.  (The filter press removes water from the tailings slurry for reuse in the Mill and sends the tailings to the leach pads.)

30.     The regrind circuit grinds the gold bearing slurry into an even finer concentrate, which is then sent to the leach circuit.

31.     In the leach circuit, a solution of lime and cyanide is added to the slurry, which is then pumped through six leach tanks.

32. After the slurry moves through all six leach tanks, it exits to the "CIP" circuit where the gold will collect on carbon particles in a series of CIP tanks. In the CIP tanks, the gold separates from the slurry and attaches to carbon particles, which stay in the CIP tanks.

33. The carbon is collected, washed and transported to an ADR refinery, while the slurry is put through a filter press to remove as much water as possible for reuse.

34. The Mill was supposed to have a throughput rate, or nameplate capacity, of 250 dry short tons per hour ("STPH").

35. In the gold processing industry, the nameplate capacity is the floor at which equipment is intended to operate, not the ceiling.

36. As of late 2014, with construction on the Mill nearing completion, AGA started the process of commissioning the Mill in an effort to meet AGA's public claim that the Mill would produce "first gold" in 2014.

**II.    In March 2015, Defendant Chancellor Instructs the AGA Business Team to Withhold Information from Newmont Regarding Defects with the Mill.**

37. In late 2014, CC&V learned there were some construction and structural defects with the Mill.

38. Specifically, the Mill—which sits at an elevation of over 10,000 feet—was not constructed to withstand high winds or certain snow loads.

39. In fact, the Mill was under evacuation restrictions which required all personnel to evacuate the Mill when winds rose to a certain level or a certain amount of snow accumulated.

40. In addition, when the Mill was run to produce "first gold" in December 2014, the rod mill suffered a catastrophic failure and the Mill was unable to operate again until March 2015.

41.     In early 2015, AGA began marketing CC&V for sale.

42.     Although CC&V stock was held by AGA-NA and AGA-USA, AGA marketed CC&V for sale and operated as the seller or authorized agent with respect to interactions with potential buyers, including Newmont.

43.     At all relevant times during the marketing and sales process, AGA had complete and actual control over, or acted as the authorized agent for, AGA-NA and AGA-USA.

44.     Defendant Chancellor, Vice President and General Counsel of AGA Americas, operated as the principal point of contact for AGA for the marketing and sale of CC&V.

45.     At all relevant times during the marketing and sales process, Defendant Chancellor was acting on behalf, and with the knowledge and express authority, of each of the AGA Defendants.

46.     In connection therewith, AGA sent to Newmont an offer to sell 100% of CC&V stock in a document entitled "Cripple Creek & Victor Gold Mining Company: Unique Opportunity to Gain Exposure to a World-Class Producing Mine in a Low-Risk Jurisdiction," dated January 2015.

47.     AGA also provided to Newmont a document entitled "Project Waltz, Confidential Information Memorandum," dated February 7, 2015 (the "CIM").

48.     The CIM represented that:

- "Construction of the [Mill] was approximately 96% complete with mechanical completion expected in late January 2015";

- "Production from the [Mill] will commence in Q1 2015 and is expected to reach full production capacity in September 2015"; and

- "Overall gold recovery from the mill is expected to be 76.5%"

49.     The CIM did not disclose that the Mill had been suffering from any construction or design defects, or that the Mill was under evacuation restrictions.

50.     In March 2015, Newmont accepted AGA's invitation to visit the Mine, at which visit AGA provided Newmont with a presentation entitled, "SITE VISIT, Management Presentation" (the "Management Presentation").

51.     As late as March 6, 2015, the working draft of the Management Presentation included a slide disclosing that:  (1) in November 2014, a subcontractor notified AGA that the structural steel design of the Mill was so defective that it recommended that all construction activities should be suspended until additional risk assessments could be completed; and (2) in December 2014, during the early stages of commissioning the Mill, the rod mill suffered a catastrophic failure which required a shut down and extensive repairs.

52.     However, in March 2015, Defendant Chancellor advised AGA's business team to remove that slide in its entirety.

53.     AGA's business team accepted Defendant Chancellor's advice, and the Management Presentation AGA provided to Newmont did not include any disclosures regarding the structural and design defects that AGA knew were plaguing the Mill.

54.     AGA's deliberate choice not to disclose material information in the CIM and Management Presentation evidences AGA's intent to induce Newmont to purchase CC&V at an unjustly inflated price.

**III.     AGA Induces Newmont to Sign the SPA by Agreeing to Provide Newmont with Written Notice of the Occurrence of Any Matter Material to the Mine or the Mill.**

55.     Relying on AGA's misleading and false representations and concealment of material facts, on April 30, 2015, Newmont sent to AGA a binding proposal to accept AGA's offer to sell 100% of CC&V.

9

56.     AGA and Newmont negotiated a revised binding proposal, which Newmont sent to AGA on May 16, 2015, and the parties thereafter began negotiating a purchase agreement with a set deadline of June 8, 2015.

57.     Defendant Chancellor served as the primary negotiator and point of contact for the AGA Defendants.

58.     On at least one occasion, the parties, including Defendant Chancellor, met at the New York offices of AGA's outside counsel to negotiate the terms of transaction.

59.     Mere days before the June 8 deadline, AGA notified Newmont for the first time that there were structural-related issues with the Mill.

60.     Specifically, AGA advised Newmont that certain subcontractors had made claims against CC&V arising out of the additional and delayed work caused by structural problems during construction.

61.     AGA did not indicate in any way that the disputes with the subcontractors involved any ongoing problems or design defects with the Mill.

62.     To account for the disputes with the subcontractors, the parties agreed to include in their agreement a "Designated Matters" provision, which would govern how the parties would share costs and recoveries from those disputes.

63.     AGA's outside counsel provided Newmont with the first draft of the Designated Matters provision on June 7, 2015.

64.     Although AGA's June 8, 2015 deadline limited the amount of time in which Newmont could assess the subcontractor disputes, Newmont agreed to the provision because AGA agreed to warrant and covenant that it had and would continue to provide written notice to Newmont of any information material to operations at the Mill.

10

65.     On June 8, 2015, Defendants and Newmont entered into the SPA. *See* Exhibit 1.

66.     In more than one provision, an AGA entity or entities represented and warranted to Newmont that it/they had disclosed and would continue to disclose any information material to operations at the Mill.

67.     For example, in Section 6.01(b) AGA-NA covenanted that it:

> shall promptly advise [Newmont] in writing of . . . the occurrence of any matter or event that is material to the business condition (financial or otherwise), working capital, or results of operations of [CC&V], taken as a whole, [CC&V's assets], taken as a whole, or the Mine, provided, however, that the delivery of any such notice shall not cure any breach of, or non-compliance with, any provision of this Agreement or limit the remedies available to [Newmont] under this Agreement.

68.     Similarly, pursuant to Section 4.14 and Schedule 4.14, AGA-NA and AGA-USA represented and warranted that there had not been any "Company Material Adverse Effect" within the meaning of clause (ii) of that term's definition since December 31, 2014.

69.     Pursuant to Section 10.05(b), Company Material Adverse Effect:

> means any change, effect, event, occurrence, circumstance or state of facts that, with all other changes, effects, events, occurrences, circumstances or states of facts . . . (ii) is or would be reasonably expected to be materially adverse to the business, results of operations, condition (financial or otherwise) of [CC&V], taken as a whole, [CC&V's assets], taken as a whole, or the Mine . . .

70.     With respect to real property and mining claims, AGA-NA and AGA-USA warranted that the SPA "sets forth a true and complete list of all royalties, overriding royalties, net profit interests, payments on or out of production in each case, to which any Company property is subject [] and all Company Property . . . for which [AGA subsidiaries] in the aggregate do not have 100% ownership." Ex. 1 at § 4.05(j).

71.     The SPA specifically entitles Newmont to indemnification for any loss, damage, cost, liability, or expense that Newmont suffers as a result of "any representation or

warranty of [AGA-NA], AGA-USA and AGA contained in this Agreement not being true and correct when made or at the Closing." *Id.* at § 9.02(a)(i).

72.     Further, AGA agreed to be "jointly and severally liable for" losses suffered by Newmont as a result of any breaches of warranty by AGA-NA and AGA-USA. *Id.* at § 9.02(a).

73.     The SPA provides procedures through which the parties could resolve certain disputes regarding the calculation of post-closing purchase price adjustments by submitting the dispute to an accountant arbitrator. *Id.* at § 2.04(b).

74.     However, the arbitrator's authority is specifically limited to matters relating to the mathematical calculation, and the arbitrator is specifically excluded from making substantive determinations relating to compliance with provisions of the SPA. *Id.* at § 2.04(d).

75.     Section 2.04(i), which is outside the scope of the arbitrator's authority, defines the "Indebtedness" component of the purchase price adjustment formula.

76.     The SPA provides that a "party in breach of this Agreement shall, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party." *Id.* at § 10.03.

77.     The SPA is governed by New York law and specifically provides that each party: (a) consents to jurisdiction in the United States District Court for the Southern District of New York ("SDNY"); and (b) agrees to commence any action in SDNY to the extent possible. *Id.* at §§ 10.09, 10.10.

IV. **The AGA Defendants Breach Their Warranties and Induce Newmont to Close by Repeatedly Failing to Disclose Their Knowledge of Increasingly Material Problems with the Mill—Including the Winterton Memo.**

A.   *Defendant Chancellor Declares Internally that Providing Newmont with Access to Information Is "the Exception Rather than the Rule."*

78.   In June and July 2015, Defendants became aware that CC&V was experiencing increasingly severe problems with the Mill.

79.   These problems went beyond mere commissioning issues and instead reflected serious design defects.

80.   In fact, by June, CC&V management had concluded that the Mill may never perform at design capacity.

81.   Rather than making the disclosures required by the covenants, representations and warranties contained in the SPA, Defendants instead took affirmative steps to hide from Newmont the existence of the increasingly severe problems.

82.   For example, on June 17, 2015, Defendant Chancellor sent an email entitled "Rules of Engagement" outlining when and how AGA would allow Newmont access to CC&V personnel, the Mine and information.

83.   The email explains that "the AGA management team" determined that "[a]ccess to people, property, or information by Newmont . . . should be the exception rather than the rule."

84.   Defendant Chancellor called out, as an example of an inappropriate request, Newmont's request to have its Regional Projects manager, who would be taking over the commissioning of the Mill, visit the site.

85.   In addition, he said that while it was understandable that Newmont would want to "kick the tires," it was not required for closing.

86.     Finally, after basically refusing to allow any on-site visits and only limited off-site meetings, Defendant Chancellor stated that with "regard to access to information," the focus once again should . . . "not be on prolonged and continued due diligence."

B.     *Defendants Intentionally Withhold from Newmont the July 2015 Winterton Memo.*

87.     AGA followed through and acted in accordance with its program that access to information would be the exception rather than the rule.

88.     In June 2015, CC&V's Process Manager, Jeff Winterton, began drafting a memorandum documenting the increasingly severe problems with the Mill and explaining what those problems meant with respect to the Mill's performance capabilities.

89.     The final version of the memorandum is entitled "Mill Ramp-Up Progress Summary and Execution Plan" and is dated July 2015 (the "Winterton Memo").

90.     The Winterton Memo concluded in no uncertain terms that the Mill's "maximum sustainable throughput that can be regularly achieved and controlled is just 200 STPH; 20% blow nameplate design"—well below the targets set by AGA's commissioning curve, which was based on well-established industry standards.

91.     In reality, CC&V had never been able to sustain 200 STPH, for more than a few hours at a time.

92.     The Winterton Memo further explained in detail the design defects plaguing virtually every component of the Mill's process circuit:

- Gravity Circuit:  There were "two critical issues imped[ing] operation of the gravity circuit:" (1) excessive vibration in the support structure; and (2) a lack of process to refine the slurry.  The Winterton Memo specifically states that remedial efforts were "being headed by corporate AGA metallurgists and [are] currently sidelined because of the sale."

- Floatation Circuit:  Defects created "side-to-side oscillations" which led to "frosh sloshing in the tanks," causing a "negative impact on recovery."  As of July 2015, AGA already knew that there had to be some structural repairs post-closing.

14

- <u>Pumps</u>:  The Mill suffered from severe problems due to undersized pumps that were not strong enough to move the slurry through the process circuit.  (The small circles in Figure 1 indicate the locations of the problematic pumps.)  Previous attempts by subcontractors failed to fix the problems because "[t]heir approach so far has been essentially trial and error with no emphasis on investigating the root cause of the issues."  According to the Winterton Memo, "the pumps are one of the principal bottlenecks limiting overall throughput through the [Mill]."

- <u>Leach Tanks</u>:  The design of the mechanism linking the six leach tanks led to "frictional drag" that "will only get worse as throughput is increased."  By July 2015, it was apparent that the solution required a complete redesign, which AGA had "discussed, but the work has not been pursued as resources have been devoted to more pressing matters."

- <u>Filter Presses</u>:  In June and July, the filter presses had become "the primary limitation to stabilizing operations and increasing mill throughput."  Numerous attempted fixes increased capacity to 200 STPH, but progress had plateaued and there was "scant room for upsets of any kind" even at that reduced throughput.

93.     The Winterton Memo also concluded that prior assumptions regarding recovery rates were no longer valid:  "Budget production estimates are based on a blanket overall recovery of 76.5%.  Subsequent laboratory testing, as well as operational data shows that this assumption is not valid."

94.     The "subsequent laboratory testing" was a result of an AGA in-house investigation conducted in Q2 2015.  The fact and results of this testing were not disclosed to Newmont prior to closing.

95.     The identification of this issue alone effectively eliminated the recovery of 35,000 to 65,000 ounces which, at a value of $1,200 an ounce, results in a loss in value of between $42 and $62 million.

96.     In addition, Mr. Winterton and others had come to the conclusion in June and July 2015 that it was unlikely that the Mill would ever perform at nameplate capacity.

97.     AGA received multiple drafts of the Winterton Memo.

98.     AGA's then-COO knew of the problems with the Mill discussed in the Winterton Memo prior to closing.

99.     Defendant Chancellor knew of the problems with the Mill discussed in the Winterton Memo prior to closing.

100.    Defendants were aware of the Winterton Memo prior to closing.

101.    Defendants were aware of the problems with the Mill discussed in the Winterton Memo prior to closing.

102.    AGA did not provide the Winterton Memo to Newmont.

103.    AGA-NA did not provide the Winterton Memo to Newmont.

104.    AGA-USA did not provide the Winterton Memo to Newmont.

105.    Defendant Chancellor did not provide the Winterton Memo to Newmont.

106.    AGA did not provide written notice to Newmont of the problems with the Mill discussed in the Winterton Memo.

107.    AGA-NA did not provide written notice to Newmont of the problems with the Mill discussed in the Winterton Memo.

108.    AGA-USA did not provide written notice to Newmont of the problems with the Mill discussed in the Winterton Memo.

109.    Defendant Chancellor did not provide written notice to Newmont of the problems with the Mill discussed in the Winterton Memo.

110.    AGA did not disclose to Newmont the problems with the Mill discussed in the Winterton Memo.

111.    AGA-NA did not disclose to Newmont the problems with the Mill discussed in the Winterton Memo.

16

112.    AGA-USA did not disclose to Newmont the problems with the Mill discussed in the Winterton Memo.

113.    Defendant Chancellor did not disclose to Newmont the problems with the Mill discussed in the Winterton Memo.

114.    Newmont could not have discovered the extent or nature of the problems with the Mill discussed in the Winterton Memo through review of the documents AGA made available to it.

115.    Newmont could not have discovered the extent or nature of the problems with the Mill discussed in the Winterton Memo through a site visit.

C.    *AGA Refuses to Make Mr. Winterton Available to Newmont and Warns CC&V Employees Not to Disclose Extent of Problems.*

116.    Without knowing that Mr. Winterton had authored a memorandum detailing the defects with the Mill, on June 4, 2015, Newmont requested from AGA the opportunity to meet with CC&V's process manager (which was Mr. Winterton).

117.    AGA, however, did not provide Newmont access to Mr. Winterton.

118.    Rather, AGA offered to allow Newmont to speak with Jose Barron, the individual who oversaw the construction of the Mill, but who had little to no involvement in its commissioning or operation.

119.    AGA also offered to allow Newmont's incoming general manager to speak to certain CC&V personnel selected by AGA.

120.    AGA scheduled the meeting with the handpicked CC&V personnel for July 21, 2015 at the Mine.

121.    Mr. Winterton was not scheduled to be at the Mine on July 21, 2015.

17

122.    On July 16, 2015—five days before the meeting with Newmont—AGA Vice President and CC&V General Manager Lowe Billingsley sent an email to the CC&V management group, which included the people who would be meeting with the incoming general manager on July 21.

123.    In that July 16 email, Mr. Billingsley directed the CC&V employees on how to communicate with Newmont's general manager and specifically directed them not to use phrases such as "that will never meet design capacity" or "we will never achieve ___."

124.    Newmont's general manager met with the CC&V personnel on July 21, 2015.

125.    Mr. Winterton was not present at the July 21, 2015 meeting.

126.    In fact, Mr. Winterton was not even at the Mine on July 21, 2015.

127.    Nobody in the July 21, 2015 meeting disclosed to Newmont the problems with the Mill discussed in the Winterton Memo.

128.    The information AGA failed to disclose was material to assessing the operations of the Mill and to Newmont's decision to proceed with the purchase.

129.    If AGA had disclosed to Newmont the problems with the Mill discussed in the Winterton Memo, Newmont would not have closed the transaction at the unjustly inflated stock price the parties had contemplated when they executed the SPA.

**V.    *After the Closing, Newmont Suffers Damages as a Result of AGA's Failure to Disclose the Material Changes with the Mill.***

   A.    *Newmont Learns that Defendants Failed to Disclose the Process Circuit Defects.*

130.    In the days leading up to the closing, the AGA Defendants, Newmont and several attorneys—including Defendant Chancellor—discussed at length several different amendments to the SPA and its schedules.

131.    At no point during these discussions did Defendants disclose to Newmont the problems with the Mill discussed in the Winterton Memo.

132.    On July 30, 2015, the AGA Defendants and Newmont agreed to a final set of amendments to the SPA and its schedules.

133.    The amendments to the SPA and its schedules did not include an amendment of Schedule 4.14 or a disclosure pursuant to Section 6.01.

134.    On August 3, 2015, the transaction closed at the offices of AGA's counsel in New York, New York.

135.    Defendant Chancellor was present in New York at the closing.

136.    The transaction closed without an adjustment to the price set in the SPA.

137.    On August 4, 2015, Mr. Winterton sent a copy of the Winterton Memo to Newmont personnel.

138.    This was the first time Newmont learned of the severe process circuit defects with the Mill that arose prior to the closing.

139.    Over the next two years, Newmont spent approximately $12 million attempting to fix the problems with the Mill that arose prior to closing.

140.    To this day, the Mill still does not run at the 250 STPH nameplate capacity.

141.    To the contrary, even after spending approximately $12 million to fix the processing problems, the Mill currently runs at approximately 225 STPH, which is 88% of nameplate capacity.

142.    Newmont is still incurring costs as it continues to fix the problems with the Mill that arose prior to closing.

19

143.    On top of the costs it has incurred fixing the problems, Newmont has already suffered lost profits due to the inability of the Mill to operate at the levels as established by AGA's own commissioning schedule.

144.    Newmont expects it will suffer more lost profits over the next 8 years due to the inability of the Mill to operate at the appropriate levels as established by AGA's own commissioning schedule.

B.    *Newmont Learns that Defendants Failed to Disclose Mineral Interests.*

145.    Newmont also learned after the closing that Defendants had knowingly failed to disclose certain interests in violation of Section 4.05(j) of the SPA.

146.    Specifically, Newmont learned that Messrs. Chancellor and Billingsley were informed in a November 12, 2014 email that certain third parties held mineral interests on a portion of plot MS 9282.

147.    However, Defendants did not disclose those interests in Schedule 4.05(j).

148.    Upon information and belief, the AGA Defendants have failed to pay several millions of dollars to satisfy obligations related to the mineral interests on a portion of plot MS 9282.

C.    *Newmont Learns that Defendants Failed to Disclose the Fact that Remedying the Structural Defects Would Be Significantly More Expensive than Expected.*

149.    Prior to closing, AGA told Newmont that it would cost approximately $3 million to remedy the structural problems relating to the subcontractors.

*150.*    AGA also told Newmont that these structural remedies would be completed prior to or immediately after closing.

20

151.    In June and July 2015, Defendants became aware that it would cost significantly more than $3 million to remedy the structural problems relating to the subcontractors.

152.    However, Defendants did not disclose to Newmont the fact that these structural repairs would cost significantly more than $3 million and would not be completed in August or September of 2015.

153.    Accordingly, Newmont did not learn until after closing that the remedies to the structural problems—which were still not completed at closing—would cost significantly more than $3 million and that less than $1 million of repairs had been completed.

154.    CC&V could not obtain the certificate of occupancy until after it remedied the structural problems.

155.    To date, Newmont has spent approximately $5 million remedying the structural problems with the Mill so that it would be safe for CC&V personnel and not subject to evacuation restrictions.

## VI.    The AGA Defendants Refuse to Abide by Their Post-Closing Contractual Obligations.

### A.    AGA-NA Refuses to Pay Over $4 Million by Disputing the Definition of "Indebtedness" Required for the Purchase Price Adjustment.

156.    On October 1, 2015, AGA-NA sent to Newmont the Statement pursuant to Section 2.04 of the SPA.

157.    On October 29, 2015, Newmont sent to Defendant Chancellor Newmont's Notice of Disagreement, which detailed a dispute over the "Indebtedness" component of the Statement.

158.    Specifically, the October 29 letter explained that "Indebtedness should also include, pursuant to clause (v) of the definition thereof, payment obligations under any

commodity derivative, hedge, future, forward purchase or sale of other transaction similar in nature or effect."

159.    The October 29 letter went on to explain that, under the required definition Indebtedness, AGA-NA owed to Newmont $4,402,894, together with any interest as required by the SPA, in light of a payment obligation related to a certain "Sinclair Oil Agreement."

160.    On November 18, 2015, AGA-NA responded to Newmont by arguing that the Sinclair Oil Agreement did not constitute an "Indebtedness" under the definition contained in Section 2.04(i).

B.    *The AGA Defendants Refuse to Honor Their Indemnification Obligations.*

161.    In a December 21, 2016 Notice of Breach of Representation and Warranty under the Stock Purchase Agreement ("SPA") / Notice of Obligation for Indemnity and Continued Demand for Purchase Price Adjustment (the "Indemnity Demand"), Newmont invoked its right to indemnification under Section 9.02(a)(1) of the SPA for the failure of AGA-NA and AGA-USA to disclose the material changes in the Mill pursuant to Section 4.14.

162.    The Indemnity Demand also reiterated Newmont's right to a purchase price adjustment in accordance with Section 2.04 and the October 29, 2015 letter.

163.    The AGA Defendants refused to provide the requisite indemnification, placing all three entities in breach of Section 9.02(a)(1).

164.    The AGA Defendants also refused to provide the purchase price adjustment, placing all three entities in breach of Section 9.02(a)(1).

165.    On May 1, 2017, Newmont and the AGA Defendants entered into an Agreement to Toll Statutes of Limitations (the "Tolling Agreement"), which arrested, suspended and tolled any and all statutes of limitations related to any claims related to the SPA.

166.    The Tolling Agreement also precluded the parties from initiating any litigation without terminating the Tolling Agreement upon 30 days' notice.

167.    On September 18, 2017, Defendant Chancellor provided a notice of termination of the Tolling Agreement effective October 19, 2017.

## FIRST CAUSE OF ACTION

### Breach of Contract Against the AGA Defendants

168.    Newmont repeats and realleges all other paragraphs of this Complaint as if fully set forth herein.

169.    The SPA is a valid contract between Newmont and the AGA Defendants.

170.    Newmont performed its obligations under the SPA.

171.    AGA-NA and AGA-USA failed to perform their obligations under the SPA by failing to disclose: (a) the mineral interests related to plot MS 9282 pursuant to Section 4.05(j); and (b) the increasingly severe problems with the Mill, including, but not limited to, the problems detailed in the July 2015 Winterton Memo, pursuant to Section 4.14.

172.    AGA-NA failed to: (1) perform its obligations under Section 6.01(b) by failing to provide written notice of the increasingly severe problems with the Mill, including, but not limited to, the problems detailed in the July 2015 Winterton Memo; and (2) include the payment obligation related to the Sinclair Oil Agreement in the Indebtedness component of the purchase price adjustment.

173.    The AGA Defendants failed to perform their obligations under Section 9.02(a)(1) of the SPA by failing to indemnify Newmont after it submitted the Indemnity Demand.

174.    Newmont has suffered damages as a result of Defendants' numerous breaches of contract.

23

## SECOND CAUSE OF ACTION

### Fraudulent Inducement Against All Defendants

175.    Newmont repeats and realleges all other paragraphs of this Complaint as if fully set forth herein.

176.    Defendants made a false representation of and/or failed to disclose facts by:

a.      Representing that there had not been any material adverse changes related to the Mill since December 31, 2014;

b.      Representing that AGA-NA would promptly advise Newmont in writing of the occurrence of any matter or event that is material to the Mill;

c.      Representing that Schedule 4.05(j) contained a true and complete list of all royalties, overriding royalties, net profit interests, or payments on or out of production on all properties for which AGA or its subsidiaries did not have 100% ownership;

d.      Concealing from and failing to disclose to Newmont the Winterton Memo;

e.      Concealing from and failing to disclose to Newmont the numerous severe problems with the Mill that occurred between December 31, 2014 and June 8, 2015; and

f.      Concealing from and failing to disclose to Newmont the numerous severe problems with the Mill that occurred between June 8, 2015 and August 3, 2015, including, but not limited to, the problems discussed in the Winterton Memo.

177.    The facts Defendants misrepresented and/or concealed were material.

178.    At the time Defendants made the representations and/or concealed the facts, Defendants knew the representations were false and/or knew that concealing the facts would create a false impression of the actual facts in the mind of Newmont.

24

179.     Defendants made the representations with the intent that Newmont would rely on the representation, and/or concealed the facts with the intent that Newmont would take a course of action it might not take if it knew the actual facts.

180.     Newmont relied on the false representations and/or took action or decided not to act on the assumption that the falsely-represented facts were true and/or the undisclosed facts did not exist or were different from what they actually were.

181.     Newmont's reliance was justified.

182.     This reliance caused damages to Newmont.

<u>**THIRD CAUSE OF ACTION**</u>

**Violation of § 10(b) of the 1934 Securities Act and Rule 10b-5 Against the AGA Defendants**

183.     Newmont repeats and realleges all other paragraphs of this Complaint as if fully set forth herein.

184.     The AGA Defendants used an instrumentality of interstate commerce, or a facility of a national securities exchange, in connection with the sale of securities.

185.     In connection with such sale, the AGA Defendants employed a device, scheme, or artifice to defraud; made an untrue statement of material fact, or omitted to state a material fact necessary in order to make the statements that were made, in light of the circumstances under which they were made, not misleading; and engaged in an act, practice or course of business that operated as a fraud or deceit upon Newmont in connection with the sale of securities, including by:

a.     Representing that there had not been any material adverse changes related to the Mill since December 31, 2014;

b.     Representing that AGA-NA would promptly advise Newmont in writing of the occurrence of any matter or event that is material to the Mill;

25

       c.       Representing that Schedule 4.05(j) contained a true and complete list of all royalties, overriding royalties, net profit interests, or payments on or out of production on all properties for which AGA or its subsidiaries did not have 100% ownership;

       d.       Concealing from and failing to disclose to Newmont the Winterton Memo;

       e.       Concealing from and failing to disclose to Newmont the numerous severe problems with the Mill that occurred between December 31, 2014 and June 8, 2015; and

       f.       Concealing from and failing to disclose to Newmont the numerous severe problems with the Mill that occurred between June 8, 2015 and August 3, 2015, including, but not limited to, the problems discussed in the Winterton Memo.

186.    The AGA Defendants acted knowingly.

187.    Newmont justifiably relied upon the AGA Defendants' conduct.

188.    Newmont suffered damages as a result of the AGA Defendants' conduct.

## FOURTH CAUSE OF ACTION

**Violation of § 20(a) of the 1934 Securities Act and *Respondeat Superior* Against AGA**

189.    Newmont repeats and realleges all other paragraphs of this Complaint as if fully set forth herein.

190.    AGA was a controlling person of AGA-NA and AGA-USA within the meaning of Section 20(a) of the 1934 Securities Act.

191.    AGA had complete and actual control over AGA-NA and AGA-USA.

192.    The AGA Defendants each violated Section 10(b) and Rule 10b-5 promulgated thereunder by their acts and omissions as alleged in this Complaint.

193.    By virtue of its position as a controlling person, AGA is liable pursuant to Section 20(a) of the Securities Act.

194.    As a direct and proximate result of AGA's wrongful conduct, Plaintiffs suffered damages in connection with the purchase of the securities.

**FIFTH CAUSE OF ACTION**

**Violation of the Colorado Securities Act Against the AGA Defendants**

195.    Newmont repeats and realleges all other paragraphs of this Complaint as if fully set forth herein.

196.    Newmont purchased 100% of CC&V stock from the AGA Defendants.

197.    The CC&V stock was a security.

198.    The sale and/or the offer or acceptance to sell or to purchase the stock took place in Colorado.

199.    In connection with the sale of the CC&V stock, the AGA Defendants employed a device, scheme, or artifice to defraud; made an untrue statement of material fact, or omitted to state a material fact necessary in order to make the statements that they made, in light of the circumstances under which they were made, not misleading; and engaged in an act, practice or course of business that operated as a fraud or deceit upon Newmont in connection with the sale of the securities, including by:

a.    Representing that there had not been any material adverse changes related to the Mill since December 31, 2014;

b.    Representing that AGA-NA would promptly advise Newmont in writing of the occurrence of any matter or event that is material to the Mill;

c.    Representing that Schedule 4.05(j) contained a true and complete list of all royalties, overriding royalties, net profit interests, or payments on or out of production on all properties for which AGA or its subsidiaries did not have 100% ownership;

27

        d.      Concealing from and failing to disclose to Newmont the Winterton Memo;

        e.      Concealing from and failing to disclose to Newmont the numerous severe problems with the Mill that occurred between December 31, 2014 and June 8, 2015; and

        f.      Concealing from and failing to disclose to Newmont the numerous severe problems with the Mill that occurred between June 8, 2015 and August 3, 2015, including, but not limited to, the problems discussed in the Winterton Memo.

200.    The AGA Defendants acted recklessly, knowingly, or intentionally.

201.    At the time Newmont purchased securities from the AGA Defendants, it did not know, and in the exercise of reasonable care could not have known, that the representations made to it were materially false and misleading, and did not know the true facts which are alleged in this Complaint to have been omitted.

202.    Newmont justifiably relied upon the AGA Defendants' conduct.

203.    Newmont suffered damages as a result of the AGA Defendants' conduct.

204.    The AGA Defendants are liable to Plaintiffs pursuant to Section 11-51-604(3) and (4), COLO. REV. STAT., for the sale of securities in violation of Section 11-51-501(1)(a), (b), and (c), COLO. REV. STAT.

## SIXTH CAUSE OF ACTION

### Control Person Liability Under the Colorado Securities Act Against AGA

205.    Newmont repeats and realleges all other paragraphs of this Complaint as if fully set forth herein.

206.    AGA was a controlling person of AGA-NA and AGA-USA within the meaning of Section 11-51-604(5), COLO. REV. STAT.

207.    AGA had actual control over AGA-NA and AGA-USA.

28

208.    The AGA Defendants each violated Section 11-51-604(3) and (4) by their acts and omissions as alleged in this Complaint.

209.    By virtue of its position as a controlling person, AGA is liable to Plaintiffs pursuant to Section 11-51-604(5), COLO. REV. STAT.

## SEVENTH CAUSE OF ACTION

### Aiding and Abetting Violation of the Colorado Securities Act Against Defendant Chancellor

210.    Newmont repeats and realleges all other paragraphs of this Complaint as if fully set forth herein.

211.    The AGA Defendants engaged in primary violations of the Colorado Securities Act.

212.    Defendant Chancellor, at all relevant times, had knowledge of the primary violations by the AGA Defendants.

213.    Defendant Chancellor provided substantial assistance to the AGA Defendants.

214.    By reason of the conduct alleged herein and pursuant to Section 11-51-604(5), COLO. REV. STAT., Defendant Chancellor is liable, jointly and severally, and to the same extent as the AGA Defendants for the aforesaid wrongful conduct, and is liable to Plaintiffs for the damages they suffered in connection with the purchase of securities.

*       *       *

WHEREFORE, Plaintiff Newmont Mining Corporation prays that the Court grant it relief, including as follows:

(a)    Damages as a result of the AGA Defendants' breaches of contract;

(b)    Damages as a result of Defendants' fraudulent inducement;

29

(c)     Damages as a result of the AGA Defendants' violation of Sections 10(b) and 20

        of the Securities Act of 1934 and Rule 10b-5;

(d)     Damages as a result of the AGA Defendants' violation of the Colorado Securities

        Act;

(e)     Damages as a result of Defendant Chancellor's aiding and abetting of violations

        of the Colorado Securities Act;

(f)     Punitive damages;

(g)     Reasonable attorneys' fees and costs;

(h)     Prejudgment and post-judgment interest; and

(i)     All other relief as this Court deems appropriate.

Dated:  New York, New York                    Ballard Spahr LLP

        October 19, 2017


                                  By:     */s/ Gregory P. Szewczyk*
                                          Gregory P. Szewczyk

                                  Gregory P. Szewczyk
                                  BALLARD SPAHR LLP
                                  919 Third Avenue, 37th Floor
                                  New York, NY 10022
                                  Telephone: 212.223.0200
                                  Facsimile: 212.223.1942
                                  -and-
                                  1225 17th Street, Suite 2300
                                  Denver, CO  80202-5596
                                  Telephone: 303.292.2400
                                  Facsimile: 303.296.3956

                                  *Attorneys for Plaintiff Newmont Mining Corporation*

Plaintiff:      Newmont Mining Corporation
                6363 S. Fiddlers Green Circle #800
                Greenwood Village, Colorado 80111