UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 9/30/2018

NEWMONT MINING CORPORATION,

        Plaintiff,

        v.

ANGLOGOLD ASHANTI LIMITED,
ANGLOGOLD ASHANTI NORTH
AMERICA, INC., ANGLOGOLD ASHANTI
USA INCORPORATED and WAYNE M.
CHANCELLOR,

        Defendants.

No. 17-CV-8065 (RA)

OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

Newmont Mining Corporation brings this action against three related corporate entities—collectively, "AngloGold"[1]—and one individual, Wayne Chancellor, for various claims arising from Newmont's purchase of a gold mine in Colorado. There are currently three motions pending in this case. For the reasons explained below, Chancellor's motion to dismiss for lack of personal jurisdiction is denied and the other two motions—AngloGold's motion to compel arbitration as to one part of the case and Defendants' shared motion to dismiss another aspect of it—are granted.

## BACKGROUND

This case is about the ownership, operations, and sale of an open-pit gold mining operation in Colorado. Because each of the pending motions relies on a different set facts, the Court discusses here only the background necessary to understand the case's general context.

---

[1] Although the Complaint's allegations and claims against the AngloGold entities vary somewhat, any differences are largely immaterial for the purposes of this Opinion. Unless otherwise noted, the Court refers to the three entities as one.

Originally, the mine at issue was owned by the Cripple Creek & Victor Mining Company ("Victor Mining"), a 100% subsidiary of AngloGold. *See* Compl. ¶ 19 (Dkt. 7). In 2012, Victor Mining began planning for and building a new high grade mill. *See id.* ¶¶ 4, 24–26. Since then, however, the mill has suffered from various structural issues and production problems and has not operated at capacity as a result. *See id.* ¶¶ 37–40, 96, 140. At some point prior to November 2014, a third party allegedly acquired the mineral interests on a plot of land on Victor Mining's property adjacent to the mill, referred to by the parties as MS 9282 ("the Plot"). *See id.* ¶¶ 146–148, 171.

In early 2015, AngloGold began marketing Victor Mining for sale and sent Newmont an offer to sell the company. *See id.* ¶¶ 41–46. Wayne Chancellor, who was the Vice President and General Counsel to one of the AngloGold entities during the relevant time period, actively participated in the marketing and sale process on behalf of AngloGold. *See id.* ¶¶ 44–45. Negotiations proceeded over the next few months. In May 2015, executives from Newmont and AngloGold, including Chancellor, met for two days in New York City, at the offices of AngloGold's outside counsel, Cravath, Swaine & Moore LLP, to discuss the transaction, negotiate certain terms of the deal, and finalize the agreement. *See* Compl. ¶ 58; Chancellor Decl. ¶¶ 35–37 (Dkt. 20).

On June 8, 2015, Newmont and AngloGold entered into a Stock Purchase Agreement ("SPA") in which Newmont agreed to purchase 100% of Victor Mining's stock for approximately $820 million. *See* Compl. ¶ 2; SPA § 2.01 (Dkt. 7-1). That price was approximate because the contract permitted the parties to adjust the price after closing through a "Purchase Price Adjustment" procedure. *See* SPA § 2.04. The SPA also included a promise by AngloGold to keep Newmont updated on all material business matters and events prior to the deal's closing date. *See* Compl. ¶¶ 3, 67, 69; SPA § 6.01(b). The SPA further provided that any lawsuit arising therefrom

would be governed by New York law and that the parties consented to the jurisdiction of and to bring lawsuits in the U.S. District Court for the Southern District of New York. *See* Compl. ¶ 77; SPA §§ 10.09, 10.10.

Over the next two months, the AngloGold Entities allegedly began experiencing increasingly severe problems with the mill—the result of purported "design defects." *See* Compl. ¶¶ 5, 78–79. Instead of clearly communicating these problems with Newmont, AngloGold allegedly took various "steps to hide . . . the existence of the increasingly severe problems." *See id.* ¶ 81; *see also, e.g., id.* ¶¶ 61, 82–86. Chancellor allegedly participated in this fraud in a variety of ways, including by failing to disclose the problems with the mill that had been identified in an internal Victor Mining memorandum. *See id.* ¶¶ 82–86, 88, 99, 105, 109, 113.

The deal closed in New York City on August 3, 2015, without any adjustment in price. *See id.* ¶¶ 134–136. Chancellor attended the closing. *See id.*; Chancellor Decl. ¶ 35. According to the Complaint, neither at nor prior to closing did Chancellor or others at AngloGold inform Newmont about the problems that the mill had been having or about any third party's ownership of the mineral interests in the Plot. *See* Compl. ¶¶ 136, 138, 145. After closing, AngloGold and Newmont disputed the proper amount of the pertinent Purchase Price Adjustment under the SPA. *See id.* ¶¶ 156–60, 172.

Newmont filed this action on October 19, 2017, seeking damages from Defendants relating to the mill's deficiencies, various purported misrepresentations and fraudulent omissions, and the disagreement with respect to the Purchase Price Adjustment. Defendants filed three motions to dismiss or stay this action: (1) a motion to compel arbitration and stay the Purchase Price Adjustment claim; (2) a motion to dismiss Chancellor for lack of personal jurisdiction; and (3) a

motion to dismiss Plaintiff's claims regarding the third-party mineral interest in the Plot on the merits. Newmont responded in opposition to all three motions, and Defendants replied.

## DISCUSSION

### I.    Motion to Compel Arbitration

As an initial matter, the Court will address AngloGold's partial motion to compel arbitration for Newmont's claim that, after the closing, AngloGold failed to properly "adjust" the purchase price for Victor Mining under the SPA. "In deciding motions to compel, courts apply a 'standard similar to that applicable for a motion for summary judgment.'" *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (quoting *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003)). A court must therefore "consider all relevant, admissible evidence submitted by the parties" and "draw all reasonable inferences in favor of the non-moving party." *Id.* (citations omitted).

The SPA stated that the sale price of Victor Mining would be approximately $820 million, but § 2.04 of the SPA permitted a post-closing "Purchase Price Adjustment" to that price. Such adjustments had to be submitted according to the following procedure:

> (a) Within 60 days after the Closing Date, Seller shall prepare and deliver to Purchaser a statement (the "Statement") . . . setting forth the Adjustment Amount and a certificate of Seller that the Statement has been prepared in compliance with the requirements of this Section. . . .
>
> (b) The Statement shall become final and binding upon the parties on the 30th day following delivery thereof, unless Purchaser gives written notice of its disagreement with the Statement (a "Notice of Disagreement") to Seller prior to such date. Any Notice of Disagreement shall . . . only include disagreements based on mathematical errors or based on the Adjustment Amount not being calculated in accordance with this Section 2.04. . . . During the 30-day period following the delivery of a Notice of Disagreement, Seller and Purchaser shall seek in good faith to resolve any differences that they may have with respect to the matters specified

by Purchaser in the Notice of Disagreement. At the end of such 30-day period, Seller and Purchaser shall submit to an independent accounting firm (the "Accounting Firm") for resolution any and all matters that were included by Purchaser in the Notice of Disagreement and that remain in dispute.

SPA § 2.04(a), (b). The "Adjustment Amount" calculated by AngloGold in its Statement was based in part on a "Net Cash Amount," which in turn was calculated by taking "the aggregate amount of cash and cash equivalents ... minus ... the aggregate principal amount of Indebtedness" of certain entities as of a particular time. *See id.* § 2.04(i). Section 2.04 further defined "Indebtedness" to include various types of payment obligations, including those "under any commodity derivative, hedge, future, forward purchase or sale or other transaction similar in nature or effect." *Id.* The SPA specified that "[t]he dispute resolution by the Accounting Firm under this Section 2.04 shall constitute an arbitration under the Federal Arbitration Act, and the Accounting Firm shall be an arbitrator." *Id.* § 2.04(f).

Pursuant to the procedure set out in § 2.04, AngloGold provided Newmont with a Statement on October 1, 2015, detailing the Purchase Price Adjustment it had calculated. *See* Compl. ¶ 156. Newmont responded with its Notice of Disagreement on October 29, 2015, stating that AngloGold had miscalculated the Purchase Price Adjustment by nearly $4.5 million by not counting "a payment obligation related to a certain 'Sinclair Oil Agreement'" as an "Indebtedness" that impacted Victor Mining's value. *See id.* ¶¶ 157–159. AngloGold responded on November 18, 2015, stating its view that the Sinclair Oil Agreement did not qualify as an "Indebtedness" under the SPA. *See id.* ¶ 160. The parties never submitted this dispute to an "independent accounting firm" under the terms of the SPA. Newmont instead filed this action, seeking determinations from the Court that the Sinclair Oil Agreement should have been counted as an

"Indebtedness" under the SPA and that the Adjustment Amount should have been altered accordingly.

In the motion to compel arbitration, AngloGold argues that the dispute over whether the Sinclair Oil Agreement qualifies as an "Indebtedness" must be resolved by the "Accounting Firm" identified in SPA § 2.04(b). To succeed on this motion, AngloGold must demonstrate (1) that there was a binding arbitration agreement between the parties, and (2) that the dispute at issue here falls within the scope of that agreement. *See Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 26 (2d Cir. 2002). There is no dispute that the parties here agreed to resolve "certain disputes regarding the calculation of post-closing purchase price adjustments by submitting the dispute to an accountant arbitrator." *See* Compl. ¶ 73; *see also id.* ¶ 169. The only question, then, is whether the dispute here—*i.e.*, whether the Sinclair Oil Agreement should have been accounted for as an Indebtedness—fell within the scope of that agreement. To determine "whether a particular dispute falls within the scope" of an arbitration clause, the Court must first "classify the particular clause as either broad or narrow" and then "determine whether the dispute is over an issue that is on its face within the purview of the clause, or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause." *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 224 (2d Cir. 2001) (internal quotation marks omitted). If the arbitration agreement is a narrow one, collateral issues will generally fall outside its scope. *See id.*

The arbitration provision of the Purchase Price Adjustment is a narrow one that explicitly defines and limits its own scope in two different provisions. *See* SPA § 2.04(b), (d). The problem, however, is that those internal definitions are worded in slightly different ways. On the one hand, § 2.04(b) provides that Newmont shall provide in its Notice of Disagreement "only . . .

6

disagreements based on mathematical errors *or* based on the Adjustment Amount not being calculated *in accordance with this Section 2.04*" and then requires the parties to submit to the Accounting Firm "for resolution" the remaining disputes with respect to "any and all matters that were included by" Newmont in that Notice of Disagreement. *See* § 2.04(b) (emphasis added). On the other hand, § 2.04(d) provides that "scope of the disputes to be resolved by the Accounting Firm" is limited in relevant part to "whether the Statement was prepared *in accordance with the Adjusted Accounting Principles* with respect to the matters that were submitted for resolution to the Accounting Firm." *See* § 2.04(d) (emphasis added). The parties now dispute, essentially, which of these definitions applies and, if it is only the one in § 2.04(d), whether AngloGold's determination with respect to the Sinclair Oil Agreement was made based on the Adjusted Accounting Principles or the terms of SPA.

Under the Federal Arbitration Act, when "the problem at hand is the construction of the contract language itself," then "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983); *see also Specht*, 306 F.3d at 35. Indeed, "[a]lthough the FAA does not require parties to arbitrate when they have not agreed to do so, arbitration is indicated unless it can be said with positive assurance that an arbitration clause is not susceptible to an interpretation that covers the asserted dispute." *Specht*, 306 F.3d at 35 (internal quotation marks and citations omitted). Even so, having recognized that the scope of the arbitration agreement is narrow here, the Court "must be careful to carry out the specific and limited intent of the parties." *McDonnell Douglas Fin. Corp. v. Pennsylvania Power & Light Co.*, 858 F.2d 825, 832 (2d Cir. 1988) (citation omitted). The Court "must be mindful of the federal presumption in favor of arbitration, [but] cannot allow that presumption to have the strong effect" that it would if the arbitration clause were broad. *Id.*

Here, the language of the contract itself provides (1) that Newmont was required to include any disagreement about "the Adjustment Amount not being calculated in accordance with this Section 2.04" in its Notice of Disagreement, and (2) that the parties were required to submit any dispute included in the Notice of Disagreement that was not amicably resolved to the Accounting Firm "for resolution." *See* SPA § 2.04(b). It appears from § 2.04(d) that the parties expected that most, if not all, of such disputes would involve questions of how the Adjusted Accounting Principles should be applied. As to the parties' present dispute, the question of whether a particular contract should have counted as a "payment obligation" and "Indebtedness" appears inextricably intertwined with the question of whether AngloGold's assessment of the Sinclair Oil Agreement comported with the relevant Accounting Principles.[2] AngloGold for its part appears to have relied on the Adjusted Accounting Principles in implementing and interpreting the terms "Indebtedness" and "payment obligation" while calculating the Adjustment Amount. *See* Response to Notice of Disagreement at 1 (Dkt. 25-5) (stating that, "[c]onsistent with the Adjusted Accounting Principles, ... the Sinclair Oil Agreement was not booked as a financial liability" as of the relevant time). Section 2.04 does not explain what role the Adjusted Accounting Principles should play in the Adjustment Amount equation. Yet it specifically provides that the Accounting Firm may resolve disputes over AngloGold's use of those Principles and that the parties must submit to the Accounting Firm "for resolution" any dispute over whether the Adjustment Amount was calculated in accordance with § 2.04. *See* SPA §§ 2.04(b), (d). Clearly, then, the Principles were

---

[2] The SPA's definition of "Indebtedness," as relevant here, requires an assessment of what counts as a "payment obligation under any commodity derivative, hedge, future, forward purchase or sale or other transaction similar in nature or effect." *See* SPA § 2.04(i). The Adjusted Accounting Principles, meanwhile, specifically include "the principles, policies and procedures set forth in Schedule 2.04," as well as "the Company's historic accounting practices" to the extent Schedule 2.04 was inapplicable. *See id.* Schedule 2.04 includes some discussion with regard to how "financial liabilities," "[f]inancial guarantee contracts," and "derivatives and hedge accounting" are measured by AngloGold. *See* Dkt. 7-3 at 8.

to play a role in calculating the Adjustment Amount. Thus, at the very least, whether AngloGold's treatment of the Sinclair Oil Agreement and interpretation of the term "Indebtedness" was proper under the Adjusted Accounting Principles is an issue within the scope of both § 2.04(b) and § 2.04(d). Accordingly, the Court grants AngloGold's motion to compel arbitration of the Purchase Price Adjustment Claim.

Newmont argues that its Purchase Price Adjustment claim rests on § 2.04(a)'s covenant that AngloGold's Statement of the Adjustment Amount would be "prepared in compliance with the requirements of this Section 2.04." *See* SPA § 2.04. According to Newmont, the question of whether AngloGold complied with the equation within that section and the definition of Indebtedness is entirely separate from the question of whether AngloGold complied with the Adjusted Accounting Principles. The inference that Newmont asks this Court to draw, however, is not a reasonable one. Even if Newmont were correct that the definition of Indebtedness was not informed by the Adjusted Accounting Principles—which this Court doubts for the reasons explained above—the SPA still facially required Newmont to include its disagreement with respect to the proper calculation of the Adjustment Amount in its Notice of Disagreement (which Newmont did) and, ultimately, to send that disagreement to arbitration (which it did not). *See id.* § 2.04(b). If the Accounting Firm lacked the authority to resolve disputes "based on the Adjustment Amount not being calculated in accordance with this Section 2.04"—including the definition of Indebtedness—it would have made no sense to require that the full set of such disputes be sent to the Accounting Firm "for resolution." *See id.*

The Court is not unsympathetic to Newmont's position. To the extent that Newmont can state a claim for breach of the covenant in § 2.04(a)—which the parties dispute—such a claim explicitly falls outside the authority of the Accounting Firm. The SPA states that the "Accounting

Firm is not authorized to, and shall not, make . . . any determination as to compliance by any party hereto with any of its covenants in this Agreement, other than Section 2.04(h)." *See id.* § 2.04(d). As explained above, however, the SPA expressly requires the parties to submit to the Accounting Firm for resolution any disputes with respect to the correctness of AngloGold's calculations under § 2.04. In light of this language, the Court grants AngloGold's motion to compel arbitration and stays the case as to the Purchase Price Adjustment Claim only. Because this claim under § 2.04 is distinct from Newmont's other claims, there is no need to stay any other portion of the case. *See generally Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 856 (2d Cir. 1987).

## II.     Personal Jurisdiction over Chancellor

The Court must next determine whether it has personal jurisdiction over Defendant Chancellor, a Colorado resident who has worked as the General Counsel for and Vice President of one of the AngloGold entities since 2010. *See* Compl. ¶¶ 14, 44; Chancellor Decl. ¶¶ 2, 12, 13. Chancellor argues that he lacks sufficient contacts with New York for this Court to exercise jurisdiction over him.

Newmont bears the burden of demonstrating that this Court has personal jurisdiction over each defendant. *See Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996); *see also Troma Entm't, Inc. v. Centennial Pictures Inc.*, 729 F.3d 215, 217 (2d Cir. 2013). "Where, as here, a court relies on pleadings and affidavits, rather than conducting a 'full-blown evidentiary hearing,' the plaintiff need only make a prima facie showing that the court possesses personal jurisdiction over the defendant." *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (citations omitted). This prima facie showing "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *Metro. Life Ins. Co.*, 84 F.3d at 567 (citation and internal alterations omitted). The

10

Court typically must not resolve factual disputes and must instead assess the sufficiency of plaintiff's affidavits and pleadings "notwithstanding any controverting presentation by the moving party." *See Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 86 (2d Cir. 2013) (per curiam); *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981).[3]

The exercise of personal jurisdiction is proper here only if both New York's long-arm jurisdictional statute and the U.S. Constitution permit it. *See Bensusan Rest. Corp. v. King*, 126 F.3d 25, 27 (2d Cir. 1997). For the reasons set forth below, the Court concludes that Plaintiff has made a prima facie showing that this Court has personal jurisdiction over Chancellor.

## A. New York's Long-Arm Statute

Chancellor argues that New York's long-arm statute does not extend to him. As relevant here, that statute permits the exercise of specific personal jurisdiction over someone who lives in a different state when that individual, "in person or through an agent[,] . . . transacts any business within the state or contracts anywhere to supply goods or services in the state; or [2] commits a tortious act within the state (except defamation)," so long as the "cause of action aris[es] from" the transaction or tortious act. N.Y.C.P.L.R. § 302(a); *see Licci v. Lebanese Canadian Bank, SAL* ("*Licci I*"), 673 F.3d 50, 60 (2d Cir. 2012). Specifically, Chancellor contends that he did not "transact any business within the state" under the meaning of § 302(a)(1) because he visited New York and transacted business, if at all, only on behalf of his employer AngloGold.[4]

---

[3] Plaintiff has not submitted an affidavit that refutes the facts set forth in Chancellor's declaration. The Second Circuit has observed that "[t]he allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits. If the parties present conflicting affidavits, . . . the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party." *Seetransport Wiking Trader v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993), *as amended* (May 25, 1993) (citation omitted). Because the Court concludes that the uncontroverted aspects of the Complaint are sufficient to establish a prima facie case, the Court need not resolve any factual disputes between the Complaint and Chancellor's declaration at this stage.

[4] The parties also dispute whether § 302(a)(2) applies here. Because the Court concludes that § 302(a)(1) applies, it need not address those arguments.

### 1.    Requirements of N.Y.C.P.L.R. § 302(a)(1)

"CPLR § 302(a)(1) provides no specific guidelines as to what constitutes a transaction of business for purposes of establishing specific personal jurisdiction over non-domiciliary defendants." *Vista Food Exch., Inc. v. Champion Foodservice, L.L.C.*, No. 14-CV-804 (RWS), 2014 WL 3857053, at *5 (S.D.N.Y. Aug. 5, 2014). New York courts, however, define "transacting business" to include all purposeful activity, *i.e.*, any "act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246–47 (2d Cir. 2007) (citation and internal quotation omitted); *see also Licci I*, 673 F.3d at 61. Even a "single act" or transaction "is sufficient to invoke jurisdiction," so long as the relevant New York activities "were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Am./Int'l 1994 Venture v. Mau*, 42 N.Y.S.3d 188, 197 (N.Y. App. Div. 2016) (quoting *Kreutter v. McFadden Oil Corp.*, 522 N.E.2d 40, 43 (N.Y. 1988)). The inquiry into whether the relevant acts constituted "personal availment" is an objective one that "always requires a court to closely examine the defendant's contacts for their quality" and under the totality of the circumstances. *Id.* (citation and emphasis omitted).

Chancellor argues that, even putting aside that his actions were taken in his corporate capacity, the negotiations in which he participated were too insignificant or fortuitous to amount as transactions of business under N.Y.C.P.L.R. § 302(a). In the context of contracts specifically, the Second Circuit has identified several factors—although "no one factor is dispositive and others may be considered"—that may be relevant to whether a defendant has "transacted business" within the meaning of § 302(a)(1). *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 23–24 (2d Cir. 2004) (citation omitted). Those factors include "whether the contract was negotiated or executed in New

York" and "what the choice-of-law clause is in any such contract." *Id.* at 22 (citation omitted). As to negotiations and meetings specifically, the meetings need not be "solely for business purposes" so long as the relevant discussions increased "the likelihood of a more solid business relationship between the parties." *See CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 367 (2d Cir. 1986); *see also NW Direct Design & Mfg., Inc. v. Glob. Brand Mktg., Inc.*, No. 98-CV-4756 (LAP), 1999 WL 493348, at *3 (S.D.N.Y. July 12, 1999). Indeed, "New York courts routinely find that negotiations involving [one or two] New York meetings . . . suffice for jurisdiction, so long as they were substantive," *see Sherwin-Williams Co. v. C.V.*, No. 14-CV-6227 (RA), 2016 WL 354898, at *3 (S.D.N.Y. Jan. 28, 2016) (gathering cases), or were "directly related to the creation" of the agreement at issue in the case, *see Zainal v. Am.-Europe-Asia Int'l Trade & Mgmt. Consultants*, 670 N.Y.S.2d 76, 77 (N.Y. App. Div. 1998) (citations omitted).

## 2.     Allegations and Claims as to Chancellor's Contacts with New York

It is undisputed that Chancellor did not personally sign or enter into any contract—in either his personal or corporate capacities—at issue in this case. *See* Dkt. 7-1 at 81. The parties also agree, however, that he attended two meetings in New York regarding the sale of Victor Mining: one in which certain terms of the contract were negotiated and another when the closing occurred. *See* Compl. ¶¶ 58, 134, 135; Chancellor Decl. ¶¶ 35–37. The Complaint characterizes the first meeting as one where the parties were actively "negotiat[ing] the terms of the transaction," and Chancellor similarly describes it as a meeting for "finalizing the SPA's language" and "negotiating certain specific aspects of the transaction." *See* Compl. ¶ 58; Chancellor Decl. ¶ 37.

According to the Complaint, Chancellor assumed the role of "primary negotiator and point of contact" for AngloGold. Compl. ¶ 57. Chancellor disputes this characterization and avers that he lacked decisionmaking authority in the relevant negotiations. *See* Chancellor Decl. ¶¶ 30, 36.

He concedes, however, that he "traveled to New York for a two-day meeting . . . to discuss the SPA's terms"; that he at minimum attended that meeting "to support" AngloGold and "to provide advice regarding U.S. law" during the negotiations; and that he "traveled to New York . . . for the transaction's closing." *See* Chancellor Decl. ¶¶ 37, 39.[5]

The allegations in the Complaint further indicate that Chancellor, as the Vice President and General Counsel to one of the AngloGold entities, was intensely involved in the contract's drafting and would have been aware of its terms. *See, e.g.*, Compl. ¶ 130 ("In the days leading up to the closing, the AGA Defendants, Newmont and several attorneys—including Defendant Chancellor—discussed at length several different amendments to the SPA and its schedules."). Nothing in Chancellor's affidavit, meanwhile, indicates that he lacked familiarity with the SPA's terms. Indeed, Chancellor's declaration at least partially corroborates the Complaint in this respect. He avers that he, among other things, "review[ed] certain transaction documents"; "prepar[ed] certain SPA schedules related to legal and land matters"; and had at least some "opportunities to review and provide input on the terms of the SPA from the perspective of a U.S. lawyer familiar with the operations at" Victor Mining. *See* Chancellor Decl. ¶¶ 31, 32, 34. He also admits to some amount of participation in his employer's finalization of the SPA's terms during the negotiations in New York in May 2015. *See id.* ¶¶ 36, 37. Well before the closing, those terms declared that the SPA would be "governed by New York law" and specifically

---

[5] Furthermore, although Chancellor outright disavows any "role in defining or negotiating" the so-called "Key Terms" of the contract, he also avers that those "Key Terms" were not on the table at the two-day negotiation he attended in New York. *See* Chancellor Decl. ¶¶ 37, 39. He makes no similarly sweeping declaration that he did not participate in negotiating the provisions discussed during the New York meeting—namely, the "provisions related to indemnification, labor issues, and corporate structure, as well as the royalty payment." *Id.* ¶ 37. As to those terms, Chancellor avers only that he was not the "primary" or "lead" negotiator and that he lacked final decision-making authority—not that he did not participate at all. *See id.* ¶ 36.

provided that the parties consented to jurisdiction in this district. *See* Compl. ¶ 77.[6]

Newmont brings two claims against Chancellor specifically. First, Newmont asserts that he participated in the fraudulent inducement of Newmont to enter into the SPA by making representations regarding the mine's quality while failing to disclose, for example, his knowledge of the mill's defects, the Victor Mining internal memorandum, and the third-party mineral interests in the Plot. *See id.* ¶¶ 175–82. Second, Newmont claims that Chancellor aided and abetted AngloGold's violations of Colorado's securities laws—*i.e.*, that he had knowledge of the fraud AngloGold was allegedly perpetrating in the SPA and provided AngloGold substantial assistance in executing that fraud. *See id.* ¶¶ 210–14.

### 3. New York's Long-Arm Statute Extends to Chancellor

The Complaint's uncontroverted allegations make a prima facie case for exercising personal jurisdiction over Chancellor under New York's long-arm statute. Even though Chancellor was not a party to the contract, he admits to having attended a two-day meeting in New York to discuss the SPA's terms, having aided his employers in negotiating specific terms of the SPA while there, and having provided them advice with respect to how U.S. law impacted the transaction. *See* Chancellor Decl. ¶¶ 37–38. These activities, combined with his official attendance at the closing and his familiarity with the contract (presumably including its choice of law provision), are sufficient to satisfy the Court that he purposefully availed himself of "the privilege of conducting activities"—including, it seems, the practice of law—"within the forum State, thus invoking the benefits and protections of its laws." *Best Van Lines, Inc.*, 490 F.3d at 246–47. Although none of these actions alone would be dispositive, the totality of Chancellor's

---

[6] Chancellor argues that he is not bound by the forum selection clause—which Newmont does not dispute—and that the clause is not relevant. To the extent the Court considers the existence of the clause at all, it does so only as part of the totality of the circumstances surrounding Chancellor's contacts with New York and the fairness of permitting this lawsuit to proceed against him here.

contacts with New York suffice to establish jurisdiction. Under the circumstances here, the Court concludes that Chancellor transacted business under § 302(a)(1) when he purposefully traveled to New York and, while in the state, provided legal advice to his employer, assisted with the negotiation and finalization of terms in an agreement that specifically invokes New York law, and attended the closing for that very transaction.

Chancellor responds that his trips to New York were not essential or substantial enough to the formation of the SPA to count as a transaction of business under § 302(a)(1). There is no *per se* requirement, however, that a contract's key terms must be negotiated in the forum state for those negotiations to count as a transaction of business. *See NW Direct Design*, 1999 WL 493348, at *3 ("Courts have consistently held that contract negotiations occurring in New York are sufficient to support jurisdiction when they [1] either 'substantially advanced' or were 'essential' to the formation of a contract or [2] if they resulted in a more solid business relationship between the parties."). Here, Chancellor participated in the active negotiation of several of the SPA's contract terms, helped to finalize those terms, provided legal advice to his employer about those terms, and attended a closing for the deal—all within the state of New York. This combination of contacts was essential enough to the advancement of the deal and the solidification of the relationship between the parties to satisfy § 302(a)(1) and to distinguish this case from those where courts have held contacts to be too inconsequential, incidental, or attenuated to convey jurisdiction.[7]

---

[7] *See, e.g., Juron & Minzner v. Dranoff & Patrizio*, 598 N.Y.S.2d 514, 514 (N.Y. App. Div. 1993) (holding that "one visit . . . made at plaintiff's specific request for the purpose of retrieving [a] file" that involved "only an incidental preliminary discussion" of other business matters was too inconsequential to establish jurisdiction); *Aquiline*, 861 F. Supp. 2d at 388 (declining to exercise jurisdiction when the relevant meetings "did not involve the drafting or negotiation of any letter agreements at issue"); *Three Five Compounds, Inc. v. Scram Techs., Inc.*, No. 11-CV-1616 (RJH), 2011 WL 5838697, at *11 (S.D.N.Y. Nov. 21, 2011) (discounting two meetings that "did not occur during contract negotiations and did not result in any contract"); *Palmer v. Globalive Commc'ns Corp.*, No. 07-CV-38 (MGC), 2008 WL 2971469, at *6 (S.D.N.Y. Aug. 1, 2008) (holding that there was no "transaction" when there was no New York choice of law provision in any relevant contract and the only activity in New York was one meeting where the parties

Chancellor relatedly asserts that the reasons he went to New York were outside of his control and that it was essentially arbitrary that the deal ended up being negotiated in part and closed in New York. "But one can make the same argument for almost any contract," *see Grand River Enterprises Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 166 (2d Cir. 2005), and the Court is unpersuaded that it precludes personal jurisdiction here. Although Chancellor conducted his New York activities on behalf of his employer, he cannot claim they were accidental or that he did not purposefully invoke the benefits and protections of New York law of participating in them. *Cf. Kreutter*, 522 N.E.2d at 47 ("[R]arely, if ever, does a corporate agent not derive some benefit from acting on behalf of his principal.").[8]

Chancellor nonetheless argues that he cannot have purposefully availed himself of the law because he was acting in his corporate capacity. In support, Chancellor primarily relies on *Aquiline Capital Partners LLC v. FinArch LLC*, 861 F. Supp. 2d 378, 386 (S.D.N.Y. 2012), for the proposition that Plaintiff must prove that Chancellor availed himself of New York's laws "on his own initiative" rather than at his corporation's direction. *See id.* The court in *Aquiline*, however, did not address the precise issue here—it merely quoted the "on his own initiative" language from

---

signed a nonbinding letter of intent that had been negotiated outside of New York); *Kahn Lucas Lancaster, Inc. v. Lark Int'l Ltd.*, 956 F. Supp. 1131, 1136 (S.D.N.Y. 1997) (concluding that insignificant "courtesy calls" were not "essential to the continuance or development of" a business relationship and thus did not confer jurisdiction); *see also, e.g., Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 787–89 (2d Cir. 1999) (concluding that there was no jurisdiction when non-domiciliary lawyers provided legal advice to a client in the forum state but "*all* of the relevant services" occurred in Puerto Rico and the lawyers never traveled to New York (emphasis added)); *Bissonnette v. Podlaski*, 138 F. Supp. 3d 616, 624–25 (S.D.N.Y. 2015) (holding that the provision of legal services "from outside New York" did not establish personal jurisdiction).

[8] Chancellor also argues that personal jurisdiction does not automatically extend to an employee from his or her corporate employer and that the jurisdiction over AngloGold cannot be imputed to Chancellor under the facts here. *See Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984); *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 169 (2d Cir. 2010); *Jonas v. Estate of Leven*, 116 F. Supp. 3d 314, 328 (S.D.N.Y. 2015). The Court need not address this argument, however, because it is not imputing AngloGold's activities to Chancellor—Plaintiff has made a prima facie case based on Chancellor's own conduct in New York, even if that conduct was on his employer's behalf.

the New York Court of Appeals's decision in *Parke–Bernet Galleries v. Franklyn*, 256 N.E.2d 506

(N.Y. 1970). The full quote from that decision explained as follows:

> Considering, first, the defendant's direct and personal involvement
> in activities here, it is highly significant that, on his own initiative,
> the defendant, in a very real sense, projected himself into the auction
> room [over an open telephone line] in order to compete with the
> other prospective purchasers who were there. This activity far
> exceeded the simple placing of an order by telephone. [The
> defendant's] active participation in the bidding which resulted in the
> paintings' being sold to him amounted to the sustained and
> substantial transaction of business here. Indeed, his conduct, the
> business he was transacting, affected not only the plaintiff but all
> those who were in the auction room. In acting as he did, the
> defendant 'purposefully' availed himself 'of the privilege of
> conducting activities' within New York and thereby 'invok(ed) the
> benefits and protections of its laws' relating to the conduct of
> auctions.

*Id.* at 508–09. That the defendant in *Parke-Bernet* acted "on his own initiative" was certainly

significant to that court's decision, but it does not, as Chancellor appears to argue, create a carte

blanche rule that an action cannot be "purposeful" if it is taken on behalf of an employer.

A subsequent decision by the New York Court of Appeals further supports the conclusion

that *Parke-Bernet*'s language cannot be so construed. When that court decided *Kreutter v.*

*McFadden Oil Corp.* in 1988, it rejected the so-called "fiduciary shield" doctrine, which would

have automatically immunized employees from personal jurisdiction in the event that the activities

in the forum state "were solely in a corporate capacity." *See* 522 N.E.2d at 44. As the *Kreutter*

court explained, that doctrine "is based upon the notion that it is unfair to subject a corporate

employee personally to suit in a foreign jurisdiction when his only contacts with that jurisdiction

have been undertaken on behalf of his corporate employer." *Id.* But the court then held that the

fiduciary shield doctrine had no place—statutory or equitable—under New York law. *See id.* at

46.[9]  Rather, "[t]he equitable concerns which motivated development of the doctrine are amply protected by constitutional due process requisites which guarantee that jurisdiction over a nonresident will be sustained only when the demand for his presence is reasonable and consistent with notions of 'fair play and substantial justice.'" *Id.* (citation omitted). Of course, the relevant individual must still transact business, and do so purposefully—*i.e.*, knowingly and intentionally, or not accidentally—to qualify under § 302(a)(1), but it matters not whether such transactions are on his own or his employer's behalf, or whether the employer directed him to do so.[10] For the reasons explained above, Plaintiff has made that prima facie showing here.

Plaintiff must also show that the claims in this action arose from Chancellor's New York transactions under § 302(a). Chancellor argues that Plaintiff has failed to make this showing because the bulk of Plaintiff's claims relate to Chancellor's conduct in Colorado rather than his conduct in New York. To "arise from" a transaction, however, there need only be some "articulable nexus" or "substantial relationship" between the transaction and the claim asserted. *See Al Rushaid v. Pictet & Cie*, 68 N.E.3d 1, 11 (N.Y. 2016). That standard is "relatively

---

[9] The analysis further indicated that the relevant defendant in that case would have been subject to personal jurisdiction because he was "an individual who was a primary actor in the" relevant transaction, "not some corporate employee" in another state "who played no part in it." *Kreutter*, 522 N.E.2d at 45. Although the parties dispute the extent of Chancellor's involvement here, there is no question that he was actively involved in the drafting and reviewing of the SPA and that his involvement brought him purposefully into New York.

[10] Chancellor points to three decisions from this district that he argues are to the contrary. In *CCS International, Ltd. v. ECI Telesystems, Ltd.*, Judge Preska concluded that there was no personal jurisdiction over two individuals who never "negotiated any agreement in their own names" and who "acted exclusively as agents" of a corporation. *See* No. 97-CV-4646 (LAP), 1998 WL 512951, at *5 (S.D.N.Y. Aug. 18, 1998). That decision, however, did not explicitly grapple with the issues addressed here. The second decision Chancellor cites, *Family Internet, Inc. v. Cybernex, Inc.*, rested its ultimate holding on the "disjunction between the business transacted" and the claims asserted in the case—not on the necessity that such business must have been conducted on the defendant's own behalf. *See* No. 98-CV-0637 (RWS), 1999 WL 796177, at *4–6 (S.D.N.Y. Oct. 6, 1999). Finally, he cites *Merck & Co. v. Mediplan Health Consulting, Inc.*, where the court observed that the defendant-employee was not subject to § 302(a)(1) because he had not transacted business "in his individual capacity." *See* 425 F. Supp. 2d 402, 419 (S.D.N.Y. 2006). But in that case the plaintiff failed to allege "any specific actions" that the defendant-employee had taken that might invoke jurisdiction. *Id.* That is simply not the case here.

permissive" and "does not require causation, but merely 'a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former, regardless of the ultimate merits of the claim.'" *Id.* "[H]aving established that [the] defendants transacted business in New York, [a plaintiff] need show only that the cause of action is sufficiently related to the business transacted that it would not be unfair to deem it to arise out of the transacted business, and to subject the defendants to suit in New York." *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 59 (2d Cir. 1985).

The claims against Chancellor here are that he fraudulently induced Newmont to enter into the contract and aided and abetted AngloGold's violation of state securities laws by helping AngloGold make various misrepresentations to Newmont in connection with the sale of the mine and in the SPA itself. *See* Compl. ¶¶ 176–79, 212, 213. His assistance to AngloGold allegedly included his trips to New York, where he purportedly knew of and yet failed to inform Newmont about various matters material to the deal which he was participating in negotiating and closing in New York. It is unclear if any of the specific contract terms that Chancellor says were negotiated in New York—*i.e.*, those "related to indemnification, labor issues, and corporate structure, as well as the royalty payment," *see* Chancellor Decl. ¶ 37—are the basis for Newmont's claims against Chancellor specifically. Regardless, the Complaint alleges facts indicating that, during the time Chancellor was in New York, he knew of and yet failed to disclose various purported misrepresentations in the contract. The basis of Plaintiff's claims against Chancellor appears to be that he assisted his employer with finalizing the terms of the SPA, which he did while in New York, and by attending the closing in New York, *see* Chancellor Decl. ¶¶ 36, 37, all without disclosing the purported defects with the mine, among other things. These failures to disclose occurred, continued during, and are directly related to Chancellor's presence in New York on

AngloGold's behalf. As such, it is certainly fair to "deem [this action] to arise" from the Chancellor's time and activities in New York. *See Hoffritz*, 763 F.2d at 59.

In sum, Plaintiff has made a prima facie showing that Chancellor knowingly participated in negotiating contract terms in New York, in finalizing the language of the SPA there, and in closing the deal which was explicitly governed by New York law in New York state. He thereby participated in the solidification of the parties' business relationship, and did so in a manner that is substantially related to the claims against Chancellor now. Accordingly, New York's long-arm statute supports exercising personal jurisdiction over Chancellor.

### B.     Constitutional Due Process

Having come to that conclusion, the Court must still determine whether such jurisdiction is consistent with the Due Process Clauses of the Fifth and Fourteenth Amendments. Under the familiar *International Shoe* test, the Constitution requires that a defendant have certain minimum contacts with the forum state and that exercising jurisdiction over the defendant be reasonable. *See* 326 U.S. 310 (1945).

When, as here, specific jurisdiction is asserted, "minimum contacts [necessary to support such jurisdiction] exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL* ("*Licci II*"), 732 F.3d 161, 170 (2d Cir. 2013). Given the striking similarity between this standard and the one for assessing whether a defendant has transacted business in the state under § 302(a), "[i]t would be unusual, indeed, if a defendant transacted business in New York and the claim asserted arose from that business activity within the meaning of section 302(a)(1), and yet, in connection with the same transaction of business, the defendant cannot be found to have" the minimum contacts necessary to satisfy Due Process or that "the

21

assertion of specific jurisdiction would somehow otherwise 'offend traditional notions of fair play and substantial justice.'" *Id.* (citations omitted); *see also Best Van Lines, Inc.*, 490 F.3d at 246–47.

Largely for the reasons explained above, the Court concludes that the exercise of specific jurisdiction over Chancellor in this case is, at least as a prima facie matter, consistent with Due Process. His "suit-related conduct"—namely, his engagement in the negotiation and closing of the contract at issue in this case, including his alleged failure to disclose material facts within his knowledge at those times—created a sufficiently "substantial" connection with New York to exercise specific jurisdiction under the Due Process Clause. *See Walden v. Fiore*, 571 U.S. 277, 284 (2014).

In response, Chancellor again emphasizes the requirement that personal jurisdiction must "arise out of contacts that the 'defendant *himself* creates" or that are "based on his own affiliation with" the forum State. *See id.* at 284, 286 (emphasis original). That language, however, is simply a rejection of "attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State." *Id.* It does not require that the defendant himself must make contacts with the state on *his own behalf* to satisfy the Constitution. Indeed, the U.S. Supreme Court, like New York Court of Appeals, has rejected this interpretation of the minimum contacts rule: the fiduciary shield doctrine is not constitutionally required. *See Calder v. Jones*, 465 U.S. 783, 790 (1984). In *Calder*, the Court held that the defendants' "status as employees does not somehow insulate them from jurisdiction," and that "[e]ach defendant's contacts with the forum state must be assessed individually." *Id.* Furthermore, the Court did not require those individual assessments to be based on whether the contacts were on each defendant's own behalf. *Cf. Packer v. TDI Sys., Inc.*, 959 F. Supp. 192, 199 n.6 (S.D.N.Y.

1997) (recognizing that the rejection of the "fiduciary shield doctrine" does not automatically subject an employee to jurisdiction but noting that, if the defendant-employee's "physical presence" in the state "satisfie[d] the requirements of the long-arm statute," jurisdiction might be proper). The *Calder* Court explicitly rejected the defendants' arguments that they had "no direct economic stake" in their employer's conduct in the forum state and had no "control" over their employer's activities there. 465 U.S. at 789. It concluded instead that personal jurisdiction was constitutionally proper because the defendants were the "primary participants in an alleged wrongdoing intentionally directed at" the forum state, that the defendants knew that their conduct would impact the forum state, and that they knew they might reasonably be haled into court here to account for their actions. *Id.* at 790.

Unlike *Calder*, this case involves the relevant defendant's activities within the forum state rather than simply the effects of his out-of-state actions. But the same basic principles apply. Although Chancellor may not have been acting on his own behalf, he personally attended meetings in New York, participated in negotiating specific terms there, and attended the closing of the contract at issue here, which is also expressly governed by New York law. These contacts were deliberate and knowing—and significant to the formation of the contract and finalization of the deal—rather than "random," "fortuitous," or "attenuated." *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). For the reasons explained above, the claims against Chancellor were also sufficiently "deriv[ed] from, or connected with" his contacts with New York such that those contacts underlie "the very controversy" brought against him now. *See Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, 137 S. Ct. 1773, 1780 (2017).[11] That

---

[11] Chancellor asserts that the Constitution requires that his contacts in New York be the "focal point" of the present lawsuit. But the cases he cites for that proposition are all cases, or rely on cases, in which the relevant court applied the "effects test" for assessing personal jurisdiction, which applies only where the defendant's actions took place outside the state of New York. *See Walden*, 571 U.S. at 287 (relying on

Chancellor engaged in the activities he did on his employer's behalf is of little consequence to this assessment under the circumstances here. Based on uncontroverted allegations in the Complaint, Chancellor would have had "fair warning" that his activities in New York could subject him to suit here. *See Metro. Life Ins. Co.*, 84 F.3d at 567.

Other considerations with respect to whether exercising personal jurisdiction would "comport with fair play and substantial justice" similarly favor exercising jurisdiction over Chancellor: the burden on Chancellor will not be substantially different whether there is personal jurisdiction over him or not, as he will be implicated in discovery and trial regardless given his extensive alleged involvement in the case and his continued role as General Counsel to one of the AngloGold entities; the State of New York has at least some interest in adjudicating this case given that the contract was negotiated in part and closed in New York and specifically elects New York law and this forum; and it would be inefficient for both Plaintiff and the courts to entertain a separate lawsuit against Chancellor in Colorado, given that all other parties and issues involved in the contract are to be adjudicated here. *See generally Burger King Corp.*, 471 U.S. at 476–78. At this stage, Chancellor has not "demonstrate[d] that jurisdiction would be unreasonable under the particular facts of the case." *House of Diamonds v. Borgioni, LLC*, 737 F. Supp. 2d 162, 168 (S.D.N.Y. 2010). The Constitution thus permits this Court to exercise jurisdiction over him.

---

*Calder* and applying the effects test); *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 337 (2d Cir. 2016) (relying on *Calder* and *Walden* and applying the effects test); *Sullivan v. Barclays PLC*, No. 13-CV-2811 (PKC), 2017 WL 685570, at *43 (S.D.N.Y. Feb. 21, 2017) (relying, without analysis, on *Waldman*); *In re Platinum & Palladium Antitrust Litig.*, No. 14-CV-9391 (GHW), 2017 WL 1169626, at *42 (S.D.N.Y. Mar. 28, 2017) (same). That test is inapplicable here, where the basis for jurisdiction over Chancellor is his conduct within the state. As explained above, Chancellor's in-state activities are sufficiently related to the claims against him now to survive statutory and constitutional scrutiny.

## III. Motion to Dismiss for Failure to State a Claim

Finally, the Court addresses Defendants' motion on the merits to dismiss a cross-section of Plaintiff's claims that relate to purportedly undisclosed third-party mineral interests in a plot of land referred to as MS 9282 ("the Plot"). Defendants argue that Plaintiff's allegations regarding the Plot are too sparse and inconsequential to support any of Plaintiff's claims to the extent they relate to the Plot and that Newmont's claim for breach of contract is time barred regardless. For the reasons that follow, the Court concludes that—as to Plaintiff's allegations regarding the Plot only—Newmont's claim for breach of contract is time barred and its claims for fraudulent inducement and securities fraud are not supported by particularized allegations of scienter.

In the Complaint, Newmont asserts the following as to the Plot and the purportedly undisclosed mineral interests therein:

> 145. Newmont also learned after the closing that Defendants had knowingly failed to disclose certain interests in violation of Section 4.05(j) of the SPA.
>
> 146. Specifically, Newmont learned that Messrs. Chancellor and Billingsley were informed in a November 12, 2014 email that certain third parties held mineral interests on a portion of plot MS 9282.
> . . .
> 148. Upon information and belief, [AngloGold has] failed to pay several millions of dollars to satisfy obligations related to the mineral interests on a portion of plot MS 9282.
> . . .
> 171. [AngloGold] failed to perform their obligations under the SPA by failing to disclose: (a) the mineral interests related to plot MS 9282 pursuant to Section 4.05(j)[.]

Compl. ¶¶ 145, 146, 148, 171. Based on these allegations, Newmont seeks damages for breach of contract, *id.* ¶ 171(a), fraudulent inducement, *id.* ¶ 176(c), federal securities fraud, *id.* ¶¶ 185(c), 193, and Colorado securities fraud, *id.* ¶¶ 199(c), 209. Each of the fraud claims as to the Plot is based on the SPA's allegedly fraudulent representation "that Schedule 4.05(j)"—which did not

disclose the third-party mineral interests in a portion of the Plot—"contained a true and complete list of all royalties, overriding royalties, net profit interests, or payments on or out of production on all properties for which AGA or its subsidiaries did not have 100% ownership." *See id.* ¶¶ 176(c), 185(c), 199(c). Defendants' motion to dismiss is limited to this "Plot" aspect of Plaintiff's claims.

### A.     Legal Standard

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). On a Rule 12(b)(6) motion, the question is "not whether [the plaintiff] will ultimately prevail," but rather "whether his complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 529–30 (2011) (internal quotation marks omitted). In answering this question, the Court must "accept[] all factual allegations as true, but giv[e] no effect to legal conclusions couched as factual allegations." *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017) (quoting *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010)).

### B.     Fraud Claims

Defendants move to dismiss Newmont's fraud claims to the extent they arise out of Defendants' purported failure to disclose the third-party mineral interests in the Plot. Defendants' arguments as to each of Plaintiff's claims for fraudulent inducement, federal securities fraud, and

state securities fraud overlap substantially. For each claim, Newmont must adequately allege, among other things, fraudulent intent or "scienter." *See Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809–10 (2011); *People v. Prendergast*, 87 P.3d 175, 179 (Colo. App. 2003); *W. Cities Broad., Inc. v. Schueller*, 830 P.2d 1074, 1077 (Colo. App. 1991), *aff'd*, 849 P.2d 44 (Colo. 1993).[12] The Court concludes that Plaintiff has failed to do so as to the specific aspect of its claims at issue and accordingly declines to address at present Defendants' other arguments as to why Plaintiff's fraud claims should be dismissed.

Under Rule 9 of the Federal Rules of Civil Procedure—which the parties agree applies in this Court regardless of whether the relevant claim is based in state or federal law—Newmont must "state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Although this Rule permits plaintiffs to plead mental states "generally," they must also allege facts "that give rise to a strong inference of fraudulent intent." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 171 (2d Cir. 2015) (citation and internal quotation marks omitted). "An inference is 'strong' if it is 'cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Id.* at 176–77. "A plaintiff can establish this intent either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (internal quotation marks and citation omitted). In the Second Circuit, this standard applies all claims

---

[12] Defendants argue that Plaintiff's fraudulent inducement claim is governed by Colorado rather than New York substantive law. *See* Ds' Dismissal Br. at 6 (Dkt. 22). Newmont "agrees with Defendants that, absent an actual conflict, this Court is free to choose between the laws of the relevant jurisdictions in adjudicating" the fraudulent inducement claim. *See* P's Dismissal Br. at 11 n.4 (Dkt. 44). Newmont "does not believe that there is an actual conflict" between New York and Colorado Law "[f]or the purposes of this Motion." *Id.* The Court concurs and thus applies Colorado law without further addressing the choice-of-law question.

falling under Rule 9(b).[13]  As always, the ultimate question is whether Plaintiff's non-conclusory allegations, taken together with reasonable inferences drawn therefrom, "plausibly indicate Plaintiff['s] entitlement to relief."  *Id.*

Newmont alleges that Chancellor knew about the third-party mineral interests in the Plot since at least 2014 and that he worked on the Schedules to the SPA in the days leading up to the closing.  *See* Compl. ¶¶ 130, 146.  These allegations alone, however, do not give rise to a "strong inference of fraudulent intent," as they provide no plausible motive for Chancellor to leave the interest in the Plot out of the Schedule, even if he had the opportunity to do so.  To allege facts demonstrating motive, Plaintiff must at minimum allege what Chancellor or perhaps his employer specifically had to gain or lose by making the misrepresentation they apparently did.

The only allegation in the Complaint that touches on such a potential motive is paragraph 148, which alleges that AngloGold has "failed to pay several millions of dollars to satisfy obligations related to the mineral interests on a portion of" the Plot.  *See* Compl. ¶ 148.  That allegation, however, was made "upon information and belief."  "Rule 9(b) pleadings cannot be based upon information and belief" unless the relevant facts are "peculiarly within the opposing party's knowledge, in which event the allegations must be accompanied by a statement of the facts upon which the belief is based."  *See DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987) (citations omitted).  The Private Securities Litigation Reform Act of 1995 ("PSLRA") expressly echoes these requirements in the federal securities context.  *See Kalnit*, 264 F.3d at 138; *Novak*, 216 F.3d at 312.  The PSLRA, however, specifically requires that, "if an

---

[13] *See Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 304 (2d Cir. 2015) (noting that, before the PSLRA was passed, "the sufficiency of a complaint for securities fraud was governed by Rule 9"); *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) (concluding that the PSLRA did not change the standard in the Second Circuit, and thereby equating the Rule 9 and PSLRA standards for scienter).

allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Novak*, 216 F.3d at 307 (quoting 15 U.S.C. § 78u-4(b)(1)) (emphasis omitted). In any event, the Complaint contains no allegations of fact about how Newmont came to the belief that, as to this particular interest in the Plot, AngloGold owed millions of dollars. The Complaint also does not explain exactly why such a debt would motivate Defendants to hide the relevant mineral interests.

There is also no indication in the Complaint that Chancellor or others were engaged in "conscious misbehavior or recklessness" as to their preparation of Schedule 4.05(j) specifically. *See Kalnit*, 264 F.3d at 138. By all accounts, every single other item in Schedule 4.05(j) was accurate. The Complaint includes plenty of allegations of conscious misbehavior and/or recklessness on Defendants' part with respect to their purported attempts to cover up the structural problems with the mine and its mill. But if "particularity" under Rule 9(b) and the PSLRA means anything, it means that the Court cannot impute conscious misbehavior from one context to another. *See Loreley Fin.*, 797 F.3d at 173–74. The Complaint here fails to allege facts plausibly indicating that the failure to disclose the third-party interest in the Plot was in any way part of Defendants' purportedly fraudulent scheme to hide the defects with the mill. Considering the facts alleged as to the relevant representation here "in their totality," the Court therefore concludes that plaintiffs have failed to satisfy the heightened pleading standards for scienter as to any of their claims for fraud with respect to the misrepresentations in § 4.05(j). *See id.* at 171.

For these reasons, the Court grants Defendants' motion to dismiss Plaintiff's fraud claims and the accompanying claims for control-person liability, which are premised on the underlying securities fraud claims. The Court will, however, grant Plaintiff leave to amend the Complaint to the extent it can do so in good faith to attempt to meet the heightened pleading standard as to the

Defendants' failure to disclose the interest in the Plot. *See Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986) ("Complaints dismissed under Rule 9(b) are 'almost always' dismissed with leave to amend.").

### C.    Breach of Contract

AngloGold also argues that Plaintiff's claim for breach of contract, to the extent it relates to the Plot, must be dismissed because such a claim is both barred as untimely under the SPA and insufficiently alleges damages under New York law.

The SPA provisions most relevant to this claim are sections 4.05, 9.02, 9.05, and 9.07. Section 4.05(j) provides that an attached schedule sets forth "a true and complete list" of any "net profit interests" or "payments on or out of production" to which Victor Mining was subject. *See* SPA § 4.05(j) (Dkt 7-1). That schedule allegedly did not list certain third-party "mineral interests" in the Plot. Section 9.02(a), meanwhile, provides that AngloGold would be "jointly and severally liable" and would indemnify Newmont for any loss arising from, among other things, "any representation of [AngloGold] contained in this Agreement not being true and correct when made or at the Closing." SPA § 9.02(a)(i). This right to indemnification is limited by sections 9.02(d), 9.05, and 9.07. Section 9.02(d) states that "in the absence of fraud" Newmont's "sole and exclusive monetary remedy . . . shall be pursuant to the indemnification provisions set forth in this Article IX." SPA § 9.02(d). Section 9.05 provides that "[t]he obligations to indemnify" relevant here "shall terminate when the applicable representation or warranty terminates pursuant to Section 9.07, and no claim may be brought with respect to any representation and warranty following such termination" unless, prior to the termination date, a "notice" of claim is sent to the indemnifying party. SPA § 9.05. Section 9.07, in turn, states that the relevant representations and warranties "shall survive the Closing solely for purposes of this Article IX and shall terminate on

December 31, 2016." SPA § 9.07. Newmont did not file any notice of its claim regarding the Plot with AngloGold prior to December 31, 2016, and it filed the Complaint in this action on October 19, 2017.

The dispute between AngloGold and Newmont as to the interpretation and application of these terms presents two questions for this Court to decide: (1) whether the SPA permits Newmont to bring a breach of contract claim separate from the indemnification procedures of Article IX; and (2) if not, whether the time limit within Article IX applies to the claims here. New York law applies to the Court's interpretation and construction of the SPA's terms. *See* SPA § 10.10. In interpreting the SPA here, the Court bears in mind that, "when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms"— particularly when, as here, the contract "was negotiated between sophisticated business people at arm's length." *Skanska USA Bldg. Inc. v. Atl. Yards B2 Owner, LLC*, 98 N.E.3d 720, 723 (N.Y. 2018) (citations and internal alterations omitted).

### 1. Newmont May Not Pursue an Independent Breach of Contract Claim Under Article IX

The Court concludes that Article IX of the SPA bars Newmont from pursuing a claim for the breach of the warranty in § 4.05(j) that is separate from the contract's indemnification procedures. *See* SPA § 9.02(d). The SPA provides that Article IX is the exclusive remedy "in the absence of fraud" and that Newmont waives "any and all rights, claims and causes of action it may have as of the Closing against [AngloGold] arising under or based upon this Agreement, any other Transaction Documents, . . . or otherwise (except pursuant to the indemnification provisions set forth in this Article IX and for rights, claims and causes of action arising out of fraud of [AngloGold])." *Id.* (emphasis added).

Newmont argues that § 9.02(d) should be read to carve out any claims "where there are allegations of fraud" or "where there is fraud" generally. *See* P's Dismissal Br. at 8 (Dkt. 44). Even if Newmont were correct in its interpretation of the SPA, however, its argument would rely at minimum on the presence of live fraud claims as to the relevant purported breach. The Court has just dismissed Plaintiff's fraud claims for failing to adequately allege fraud as to Defendants' failure to disclose the third-party mineral interests in the Plot. Thus, Plaintiff cannot at this stage argue that its breach of contract claim "arises out of" fraud.

### 2. Any Indemnification Relief under Article IX is Time-Barred

Given that the SPA required Newmont to follow the indemnification procedures in Article IX, the Court must determine whether the time limitations set for claims for indemnification in sections 9.05 and 9.07 are enforceable against Newmont. Those provisions state as follows:

> SECTION 9.05. Termination of Indemnification. The obligations to indemnify and hold harmless any party (i) pursuant to Section 9.02(a)(i) [for "any representation or warranty of [AngloGold] contained in this Agreement not being true and correct when made or at the Closing"] ... *shall terminate when the applicable representation or warranty terminates pursuant to Section 9.07, and no claim may be brought with respect to any representation and warranty following such termination* ... provided, however, that such obligations to indemnify and hold harmless shall not terminate with respect to any item as to which the person to be indemnified shall have, *before the expiration of the applicable period,* previously made a claim by delivering a notice of such claim (stating in reasonable detail the basis of such claim) pursuant to Section 9.06 to the party to be providing the indemnification.

> SECTION 9.07. Survival of Representations. Each Seller Fundamental Representation [defined in SPA § 9.02(b)(i) to include those in §§ 3.01, 3.02, 3.03, 3.04, 4.01, 4.02 and 4.11] shall survive the Closing solely for purposes of this Article IX indefinitely and shall not terminate. *Each other representation and warranty in this Agreement [including those in SPA § 4.05] shall survive the Closing solely for purposes of this Article IX and shall terminate on December 31, 2016.*

SPA §§ 9.05, 9.07 (emphases added).

According to AngloGold, these provisions bar any claim Plaintiff might have had for indemnification as to the third-party mineral interests because the Complaint alleges no facts indicating that Newmont ever made a notice of its claim for breach of the warranty in § 4.05(j) prior to December 31, 2016, and the Complaint itself was filed after that date. "Parties to a contract may agree to a shorter period of limitations within which an action may be brought so long as the period agreed to is not unreasonably short . . . ; nevertheless, the intention to establish a shorter period must be clearly set forth in the contract." *Hurlbut v. Christiano*, 405 N.Y.S.2d 871, 873 (N.Y. App. Div. 1978) (citations omitted). "Contractual stipulations which limit the right to sue to a period shorter than that granted by statute, are not looked upon with favor because they are in derogation of the statutory limitations. Hence, they should be construed with strictness against the party invoking them." *Id.* (citations omitted).

Newmont argues that the SPA cannot cut short the statute of limitations set by New York law for breach of contract claims because the SPA does not "expressly state[] that it is intended to shorten a limitations period." *See* Newmont Dismissal Br. at 7. The Court disagrees. Sections 9.05 and 9.07 of the SPA plainly bar Plaintiff's claim for indemnification as to the Plot. In no uncertain terms, those provisions state that "no claim may be brought with respect to any representation and warranty following" the termination of the relevant warranty on December 31, 2016, unless a specific procedure is followed to preserve the claim. *See* SPA §§ 9.05, 9.07. Newmont failed to provide timely notice of its claim as to the Plot. And Plaintiff has cited no case indicating that this Court may ignore the SPA's plain language that "no claim may be brought" in

such a circumstance.[14] That the contract failed to use the magic words "statute of limitations" is of no consequence.

The Court further rejects Plaintiff's footnoted argument that "to read Section 9.05 as implicitly eliminating the statute of limitations would render the protections of Section 9.02(d) and Section 9.07 meaningless." *See* P's Dismissal Br. at 8 n.3. Plaintiff has failed to explain why that would be so, and the Court sees no reasoned basis for it—particularly given that all Plaintiff had to do to avoid the time limit on its claims was to file a notice of the claim by December 31, 2016, and that Article IX limited Newmont's relief only for claims that did not "arise out of" fraud, as explained above.

The Court thus grants AngloGold's motion to dismiss Newmont's claim for the breach of the warranty in SPA § 4.05(j). No other aspect of Newmont's breach of contract claim is affected by this ruling.

## CONCLUSION

As explained above, AngloGold's motion to compel arbitration is granted and the case is stayed as to the Purchase Price Adjustment claim only; Chancellor's motion to dismiss for lack of personal jurisdiction is denied; and Defendants' motion to dismiss Newmont's claims relating to the purported third-party mineral interests in a plot of land on Victor Mining's property is granted.

Plaintiff may amend the Complaint so long as it does so no later than October 18, 2018. As soon as practicable thereafter, and in no event later than October 25, 2018, the parties shall

---

[14] The cases on which Newmont relies are distinguishable or support this Court's conclusion. *See Hurlbut*, 405 N.Y.S.2d at 873 (holding that, in the absence of specific language about bringing a lawsuit or claim, a limitation on the survival of warranties could still require that notice be provided within the applicable period); *Uncas Int'l LLC v. Crimzon Rose, Inc.*, No. 16-CV-9610 (JSR), 2017 WL 2839668, at *5 & n.3 (S.D.N.Y. June 26, 2017) (concluding that, in the absence of a contractual notice requirement or any reference to a limitation on bringing suit, a general contract provision that warranties survived for twelve months required only that the relevant breach of warranty "come to pass or come to light" within that period following the closing).

confer and submit to the Court a letter explaining how Defendants intend to respond to the amended complaint.

The Clerk of Court is respectfully directed to terminate the motions pending at Dkts. 18, 21, and 23.

SO ORDERED.

Dated:    September 30, 2018
               New York, New York

Ronnie Abrams
United States District Judge