UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x
Newmont Mining Corporation,                          :
                                                     :
Plaintiff,                                           :      Case No. 1:17-cv-08065-RA
                                                     :
v.                                                   :
                                                     :
AngloGold Ashanti Limited, AngloGold Ashanti         :
North America, Inc., AngloGold Ashanti USA           :
Incorporated, and Wayne M. Chancellor,               :
                                                     :
Defendants.                                          :
                                                     :
------------------------------------------------------------- x

## LETTERS ROGATORY

The United States District Court for the Southern District of New York ("the Southern District") presents its compliments to the appropriate judicial authority of Ontario, Canada and requests international judicial assistance to obtain evidence to be used in the above captioned civil proceeding before this Court. Fact discovery in this matter is scheduled to close by December 21, 2018. A trial on this matter will take place sometime thereafter in this Court in New York, New York.

The Southern District has determined that it would further the interests of justice and that justice cannot be completely done between the parties without the testimony, under oath, of Deloitte LLP (Canada) ("Deloitte"), residing within your jurisdiction, along with documents that may be in its possession. The action involves claims by Newmont Mining Corporation ("Newmont") against AngloGold Ashanti North America, Inc. ("AngloGold") and others of breach of contract, fraudulent inducement, and securities fraud. Deloitte drafted a valuation report that was produced by Newmont in this litigation which Newmont may rely on to establish damages and on which their experts may rely. The testimony of Deloitte is not available from any source within the jurisdiction of the Southern District, and cannot be obtained by any means other than pursuant to an order of appropriate judicial authority of

1

Ontario, Canada, compelling Deloitte to appear for examination and produce relevant documents that are in its possession. Deloitte, a non-party to this action, resides at Bay Adelaide Centre East Tower, 8 Adelaide Street West, Suite 200, Toronto, Ontario, M5H 0A9.

This request is made pursuant to 28 U.S.C. §1781(b)(2), Rule 28 of the Federal Rules of Civil Procedure, Rule 46 of the Canada Evidence Act, R.S.C., 1985, c. C-5, and Section 60 of the Ontario Evidence Act, R.S.O. 1990, c. E.23.  The Southern District is a court of law and equity and has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.   Fact Discovery in the above-captioned matter is currently scheduled to close by December 21, 2018 and, on information and belief, Deloitte resides in Ontario, Canada.   Deloitte's testimony and the documents in its power or possession are relevant to and necessary for the fair determination of this proceeding, and are intended for use at trial. This request is made with the understanding that: (1) this request will not require Deloitte to commit any offense; (2) this request will not require Deloitte to undergo a broader form of inquiry than it would if the litigation were conducted in Canada; and (3) the requested examination and production of documents do not violate the laws of civil procedure of any Canadian court.   The Southern District has also determined that the testimony of Deloitte and the documents requested cannot be secured except by the intervention of an appropriate Canadian court.

The Southern District therefore requests that you, in furtherance of justice by the proper and usual process of your court, cause Deloitte to produce the documents requested and to produce a representative with direct knowledge of the facts in issue to appear before an official examiner authorized to administer oaths, and to take oral evidence, at a precise time to be fixed by you, and answer on his oath or affirmation questions and cross-questions, and that you will direct his deposition to be transcribed and recorded by video, and the transcript and video be sent to counsel for the parties in the action, who so request a copy. The Southern District stands ready to provide similar judicial assistance to judicial authorities in Canada when required.

THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK THEREFORE MAKES THE FOLLOWING REQUEST:

**REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE (LETTERS ROGATORY) REGARDING DELOITTE LLP (CANADA)**

1.     Requesting Judicial Authority:

The United States District Court for the Southern District of New York
500 Pearl Street
New York, New York 10017
USA

2.     Case Name:

*Newmont Mining Corporation v. AngloGold Ashanti Limited, et al.*, Docket No. 17-cv-08065-RA (S.D.N.Y.)

Nature and Purpose of the Proceedings and Summary of the Facts:

This request relates to a civil action commenced in October 2017. The Plaintiff is Newmont Mining Corporation ("Newmont").   The Defendants are AngloGold Ashanti Limited, AngloGold Ashanti North America, Inc., AngloGold Ashanti USA Incorporated, and Wayne M. Chancellor.

Following legal briefing on the sufficiency of certain of Plaintiff's claims, the applicability of an arbitration clause, and the existence of personal jurisdiction as to Defendant Chancellor, on September 30, 2018, this Court issued an Opinion and Order, compelling arbitration as to certain claims, denying Chancellor's motion to dismiss for lack of personal jurisdiction, and granting Defendants' motion to dismiss certain claims. (Case No. 17-cv-08065-RZ, ECF No. 65.) The following description of the action, assuming as true the facts alleged by Plaintiff, is taken from that Order and Opinion:

This case is about the ownership, operations, and sale of an open-pit gold mining operation in Colorado. . . .  Originally, the mine at issue was owned by the Cripple Creek & Victor Mining Company ("Victor Mining"), a 100% subsidiary of AngloGold.  In 2012, Victor Mining began planning for and building a new high grade mill.  Since then, however, the mill has suffered from various structural issues and production problems and has not operated at capacity as a result.  At some point prior to November 2014, a third party allegedly acquired the mineral interests on a plot of land on Victor Mining's property adjacent to the mill, referred to by the parties as MS 9282 ("the Plot").

In early 2015, AngloGold began marketing Victor Mining for sale and sent Newmont an offer to sell the company.  Wayne Chancellor, who was the Vice President and General Counsel to one of the AngloGold entities during the relevant time period, actively participated in the marketing and sale process on behalf of AngloGold.  Negotiations proceeded over the next few months. In May 2015, executives from Newmont and AngloGold, including Chancellor, met for two days in New York City, at the offices of AngloGold's outside counsel, Cravath, Swaine & Moore LLP, to discuss the transaction, negotiate certain terms of the deal, and finalize the agreement.

On June 8, 2015, Newmont and AngloGold entered into a Stock Purchase Agreement ("SPA") in which Newmont agreed to purchase 100% of Victor Mining's stock for approximately $820 million.  That price was approximate because the contract permitted the parties to adjust the price after closing through a "Purchase Price Adjustment" procedure.  The SPA also included a promise by AngloGold to keep Newmont updated on all material business matters and events prior to the deal's closing date.  The SPA further provided that any lawsuit arising therefrom would be governed by New York law and that the parties consented to the jurisdiction of and to bring lawsuits in the U.S. District Court for the Southern District of New York.

Over the next two months, the AngloGold Entities allegedly began experiencing increasingly severe problems with the mill-the result of purported "design defects."  Instead of

4

clearly communicating these problems with Newmont, AngloGold allegedly took various "steps to hide . . . the existence of the increasingly severe problems."  Chancellor allegedly participated in this fraud in a variety of ways, including by failing to disclose the problems with the mill that had been identified in an internal Victor Mining memorandum.

The deal closed in New York City on August 3, 2015, without any adjustment in price. Chancellor attended the closing.  According to the Complaint, neither at nor prior to closing did Chancellor or others at AngloGold inform Newmont about the problems that the mill had been having or about any third party's ownership of the mineral interests in the Plot.  After closing, AngloGold and Newmont disputed the proper amount of the pertinent Purchase Price Adjustment under the SPA.

Newmont filed this action on October 19, 2017, seeking damages from Defendants relating to the mill's deficiencies, various purported misrepresentations and fraudulent omissions, and the disagreement with respect to the Purchase Price Adjustment.

* * *

Additionally, according to Defendants, on October 8, 2015, Deloitte LLP (Canada) issued a report to Newmont USA Limited entitled "Valuation of certain assets of Cripple Creek and Victor Gold Mining Company, Inc. as at August 3, 2015," that was produced in this litigation by Newmont and Bates-Stamped NEWMONT_0000562185-279.  Defendants' assert that this report may be used by Newmont to support its damages claims in this litigation.  Therefore, Deloitte is a percipient witness to relevant facts at issue in this action.   The report, and any relevant work product related to the report, was created by Deloitte representatives in Canada.  Obtaining the production of documents and oral evidence of Deloitte in Canada is the only way to admissibly discover all relevant facts of which it is aware, including its conclusions, assumptions, and methodology in creating the report at issue.

3.     <u>Central Authority of the State of Origin:</u>

       United States Department of Justice
       Office of International Judicial Assistance
       (Office of Foreign Litigation)
       Commercial Litigation Branch, Civil Division
       Washington, DC, USA 20530

4.     <u>Central Authority of the State of Destination:</u>

       Ministry of the Attorney General
       Court Administration
       361 University Ave.
       Toronto, Ontario
       M5G 1T3
       Canada

5.     <u>Requested Judicial Authority:</u>

       A competent Judge of the Superior Court of Justice in Ontario.

6.     <u>Requesting Parties:</u>

       AngloGold Ashanti Limited, AngloGold Ashanti North America, Inc., AngloGold
       Ashanti USA Incorporated, and Wayne M. Chancellor.

7.     <u>Counsel to Requesting Parties:</u>

       Lauren Ann Moskowitz
       Cravath, Swaine & Moore LLP
       825 Eighth Avenue
       New York, NY 10019
       (212) 474-1530
       Fax: (212) 474-3700
       Email: lmoskowitz@cravath.com

Thomas Drew Leland
Holland & Knight LLP
1801 California St., Suite 5000
Denver, CO 80202
(303) 974-6643
Fax: (303) 974-6659
Email: thomas.leland@hklaw.com


Elizabeth Austin
Holland & Knight LLP
1801 California Street
Suite 5000
Denver, CO 80202
(303) 974-6660
Email: elizabeth.austin@hklaw.com


*Counsel for AngloGold Ashanti Limited, AngloGold Ashanti North America, Inc., AngloGold Ashanti USA Incorporated, and Wayne M. Chancellor*


8.   <u>Plaintiffs in Action:</u>

Newmont Mining Corporation.


9.   <u>Counsel to Plaintiffs in Action:</u>

Andrew J. Petrie
Ballard Spahr LLP (CO)
1225 17th Street, Suite 2300
Denver, CO 80202
(303) 292-2400
Fax: (303) 296-3956
Email: petriea@ballardspahr.com

Sarah Block Wallace
Ballard Spahr LLP (NYC)
1675 Broadway, 19th Floor
New York, NY 10019
(212) 223-0200
Fax: (212) 223-1942
Email: wallaces@ballardspahr.com

Gregory Paul Szewczyk
Simpson Thacher & Bartlett LLP (NY)
425 Lexington Avenue
New York, NY 10017
(212) 455-2278
Fax: (212) 455-2502
Email: szewczykg@ballardspahr.com


*Counsel for Newmont Mining Corporation*


10.     Persons (Representatives) Designated to Act in Connection with the Letters Rogatory:

Andrew Faith
Polley Faith LLP
80 Richmond St. W., Suite 1300
Toronto, ON M6H 2A4
(416) 365-1602
Email: afaith@polleyfaith.com


The above representatives will be responsible for reimbursing the judicial authorities of Ontario, Canada for costs and expenses incurred in executing these requested Letters Rogatory.


11.     Identity and Address of Entity to Be Examined of Whom Documents Are Requested:

Deloitte LLP (Canada)
Bay Adelaide East
8 Adelaide Street West, Suite 200
Toronto, Ontario
M5H 0A9


12.     Documents Requested from Deloitte:

*See* below "**Schedule A**."


13.     Subject Matter About Which Deloitte Is to Be Examined:

*See* below "**Schedule B**."

14.     <u>Requirement That the Evidence Be Given on Oath or Affirmation:</u>

The examination of the entity identified at Paragraph 11 above will be taken under oath before (I) a secretary of embassy, counsel general, consul, vice-consul, or consular agent of the United States of America or any officer authorized to administer oaths under the laws of the United States of America or of Canada or (2) before a person appointed by the Court and empowered to administer oaths and take oral evidence.

This Court further requests that you, by your proper and usual process, require that the evidence given during the above described deposition be given under the following oath or affirmation: "I [deponent] swear that the evidence that I am about to give is the truth, the whole truth and nothing but the truth, so help me God" or "I [deponent] solemnly affirm that the evidence that I am about to give is the truth, the whole truth and nothing but the truth."

15.     <u>Special Methods or Procedures to Be Followed:</u>

The examinations of the entity identified in Paragraph 11 above will be taken under the Federal Rules of Civil Procedure, except to the extent that any such procedure is incompatible with Canadian or Ontario law.  The examinations and cross-examinations shall be the same as though the deponent were testifying at trial.  The examinations and cross-examinations will be recorded stenographically and by videotape. The examination will be conducted at such time and date to be agreed with the witness but, in any event prior to December 21, 2018, unless otherwise agreed by the parties.

16.   <u>Request for Notification of Time and Place for the Execution of the Request and Address of Any Person to Be Notified:</u>

Andrew Faith
Polley Faith LLP
80 Richmond St. W., Suite 1300
Toronto, ON M6H 2A4
(416) 365-1602
Email: afaith@polleyfaith.com

Counsel for Defendants will promptly send notice to counsel for all parties to the action. Please send the original transcripts of the depositions to:

Andrew Faith
Polley Faith LLP
80 Richmond St. W., Suite 1300
Toronto, ON M6H 2A4
(416) 365-1602
Email: afaith@polleyfaith.com

Your assistance in this matter is appreciated and this Court stands ready to provide similar judicial assistance to judicial authorities in Canada.

Signed this_____ day of November, 2018 at New York, New York.

[Seal of Court]                    _____
                                   Hon. Ronnie Abrams
                                   United States District Judge
                                   Southern District of New York

## SCHEDULE  A

Definitions

The following definitions apply:

1.    "Valuation Report" means the report attached to **Schedule B** entitled "Valuation of certain assets of Cripple Creek and Victor Gold Mining Company, Inc. as at August 3, 2015," dated October 8, 2015, that was produced in the *Newmont Mining Corporation v. AngloGold Ashanti Limited, et al.*, Docket No. 17-cv-08065-RA (S.D.N.Y.) by Newmont Mining Corporation and Bates-Stamped NEWMONT_0000562185-279.

2.    "Newmont" means Newmont Mining Company, its officers, executives, employees, agents, attorneys, and accountants and any of its affiliates along with their officers, executives, employees, agents, attorneys, and accountants.

3.    "Communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

4.    "Concerning" means relating to, referring to, describing, evidencing, or constituting.

5.    "Document" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Fed. R. Civ. P. 34(a)(1)(A). A draft or non-identical copy is a separate document within the meaning of this term.

6.    "Including" shall be interpreted to mean "including but not limited to."

Relevant Time Period

The relevant period, unless otherwise indicated, shall be from January 1, 2012 through the present.

Documents Requested

The following documents are requested:

1.    A copy of any communications between you and Newmont and/or any third party regarding the Valuation Report or the subject of the Valuation Report.

2.      All documents in your possession concerning the Valuation Report or the subject of the Valuation Report.

3.      All documents and/or communications in your possession created in the course of preparing the Valuation Report, including any drafts thereof.

## SCHEDULE B

Definitions

The following definitions apply:

1.    "Valuation Report" means the report attached hereto and entitled "Valuation of certain assets of Cripple Creek and Victor Gold Mining Company, Inc. as at August 3, 2015," dated October 8, 2015, that was produced in the *Newmont Mining Corporation v. AngloGold Ashanti Limited, et al.*, Docket No. 17-cv-08065-RA (S.D.N.Y.) by Newmont Mining Corporation and Bates-Stamped NEWMONT_0000562185-279.

2.    "Newmont" means Newmont Mining Company, its officers, executives, employees, agents, attorneys, and accountants and any of its affiliates along with their officers, executives, employees, agents, attorneys, and accountants.

3.    "Communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

4.    "Concerning" means relating to, referring to, describing, evidencing, or constituting.

5.    "Document" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Fed. R. Civ. P. 34(a)( 1 )(A). A draft or non-identical copy is a separate document within the meaning of this term.

6.    "Including" shall be interpreted to mean "including but not limited to."

Relevant Time Period

The relevant period, unless otherwise indicated, shall be from January 1, 2012 through the present.

Deposition Topics

The following are the topics for the deposition of Deloitte LLP (Canada):

1.    The deponent's education, background, and employment at Deloitte, and their involvement in the creation, consideration, or preparation of the Valuation Report.

2.      Deloitte's creation, preservation, collection, and production of documents produced in response to **Schedule A**.

3.      Deloitte's communications with Newmont and/or any third party concerning the Valuation Report or the subject of the Valuation Report.

4.      Deloitte's preparation of the Valuation Report, including any preparatory work product, internal communications concerning the Valuation Report or the subject of the Valuation Report, and any drafts thereof.

5.      Deloitte's preliminary and ultimate conclusions concerning the Valuation Report or the subject of the Valuation Report.

# Deloitte.

## Newmont USA Limited
Valuation of certain assets of Cripple Creek and Victor Gold Mining Company, Inc. as at August 3, 2015

**October 8, 2015**
**Financial Advisory**

NEWMONT_0000562185



Deloitte LLP
2800 - 1055 Dunsmuir Street
4 Bentall Centre
P.O. Box 49279
Vancouver BC  V7X 1P4
Canada

Tel: 604-669-4466
www.deloitte.ca

**Private and confidential**

October 8, 2015

Newmont USA Limited
Suite 800, 6363 South Fiddler's Green Circle
Greenwood Village CO 80111
United States

Dear Sirs/Mesdames:

**Subject:  Valuation services in connection with the acquisition of Cripple Creek and Victor    Gold Mining Company, Inc.**

Deloitte LLP ("Deloitte") is pleased to assist Newmont USA Limited ("Newmont" or the "Client") in connection with its financial reporting requirements pursuant to United States generally accepted accounting principles ("US GAAP") as described in Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 805, Business Combinations. We also understand that Newmont will be using this report for the purpose of making a 338(h)(10) tax election for United States tax purposes.

Accompanying this letter is our report pertaining to the fair value of certain tangible and intangible assets of Cripple Creek and Victor Gold Mining Company, Inc. ("CC&V") as at August 3, 2015 (the "Transaction Date" or "Valuation Date").

Our report, including its exhibits and appendices, was prepared by Deloitte in connection with the engagement agreement (the "Engagement Agreement") entered into by and between Deloitte and Newmont dated August 3, 2015. Accordingly, our report, including its exhibits and appendices, are subject to all terms and conditions of the Engagement Agreement, including, without limitation, any General Business Terms and other attachments thereto.

Our report describes the purpose, use and scope of the analysis, the methodologies employed, and the results of the work.  The results, advice, recommendations, or conclusions included in the report are subject to the assumptions and limiting conditions and the certifications that are presented as appendices.

If you have any questions regarding our report, please contact Jeffrey Harder at (604) 640-3170.

Yours truly,

Deloitte LLP

D Jeffrey Harder, FCPA, FCA, FCBV, ASA
Partner
Financial Advisory
Deloitte LLP

NEWMONT_0000562186

# Glossary

The following glossary includes certain terms that are defined throughout our report, definitions of certain terms that may be relevant to this matter, as well as abbreviations for terms that are used throughout our report, for ease of reference and comprehension.

| | |
|---|---|
| AngloGold | AngloGold Ashanti Ltd. |
| Buyer's Model | LOM model prepared by Newmont |
| CC&V | CC&V Mine and Victor Gold Mining Company, Inc. |
| CICBV | Canadian Institute of Chartered Business Valuators |
| CIM | Canadian Institute of Mining |
| Client | Newmont USA Limited |
| CC&V Mine | An open pit gold mine located in Colorado, U.S. |
| DCF | Discounted cash flow |
| Deloitte | Deloitte LLP |
| EBIT | Earnings before interest and taxes |
| EIU | Economist Intelligence Unit |
| Engagement Agreement | Agreement entered into by Deloitte and Newmont on August 3, 2015 |
| EP | Exploration Potential |
| IAS | International Accounting Standards |
| IRR | Internal rate of return |
| IVS | International Valuation Standards |
| LOM | Life of mine |
| Management | Management of Newmont |
| Mineral Interest | In-situ reserves, resources and exploration potential associated with CC&V |
| Newmont | Newmont USA Limited |
| MD&A | Management's discussion and analysis |
| Net Assets | Identifiable assets acquired and liabilities assumed of CC&V |
| NI 43-101 | National Instrument 43-101 |
| R&R | Reserve and resource |
| Standards | Practice Standards of the CICBV |
| Transaction | Acquisition of all of the issued and outstanding shares of CC&V by Newmont |
| Transaction Date | August 3, 2015 |
| US | United States |
| US$ or $ | All amounts are expressed in US dollars unless otherwise indicated |
| USPAP | Uniform Standard of Professional Appraisal Practice |
| US GAAP | United States Generally Accepted Accounting Principles |
| Valuation | Independent estimate of fair value of the identifiable assets and liabilities of CC&V |

© Deloitte LLP and affiliated entities.

NEWMONT_0000562187

| | |
|---|---|
| Valuation Date | August 3, 2015 |
| VLF | Valley Leach Facility |
| VLF2 | Valley Leach Facility 2 |
| WACC | Weighted average cost of capital |

NEWMONT_0000562188

# Contents

Glossary ........................................................................................................................................ i

Contents ...................................................................................................................................... iii

Tables and schedules .................................................................................................................. iv

1.      Engagement overview ........................................................................................................ 1

2.      Scope of services ............................................................................................................... 2

3.      Company overview ............................................................................................................. 4

4.      Basis of valuation............................................................................................................... 7

5.      Valuation of the Mineral Interest ..................................................................................... 10

6.      Valuation of inventory ...................................................................................................... 15

7.      Valuation summary ........................................................................................................... 17

Schedules ................................................................................................................................... 18

Appendix A – Sources of information .......................................................................................... 24

Appendix B – Mining specific definitions .................................................................................... 26

Appendix C – Assumptions and limiting conditions..................................................................... 27

Appendix D – Weighted average cost of capital.......................................................................... 29

Appendix E – Valuation of PP&E ................................................................................................. 31

Appendix F – Certifications .......................................................................................................... 41

NEWMONT_0000562189

# Tables and schedules

Table 1 – CC&V R&R statement as at December 2014....................................................................4
Table 2 – Management's revised in-situ resources ...................................................................5
Table 3 – CC&V Mine production summary ...........................................................................11
Table 4 – Gold price.....................................................................................................11
Table 5 – Enterprise value implied by the Transaction.............................................................13
Table 6 – Fair value of the Mineral Interest..........................................................................14
Table 7 – Assumptions used for the heap leach inventory valuation..............................................15
Table 8 – Assumptions used for the stockpile valuation............................................................16
Table 9 – Summary of Deloitte fair values ............................................................................17

Schedule 1 – Valuation summary......................................................................................19
Schedule 2 – Valuation of CC&V Mine.................................................................................20
Schedule 3 – Valuation of heap leach inventory .....................................................................21
Schedule 4 – Valuation of mill ore stockpile..........................................................................22
Schedule 5 – WACC ....................................................................................................23

NEWMONT_0000562190

# 1. Engagement overview

## Prepared for

Newmont USA Limited
6363 South Fiddler's Green Circle
Suite 800
Greenwood Village CO 80111
United States

1.1   Newmont sought valuation advice and recommendations to assist it with its recognition and measurement of the identifiable assets acquired and liabilities assumed (the "Net Assets") of CC&V.  We have been engaged to provide an independent estimate of the fair value of the identifiable assets and liabilities of CC&V (the "Valuation") as at the Valuation Date.  Newmont requires the Valuation for financial reporting requirements pursuant to US GAAP as described in FASB ASC 805, Business Combinations and tax purposes in relation to the proposed 338(h)(10) election.

1.2   Newmont announced the acquisition of all of the issued and outstanding shares of CC&V on June 8, 2015 (the "Transaction") and then completed the Transaction on August 3, 2015 for a total consideration of $820.6 million. The consideration (the "Consideration") comprises of cash and a deferred net smelter royalty ("NSR").

## Purpose and use

1.3   This report, including its exhibits and appendices, was prepared by Deloitte in connection with the Engagement Agreement entered into by and between Deloitte and Newmont dated August 3, 2015.  Accordingly, this report, including its exhibits and appendices, are subject to all terms and conditions of the Engagement Agreement, including, without limitation, any General Business Terms and other attachments thereto.

1.4   This report is solely for Newmont's internal use to assist it in meeting its financial reporting and tax requirements.

1.5   Notwithstanding the foregoing, the report may be provided to Newmont's external auditor solely in connection with its audit of Newmont's financial statements.  Newmont understands and agrees that Deloitte will not provide consent to be a named expert including, without limitation, in any of Newmont's filings with the US Securities and Exchange Commission under the Securities Act of 1933 or the Securities Exchange Act of 1934, as amended.

1.6   All amounts are expressed in US dollars ("US$" or "$") unless otherwise stated.

NEWMONT_0000562191

# 2. Scope of services

## Services provided

2.1 We have prepared an Estimate Valuation Report in conformity with the Practice Standards ("Standards") of the Canadian Institute of Chartered Business Valuators ("CICBV"). An Estimate Valuation Report is based on limited review, analysis and corroboration of relevant information, which is appropriate for the purpose for which it is requested, and is typically communicated in a less detailed valuation report that provides a lower level of assurance than a Comprehensive Valuation Report as defined by the CICBV. The valuation conclusion expressed may be different had a Comprehensive Valuation Report been provided.

2.2 No part of Deloitte's fee is contingent on the conclusions reached in the Valuation or any action or event contemplated in, or resulting from the use of, the Valuation. The principal valuator and other staff involved in the preparation of the Valuation acted independently and objectively in completing this engagement.

## Description of the Net Assets

2.3 The Net Assets acquired primarily include cash, working capital, consumable inventory, heap leach inventory, mill ore stockpile, property, plant and equipment and mineral interest.

## Description of the analysis

2.4 Our analysis included, but was not necessarily limited to, the following:

2.4.1 Interviews with Management, throughout July, August and September of 2015, relating to:

2.4.1.1 Newmont's rationale for the acquisition and to understand the history of CC&V; and

2.4.1.2 CC&V's competitive position, strengths and challenges relative to the industry, its operating and non-operating assets, its historical financial position and operating performance, and future expectations regarding operating performance and financial position.

2.4.2 Discussions with Management regarding CC&V's mineral interest and related assets;

2.4.3 Research relating to:

2.4.3.1 Current economic conditions and outlook for the US economy, as well as applicable global economic conditions;

2.4.3.2 The gold mining industry; and

2.4.3.3 CC&V's competitors and other companies engaged in the same or similar lines of business.

2.4.4 Site visits to the mining facilities and CC&V offices by Deloitte personnel on August 12-13, 2015;

2.4.5 Consideration, selection and application of valuation methodologies; and

2.4.6 An estimate of the fair value of the Net Assets as at the Valuation Date.

## Type and premise of value

2.5 For financial reporting purposes in accordance with US GAAP, the Net Assets acquired are recorded at fair value. Fair value, as defined in ASC 820, Fair Value Measurements and Disclosures, is:

NEWMONT_0000562192

*The price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.*

2.6     Unless otherwise stated herein, the type of value reflects the highest and best use of each asset, group of assets, or business interest included in the Valuation.

NEWMONT_0000562193

# 3. Company overview

## Company overview

3.1 CC&V was an indirect wholly owned subsidiary of AngloGold Ashanti Ltd.("AngloGold"), a South African-based gold mining company listed on the Johannesburg Stock Exchange (JSE:ANG). CC&V is principally engaged in the operation of the CC&V mine, an open pit gold mine located in Colorado, US (the "CC&V Mine"). The location is a highly attractive mining jurisdiction and is known for its stable tax regime, access to qualified labor, robust legal framework and streamlined permitting process. The CC&V Mine has been in continuous production since 1995.

## CC&V property

### Mining methodologies

3.2 Mining is currently being undertaken by conventional open pit methods which provide ore to a crusher and the Valley Leach Facility ("VLF"), one of the largest heap leach facilities in the world. The first Mine Life Extension ("MLE1") was approved in 2008 and involved the expansion of the existing heap leach pad.

3.3 A second Mine Life Extension project ("MLE2") was approved in 2012 and relates to the construction of a second VLF ("VLF2") as well as a high grade mill facility (construction of which was recently completed). The focus of the mill is to treat high grade ore, while the focus of the VLF (and in the future VLF2) is to treat lower grade ore. The majority of CC&V's resources are forecast to be processed through the heap leach facilities, approximately 70% of CC&V's total life of mine ("LOM") production.

### Reserves and resources

3.4 AngloGold issued a reserves and resources ("R&R") statement effective December 2014. The R&R statement was prepared in accordance with the principles and guidelines of the Australian Code for Reporting of Exploration Results ("JORC code"). The following table summarizes CC&V's R&R statement as at December 2014:

#### Table 1 – CC&V R&R statement as at December 2014

|  | Tons (000s) | Grade (oz / t) | Contained oz (000s) |
|---|---|---|---|
| Proven and Probable | 182,745 | 0.022 | 3,957 |
| Measured and Indicated | 244,364 | 0.021 | 5,093 |
| Inferred | 45,373 | 0.021 | 958 |
| Total | 472,482 |  | 10,008 |

3.5 As part of its due diligence for the Transaction, Newmont reviewed AngloGold's published R&R statement. Newmont determined that the gold price and some operating cost assumptions used by AngloGold were different to Newmont's preferred assumptions. Additionally, some technical specifications with respect to how the R&R was defined, such as drill-hole spacing, were also different to Newmont's internal standards. Based on these factors, Newmont prepared a revised estimate of the R&R, which was used as the basis for Newmont's version of the CC&V model.

3.6 Based on this analysis, Management estimated the following revised in-situ resources, split between resources expected to be processed by the mill and leach facilities.

NEWMONT_0000562194

**Table 2 – Management's revised in-situ resources**

| 000 oz | Mill (contained) | Leach (recovered) |
|---|---|---|
| Measured | 279 | 829 |
| Indicated | 593 | 763 |
| Inferred | 672 | 249 |
| Total | 1,544 | 1,841 |

3.7     Table 2 sets out Newmont's best estimate of the contained mill ounces and recoverable leach ounces in-situ at the time of the Transaction.  These estimates are preliminary and CC&V's reserves will be estimated for year-end reporting. Table 2 does not include ounces in the mill stockpile and heap leach inventory as at the Transaction Date.

3.8     Newmont's analysis results in a reduction in the number of defined ounces and prima facie shows a reduction in the level of resource definition, i.e. AngloGold defined approximately 4.0 million contained ounces of reserves whereas Newmont's revised estimate includes reduced reserves and had a larger proportion of total resources classified as inferred. We held discussions with Management to understand the basis for the changes, and we were advised as follows:

3.8.1     The level of information relating to the CC&V deposit provided to Newmont as part of the due diligence process was relatively limited and therefore Newmont was unable to confirm that there were proven and / or probable reserves conforming with Newmont's internal standards. Subsequent to the completion of the Transaction and as a result of being given full access to all CC&V information and personnel, Newmont has been able to confirm that CC&V's resources include reserves as at the Valuation Date. Management advised us that Newmont will be reporting reserves in the R&R statement to be released effective December 2015 and the quantum of reserves is currently being analysed; and

3.8.2     The difference between Newmont's estimate of R&R as at the Transaction Date and AngloGold's defined R&R as at December 2014 does not necessarily indicate that the resources defined by AngloGold do not exist, but relates primarily to differences in the reporting standard and assumptions used by each company, which are inherently a matter of opinion and, particularly with respect to gold cut off price, move with market forces. Management represented that additional resources over and above what is included in the Buyer's Model may exist but Newmont will not formally report them until they have been defined in accordance with Newmont's internal standards. A process of analysis and definition to Newmont standards is ongoing.

3.9     Accordingly, in preparing our valuation of CC&V's mineral interest ("Mineral Interest"), we have:

3.9.1     Relied on Buyer's model, which includes 3.9 million ounces of recovered gold and these ounces includes reserves and resources; and

3.9.2     Been cognizant of the fact that additional resources over and above the modelled ounces likely exist and have implicitly formed part of the acquisition. We have treated these additional resources as exploration potential ("EP"). To estimate the amount of additional resources, we have considered the difference between the resources defined by AngloGold as at December 2014 and the resources included in the Buyer's Model[1]. While differences in assumptions and definition standards exist between the two estimates, both have been prepared under reputable international resource definition standards and therefore we consider these estimates to provide a reasonable basis with which to estimate the quantum of EP in existence at the Valuation Date.

---

[1] AngloGold's estimate (per Table 1) relates to contained ounces, while Newmont's estimate of 3.9 million ounces relates to recovered ounces. Given the average recovery rate assumed in the Buyer's Model is approximately 75%, AngloGold's equivalent recovered ounces is approximately 7.5 million ounces. This suggests a quantum of EP of approximately 3.6 million recovered ounces.

NEWMONT_0000562195

## Financial position

3.10      Detailed in Schedule 1 are the material assets and liabilities of CC&V as at August 3, 2015.

NEWMONT_0000562196

# 4. Basis of valuation

## Sources of information

4.1     We researched, collected and evaluated financial and nonfinancial information obtained from public sources. We also collected and considered private information provided by Newmont. The specific information relied on is summarized in Appendix A to this report.

4.2     The prospective financial information used in this analysis was prepared and approved by Management and is the responsibility of Newmont. Newmont is responsible for representations about its plans, expectations and disclosure of significant information that might affect the ultimate realization of any forecast results. Deloitte has no responsibility for the achievability of the results forecast. Events and circumstances frequently do not occur as expected. There will usually be differences between prospective financial information and actual results, and those differences may be material.

4.3     The Valuation and this report do not constitute:

4.3.1     A recommendation regarding the acquisition or financing of any business, assets, liabilities, or securities;

4.3.2     A market or financial feasibility study;

4.3.3     A fairness or solvency opinion; or

4.3.4     An examination or compilation of, or the performance of agreed-upon procedures with respect to, prospective financial information in accordance with standards established by the Canadian Institute of Chartered Accountants or the Canadian Public Accountability Board. The engagement and the Valuation are not intended to be and shall not be construed to be "investment advice" within the meaning of the Investment Advisers Act of 1940.

## Assets and liabilities acquired

4.4     The primary assets acquired by Newmont include plant and equipment, working capital, stockpile and heap leach inventory, and Mineral Interest and EP associated with the CC&V Mine. The primary liabilities assumed by Newmont include capital lease liabilities and reclamation liabilities. A full listing of assets and liabilities is set out in Schedule 1.

## Valuation methodologies and approaches

4.5     The methods commonly used to value assets and business interests are the income, market and cost approaches. The nature and characteristics of the asset indicates which approach is most appropriate for valuation. Each approach to value is introduced below, and as necessary, more specifically described in our analyses contained in this valuation report.

### Cost approach

4.6     The cost approach is based on the premise that a prudent third-party purchaser would pay no more for an asset than the cost to obtain an opportunity of equal utility. This approach would consider all costs necessary to purchase a mineral interest and construct a mine of equivalent utility at prices applicable as at the Valuation Date as well as any obsolescence applicable to the asset. In connection with a mineral property, the cost approach involves a review of the historical expenditures and their contribution to the current value of the mineral property.

NEWMONT_0000562197

## Income approach

4.7 The income approach measures the value of an asset by the present value of its future net economic benefits to be enjoyed over the life of the asset. These benefits may include earnings, cost savings, tax deductions and proceeds from disposition. The steps followed in applying this approach include estimating the expected cash flows attributable to the asset over its life and converting these cash flows to present value through discounting. The discount rate selected incorporates an appropriate return for the time value of money, the expected rate of inflation and any specific risks associated with the particular asset. The discount rate selected is generally based on rates of return from alternative investments of similar type and quality as of the Valuation Date.

## Market approach

4.8 The market approach measures the value of an asset based on what other purchasers in the marketplace have paid for assets which can be considered reasonably similar to those being valued. When the market approach is applied, data on "comparables" are collected on the prices paid for reasonably comparable assets. Considerations and adjustments are made to the comparables, as necessary, to compensate for differences in financial condition, operating performance, economic, environmental and political factors. Application of the market approach results in an estimate of the price the owner might reasonably expect to receive from the sale of the subject asset in the notional marketplace.

## Selected valuation approaches

## Consideration

4.9 The cash portion of the Consideration is assumed to have a fair value equal to book value given that it is liquid in nature. The NSR has been estimated at a fair value of nil. As at the Transaction Date, Management does not believe there is sufficient knowledge of the resource that underpins the underground mining scenario and therefore it is not possible to reasonably estimate the value associated with the underground mining scenario. Accordingly, given that the NSR is based on the cash flows to be received from underground mining, we are of the view that the NSR has no material value as at the Transaction Date.

## Cash, and working capital assets and liabilities

4.10 Cash is assumed to have a fair value equal to book value given that it is liquid in nature.

4.11 Accounts receivable primarily relate to trade receivables, which Management believes are fully collectable. Accordingly, fair value is approximated by book value.

4.12 Accounts payable and accrued liabilities relate to general expenses of CC&V (i.e. salary and operating costs). These amounts are expected to be paid as and when due. Therefore, their book values are assumed to equal fair value.

## Other assets and liabilities

4.13 Asset retirement obligation ($63.4 million) relates to the present value of the costs expected to be incurred to rehabilitate the land at the CC&V Mine that was disturbed and required remediation as at the Transaction Date. The fair value of this item has been estimated by Management.

## Inventory

4.14 Consists of purchased consumable supplies inventory, mill ore stockpiles and heap leach inventory. The fair value of purchased consumable supplies inventory was estimated by Management based on the cost of the inventory. The fair value of the mill ore stockpile and heap leach inventory were valued using the income approach, specifically the discounted cash flow ("DCF") method. This approach estimates the expected cash flows to be received from the processing and selling of the gold in the inventory. A reasonable profit allowance for the completion and selling effort was also included as part of costs of completion. Given the significant value of fixed assets in the heap leach facility, to estimate the value of the heap leach inventory, we adjusted the heap leach DCF for the fair value of the fixed assets in the heap leach facility.

NEWMONT_0000562198

## Property, plant and equipment

4.15     The fair value of the property, plant and equipment ("PP&E") has been estimated by Deloitte and our valuation is set out in Appendix E.  The primary approach used to value the PP&E was the depreciated replacement cost approach.

## Mineral Interest

4.16     In estimating the fair value of the Mineral Interest, we utilized the income approach, specifically the DCF method, to estimate the fair value of the CC&V Mine and the market approach, specifically the in-situ resource multiple method, to estimate the fair value of the inherent exploration potential of CC&V.

NEWMONT_0000562199

# 5. Valuation of the Mineral Interest

## Overview

5.1   AngloGold prepared and provided to the potential bidders a LOM model for CC&V. We understand AngloGold's model was based on its business plan effective December 2014.

5.2   As part of the due diligence process, Management revised various model assumptions to arrive at Newmont's preferred LOM plan for CC&V ("the Buyer's model"). This model was used by Newmont as a basis for its bid and was also provided to Deloitte to prepare the purchase price allocation. We held discussions with Management to understand the changes made to AngloGold's model and the reasons for such changes. The key changes made to AngloGold's model were as follows:

   5.2.1   Updated gold pricing assumptions based on Newmont's preferred pricing forecast;

   5.2.2   Revised the production profile (as discussed in Section 3 above);

   5.2.3   Revised certain operating and capital expenditure assumptions; and

   5.2.4   Removed production from the underground mining scenario. Management's view was that there was insufficient drilling and studies done on the underground scenario to warrant inclusion in the model. We understand this was one of the key transaction disagreements between Newmont and AngloGold and resulted in the NSR being agreed. Given that Newmont has not assigned any value to the underground mining scenario, it has also estimated the value of the NSR at nil.

5.3   While changes were made to AngloGold's model to allow Newmont to arrive at its estimate of the LOM plan for CC&V, the process followed by both companies appears normal and customary of a merger & acquisition transaction between two highly sophisticated, motivated but not anxious parties, dealing at arm's length. We held discussions with Newmont's head of Corporate Development, David Faley, who led Newmont's bid, to understand the process and we were advised that it was a very well run and highly competitive process. Management was of the view that Newmont paid full value for the project.

5.4   Based on the foregoing, we are of the view that there is no compelling evidence to suggest that:

   5.4.1   The Consideration paid by Newmont for CC&V does not represent fair value for CC&V; and

   5.4.2   The Buyer's Model does not represent the view of the LOM that an average market participant would consider reasonable.

5.5   The income approach, more specifically the DCF method, was used to estimate the fair value of the CC&V Mine.   The income approach converts projected cash flows (including cash income taxes and capital expenditures) to a capital value at a point in time.   The Buyer's Model projects after-tax discretionary cash flows from the CC&V Mine (the "Projections"). The Buyer's Model included Projections of production volumes and mining/processing mix, fixed and variable costs, taxes, royalties and development and maintenance capital expenditures, among other operational and financial information.   The key assumptions used in the income approach are discussed in the following paragraphs.

## Key LOM assumptions

## Production

5.6   The Buyer's Model forecasts production for 18 years exclusively from CC&V's open pit operation. Processing of mined ore occurs through one of three facilities: mill, VLF or VLF2 (forecast to be commissioned in 2016).

NEWMONT_0000562200

The mill was commissioned in early 2015 and was built to process primarily high grade ore material. Tailings from the mill are added to the heap leach process for further gold recovery. VLF has been in operation for over 10 years.

5.7 Summarized in Table 3 are the production assumptions used in the Buyer's Model.

**Table 3 – CC&V Mine production summary**

| Mill | | |
|---|---|---|
| Operating duration (from Valuation Date) | years | 12 |
| Total LOM production | 000 ounces | 1,175 |
| Average grade of throughput | Oz/t | 0.08 |
| **VLF** | | |
| Operating duration (from Valuation Date) | years | 13 |
| Total LOM production | 000 ounces | 973 |
| Average grade of throughput | Oz/t | 0.01 |
| **VLF2** | | |
| Operating duration (from Valuation Date)[1] | years | 17 |
| Total LOM production | 000 ounces | 1,779 |
| Average grade of throughput | Oz/t | 0.01 |

Notes:

1 VLF2 starts in 2016, therefore operating duration is from 2016 to 2032

## Commodity prices

5.8 The Buyer's Model was prepared in real terms. The prices we used in our Valuation were therefore also prepared in real terms. We selected our preferred pricing assumptions based on an analysis of analyst's gold price forecasts on or around the Valuation Date, and Management's view of forecast gold prices.

5.9 We reviewed the range of analyst forecasts, excluded outliers, and based the LOM gold price assumptions on the median of the available market data. Table 4 summarizes the gold price forecast used in the LOM model.

**Table 4 – Gold price**

| | 2015 | 2016 | 2017 | 2018 | 2019 | LT |
|---|---|---|---|---|---|---|
| $ / oz | 1,200.00 | 1,200.00 | 1,200.00 | 1,150.00 | 1,150.00 | 1,250.00 |

## Cash costs

5.10 Cash costs consist of open pit mining cost of $2.06 per ton of material moved, heap leach processing cost of $4.20 per ton stacked, mill processing cost of $8.53 per ton processed, fixed mill processing cost of $17.1 million per year, and general and administrative cost of $0.61 per ton mined.

## Capital expenditures

5.11 Capital expenditures over the LOM are forecast to be $352.1 million and relate to both expansion capital expenditure and sustaining capital expenditure. Expansion capital of $194.2 million is assumed to be incurred in 2015 to 2017 to complete the construction and commissioning of VLF2. The remaining capital expenditure ($157.9 million) relates to sustaining capital required to maintain the mine and allow it to run at full capacity.

5.12 Sustaining capital expenditure is highest in the first eight years of the LOM and then reduces to nil over the next 5 years.

NEWMONT_0000562201

## Income taxes

5.13    Management has provided us with the mining and income tax calculations.  These calculations are based on the following components:

    5.13.1   Alternative Minimum Tax ("AMT") federal income tax rate of 20.0%;

    5.13.2   Colorado state tax rate of 4.6%;

    5.13.3   Tax 199 rate of 9.0%;

    5.13.4   Colorado production mine tax of 1.4%; and

    5.13.5   Colorado severance tax rate of 0.4%.

5.14    Newmont is an AMT taxpayer, hence CC&V Mine is expected to also be subject to AMT. In determining AMT tax depreciation for purposes of calculating federal taxes, all existing fixed assets and future capital expenditures are depreciated based on an appropriate statutory rate. For AMT tax, the mineral property is depreciated using the cost depletion method. Fixed assets and future capital expenditures are depreciated using AMT tax depreciation rates and a half year convention. The tax calculation has been prepared assuming an asset acquisition, given Newmont's proposed 338(h)(10) tax election for U.S. tax purposes, and therefore we have assumed the starting asset bases for PP&E and Mineral Interest are equal to our assessed fair values.

5.15    For AMT purposes, we applied 90% of AMT net operating losses to ensure cash tax for 10% AMT taxable income would be incurred.  In addition, we included a net operating loss schedule to carryback the net operating loss for two years.

## Discount rate

5.16    A 5% post-tax real discount rate was used based on our assessment of the weighted average cost of capital ("WACC") for CC&V. Our WACC analysis is set out in Appendix D. This rate is also consistent with the rate used by most large gold producers in North America, based on company filing information.

## Fair value of CC&V Mine

5.17    The projected after-tax cash flows were converted to a present value using our selected WACC.  The result represents the fair value of the CC&V Mine, based on the ounces modelled in the Buyer's Model, and the other assets employed in its operations.

5.18    Based on the Buyer's Model, our selected forecast gold price assumptions and our assessed WACC, we estimated the fair value of the CC&V Mine to be $795.0 million, which includes the value of PP&E, heap leach inventory and Mineral Interest. Our valuation analysis is set out in Schedule 2.

## Fair value of EP

5.19    We have estimated the fair value of the EP using the market approach, specifically the in-situ multiple method, which applies a market based multiple to the quantum of ounces implicit in the EP. As discussed in Section 3 above, we have estimated the EP to be 3.6 million ounces of recovered gold in-situ[2]. Given that we consider the enterprise value implied by the Consideration to represent the fair value of the CC&V Mine and EP, the difference between the fair value of CC&V Mine ($807.3 million) and the implied transaction enterprise value ($826.0 million[3]) implicitly relates to the fair value of the EP. On this basis, we estimate the fair value of the EP to be approximately $18.6 million, which equates to an in-situ resource multiple of $5.2/oz.

---

[2] In-situ valuation analysis is generally done on a contained basis, however, we have not been able to perform the analysis on a contained basis as the Buyer's Model and Newmont's revised estimate of in-situ ounces to be processed through the leach facility were provided a recovered basis.
[3] Calculated as the Consideration plus total liabilities less asset requirement obligation (as this liability inherently captured in the fair value of the CC&V Mine) less cash, and less consumables and mill stockpile inventory (as these were acquired assets not forming part of the enterprise). Refer to Table 5 below.

NEWMONT_0000562202

5.20    The enterprise value implied by the Transaction ($826.0 million) was estimated as follows:

**Table 5 – Enterprise value implied by the Transaction**

| $'000s | |
| --- | --- |
| Consideration | 820,598 |
| Plus: Total liabilities | 118,844 |
| Less: ARO | (63,375) |
| Less: Other assets | (50,110) |
| Implied enterprise value | 825,957 |

5.21    We have considered the value of the EP and the implied in-situ multiple in the context of the nature of the EP and the multiples paid for similar gold mining companies. Based on our previous research and understanding of the gold mining industry, this multiple is low compared to in-situ multiples observed from transactions involving comparable projects. We have considered the facts and circumstances, and have held discussions with Management, and we make the following observations:

5.21.1    Newmont currently has no intention to do any formal exploration and / or feasibility study work on the EP for inclusion in the CC&V LOM plan in the near term future. Management advised that sufficient defined resources currently exist to underpin the CC&V LOM plan at expected capacity until 2032;

5.21.2    Some of the EP relates to the underground mining scenario, which is currently considered to have no value to Newmont;

5.21.3    Newmont's primary motivation for the Transaction was to acquire the CC&V Mine and therefore Newmont ascribed limited value to the EP; and

5.21.4    The EP may eventually be upgraded to reserves and included in the CC&V Mine LOM plan, however, this will likely occur later in the LOM. The value of the EP should therefore be discounted for the time value of money.

5.22    On this basis, we are of the view that the low value of EP and resulting low implied in-situ multiple appear reasonable.

## Fair value of Mineral Interest

5.23    In arriving at the fair value of the Mineral Interest, we deducted the fair value of all other assets employed in the operations from the fair value of CC&V.  Based on the foregoing, we estimated the fair value of the Mineral Interest as follows:

NEWMONT_0000562203

## Table 6 – Fair value of the Mineral Interest

| $'000s | |
| --- | --- |
| CC&V Mine | 807,336 |
| Plus: ARO[1] | 63,375 |
| Less: PP&E | 627,545 |
| Less: Heap leach inventory | 217,879 |
| Mineral Interest associated with CC&V Mine | 25,286 |
| | |
| Plus: EP | 18,622 |
| Total Mineral Interest | 43,908 |

Notes:

1. The ARO is implicitly captured in the CC&V fair value and is also recognised separately on the balance sheet. Therefore, it has been added back to correctly calculate the Mineral Interest value

© Deloitte LLP and affiliated entities.

NEWMONT_0000562204

# 6. Valuation of inventory

## Heap leach inventory

6.1     The value of the heap leach facility is derived from the combination of the value of the fixed assets in the facility and the ore on the leach pad. To arrive at the value of the ore on leach pad (i.e. the heap leach inventory), we first estimated the value of the leach facility using a DCF and then made an adjustment to consider the value of the fixed assets in the leach facility.

6.2     The valuation is set out in Schedule 3. Assumptions are based on Management's LOM Projections. The heap leach inventory is expected to be processed throughout the LOM.

6.3     From the estimated revenue, we deducted costs to complete, which include processing costs, general and administrative costs, royalties, the Colorado state production tax and the severance tax. We then deducted a markup equal to 18% of the total costs, to allow for a return to the notional purchaser of the inventory for the remaining processing required to create a saleable product.   The mark-up percentage was provided by Management and is Management's best estimate of the appropriate mark-up based on historical and forecast operating costs, and mark-up rates used by Newmont in downstream processing arrangements entered into in the past.  Additional selling costs, sustaining capital expenditure and income taxes were deducted to arrive at total after-tax operating income from the heap leach inventory, which were discounted back to present value using the same 5% post-tax real discount rate used for the valuation of the CC&V Mine.

6.4     Summarized in Table 7 below are the major assumptions used in the inventory valuation:

**Table 7 – Assumptions used for the heap leach inventory valuation**

| | |
|---|---|
| Process costs | $300 / oz (LOM ave) |
| G&A costs | 11% of process costs |
| Royalties | 1.6% of revenue |
| CO State Production Tax | 1.4% of revenue |
| Severance Tax | 0.4% of revenue |
| Sustaining capex | $2.9m / year (LOM ave) |
| Margin | 18% |
| Selling costs | $1.50 / oz |
| Silver credit | $224k / year |

6.5     We estimate the value of the fixed assets in the leach facility by prorating the total leach facility fixed asset value by a factor that takes account of the amount of ounces in the facility at the Valuation Date compared with the total ounces that will be processed through the facility over its remaining life. At the Valuation Date there were 656,728 ounces in the leach facility and Management forecast an additional 391,000 ounces to be placed on the pad over the remaining life of the facility. Therefore, the ounces in the facility at the Valuation Date represented 62.7% of the total ounces to be processed by the leach facility over its remaining life. Given that the fixed assets in the facility are required to support the processing of all ounces, we have only subtracted from the leach facility NPV 62.7% of the fixed asset value, being $72.9 million.

6.6     Based on the foregoing, the fair value of the heap leach inventory was estimated to be $217.9 million as detailed in Schedule 3.

NEWMONT_0000562205

## Mill ore stockpile

6.7     We estimated the fair value of the mill ore stockpile based on the income approach, specifically the DCF method, as set out in Schedule 4. This approach is applied by calculating revenue to be received from the sale of the finished gold product, less costs of remaining processing and selling, and an allowance for a reasonable profit margin on the completion and selling efforts.

6.8     Revenue was calculated based on our selected 2015 and 2016 gold price forecast based on analyst forecasts on or around the Valuation Date.

6.9     From the estimated selling price, we deducted the costs yet to be incurred (i.e. cost to complete).  We then deducted a markup equal to 18.3% of the costs to complete, to allow for a return to the notional purchaser of the inventory.  The mark-up percentage is consistent with the mark-up percentage used for the valuation of the heap leach inventory, as provided by Management.

6.10    Summarized in Table 8 below are the major assumptions used in the stockpile valuation:

### Table 8 – Assumptions used for the stockpile valuation

| | |
|---|---|
| Mill costs | $19.2 / ton |
| Leach costs | $193 / oz |
| G&A costs | 11% of mill and leach costs |
| Royalties | 0.9% of revenue |
| CO State Production Tax | 1.4% of revenue |
| Severance Tax | 0.4% of revenue |
| Sustaining capex | $1.8m / year |
| Margin | 18% |
| Selling costs | $1.50 / oz |
| Silver credit | $148k / year |

6.11    Based on the foregoing, the fair value of the mill ore stockpile was estimated to be $31.8 million as detailed in Schedule 4.

NEWMONT_0000562206

# 7. Valuation summary

7.1 Based on the scope of our review, our research, analysis and experience and subject to the restrictions and assumptions used, the fair value of certain assets acquired by Newmont as at the Valuation Date is set out in Table 9.

**Table 9 – Summary of Deloitte fair values**

| $'000s | |
| --- | --- |
| CC&V Mine | 807,336 |
| Mineral Interest associated with the CC&V Mine | 25,286 |
| EP | 18,622 |
| PP&E | 627,545 |
| Mill ore stockpile | 31,836 |
| Heap leach inventory | 217,879 |

NEWMONT_0000562207

# Schedules

© Deloitte LLP and affiliated entities.

Newmont USA Limited    18

NEWMONT_0000562208

## Schedule 1 – Valuation summary

US$000s

| | Book value | Fair value adjustments | Fair value |
|---|---:|---:|---:|
| **Assets** | | | |
| Current assets | | | |
| Cash | 1 | - | 1 |
| Cash from holding company | 1,856 | - | 1,856 |
| Accounts receivable and advances | 500 | - | 500 |
| Prepaid expenses | 1,675 | (1,174) | 501 |
| | 4,033 | (1,174) | 2,859 |
| Inventory | | | |
| Consumable inventory | 16,989 | (1,573) | 15,415 |
| Ore stockpiles | 27,255 | 4,581 | 31,836 |
| Heap leach inventory - current | - | 43,213 | 43,213 |
| Heap leach inventory - non-current | 630,112 | (455,446) | 174,666 |
| Mineral interest | - | 43,908 | 43,908 |
| Property, plant and equipment | 322,897 | 304,648 | 627,545 |
| Capital exploration | 8 | (8) | - |
| Mineral rights | 3 | (3) | - |
| **Total assets** | 1,001,295 | (61,853) | 939,442 |
| **Liabilities and shareholders' equity** | | | |
| Current liabilities | | | |
| Accounts payable and accrued liabilities | 54,956 | (13,512) | 41,444 |
| Short-term finance lease | 2,674 | - | 2,674 |
| Employee benefits | 1,772 | - | 1,772 |
| | 59,401 | (13,512) | 45,889 |
| Finance lease | 9,580 | - | 9,580 |
| Provision for decommissioning | 9,299 | (9,299) | - |
| Asset retirement obligation | 106,744 | (43,369) | 63,375 |
| | 185,025 | (66,181) | 118,844 |
| Shareholder's equity | 816,270 | 4,327 | 820,598 |
| **Total liabilities and shareholders' equity** | 1,001,295 | (61,853) | 939,442 |

NEWMONT_0000562209

## Schedule 2 – Valuation of CC&V Mine

US$000s

| | | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Production (payable gold)** | | | | | | | | | | | | | | | | | | | |
| Mill gold | 000 oz | 92 | 159 | 161 | 122 | 77 | 117 | - | - | 61 | 119 | 123 | 126 | - | - | - | - | - | - |
| VLF1 heap leach inventory | 000 oz | 148 | 153 | 99 | 89 | 80 | 72 | 64 | 58 | 52 | 46 | 42 | 37 | 34 | - | - | - | - | - |
| VLF2 heap leach inventory | 000 oz | - | 100 | 122 | 174 | 185 | 204 | 141 | 144 | 149 | 154 | 139 | 102 | 61 | 41 | 25 | 20 | 11 | 8 |
| Total gold | 000 oz | 240 | 411 | 381 | 385 | 342 | 392 | 205 | 201 | 262 | 319 | 303 | 265 | 95 | 41 | 25 | 20 | 11 | 8 |
| **Pricing** | | | | | | | | | | | | | | | | | | | |
| Gold | US$/oz | 1,200 | 1,200 | 1,200 | 1,150 | 1,150 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 |
| **Financials** | | | | | | | | | | | | | | | | | | | |
| Revenue | $000s | 288,575 | 493,327 | 457,143 | 442,539 | 393,737 | 490,441 | 256,611 | 251,576 | 352,439 | 399,129 | 378,899 | 330,662 | 118,544 | 51,150 | 30,940 | 24,419 | 14,193 | 10,177 |
| **Direct operating expenses** | | | | | | | | | | | | | | | | | | | |
| Open Pit Mining Cost | $000s | 83,571 | 132,097 | 117,178 | 119,400 | 110,980 | 113,974 | 115,908 | 106,328 | 104,348 | 117,401 | 113,542 | 51,811 | - | - | - | - | - | - |
| Underground Mining Cost | $000s | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Heap Leach Processing Cost | $000s | 60,624 | 84,872 | 71,103 | 67,719 | 91,557 | 99,385 | 84,303 | 80,417 | 75,860 | 63,149 | 59,952 | 19,811 | 19,811 | 19,811 | 19,811 | 19,811 | 19,811 | 19,811 |
| Mill Processing Cost | $000s | 23,701 | 33,879 | 33,879 | 33,679 | 33,679 | - | - | - | 33,879 | 33,520 | 33,879 | 32,485 | - | - | - | - | - | - |
| General & Administrative Cost | $000s | 23,447 | 28,231 | 28,202 | 27,649 | 27,830 | 27,850 | 42,920 | 42,968 | 28,326 | 27,359 | 26,876 | 25,109 | 4,808 | 4,855 | 4,949 | 4,911 | 4,033 | 4,033 |
| Total direct operating expenses | $000s | 191,344 | 279,080 | 250,453 | 268,738 | 270,046 | 275,086 | 222,531 | 209,709 | 242,404 | 241,009 | 234,249 | 129,017 | 24,708 | 24,667 | 24,760 | 24,723 | 23,844 | 23,844 |
| **Other operating expenses** | | | | | | | | | | | | | | | | | | | |
| Colorado Production Mine Tax | $000s | 4,040 | 6,907 | 6,400 | 6,465 | 5,752 | 6,592 | 3,449 | 3,361 | 4,737 | 5,364 | 5,091 | 4,444 | 1,580 | 667 | 416 | 328 | 191 | 137 |
| Colorado Severance Tax | $000s | 1,154 | 1,973 | 1,820 | 1,847 | 1,643 | 1,883 | 985 | 966 | 1,363 | 1,633 | 1,455 | 1,270 | 455 | 196 | 119 | 94 | 55 | 39 |
| Private Royalties | $000s | 4,322 | 3,730 | 6,643 | 3,001 | 3,398 | 9,064 | 6,743 | 4,780 | 7,778 | 8,619 | 7,632 | 7,005 | 356 | 203 | 140 | 144 | 100 | 191 |
| Environmental & Closure (Cash) | $000s | 561 | 388 | 1,305 | 1,133 | 3,811 | 3,971 | 1,083 | 923 | 179 | 4,820 | 5,814 | 7,899 | 5,061 | 11,721 | 20,458 | 20,497 | 22,739 | 3,332 |
| Silver credit | $000s | (900) | (1,542) | (1,429) | (1,443) | (1,284) | (1,471) | (770) | (755) | (1,057) | (1,197) | (1,136) | (980) | (356) | (153) | (63) | (73) | (43) | (35) |
| Total other operating expenses | $000s | 9,176 | 11,455 | 14,748 | 11,003 | 13,321 | 20,038 | 11,490 | 9,256 | 12,990 | 19,038 | 18,856 | 19,585 | 7,110 | 12,702 | 21,039 | 20,989 | 23,122 | 3,666 |
| Total operating expenses | $000s | 200,520 | 290,536 | 265,201 | 279,742 | 283,367 | 295,126 | 234,322 | 219,005 | 255,394 | 260,108 | 252,935 | 148,602 | 31,819 | 37,369 | 45,800 | 45,712 | 46,966 | 27,512 |
| Total operating income | $000s | 88,056 | 202,791 | 191,942 | 162,797 | 110,370 | 195,315 | 22,290 | 32,571 | 97,045 | 139,021 | 125,964 | 182,060 | 86,725 | 13,781 | (14,860) | (21,293) | (32,773) | (17,336) |
| Taxes | $000s | (12,942) | (26,509) | (19,243) | (13,123) | (581) | (3,087) | - | - | - | - | - | - | - | - | - | - | - | - |
| Net operating profit after taxes | $000s | 75,113 | 176,282 | 172,699 | 149,674 | 109,789 | 192,228 | 22,290 | 32,571 | 97,045 | 139,021 | 125,964 | 182,060 | 86,725 | 13,781 | (14,860) | (21,293) | (32,773) | (17,336) |
| Capital expenditures | $000s | (64,896) | (123,314) | (96,745) | (23,021) | (18,057) | (19,287) | (15,338) | (13,167) | (17,211) | (4,254) | (1,556) | (1,360) | (950) | (900) | - | (50) | (50) | (90) |
| Changes in working capital | $000s | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Free cash flow | $000s | (19,786) | 52,968 | 105,954 | 126,654 | 91,733 | 172,941 | 6,951 | 19,404 | 79,834 | 134,767 | 124,354 | 183,710 | 86,975 | 13,181 | (14,860) | (21,343) | (32,823) | (17,336) |
| Discount factor | 5.0% | 0.99 | 0.96 | 0.91 | 0.87 | 0.83 | 0.79 | 0.75 | 0.71 | 0.68 | 0.65 | 0.62 | 0.59 | 0.56 | 0.53 | 0.51 | 0.48 | 0.46 | 0.44 |
| **Present value of after-tax cash flow** | **$000s** | **807,336** | (19,589) | 50,665 | 96,521 | 109,885 | 75,797 | 136,094 | 5,210 | 13,850 | 54,270 | 87,250 | 76,675 | 106,117 | 48,138 | 7,021 | (7,538) | (10,311) | (15,192) | (7,619) |

© Deloitte LLP and affiliated entities.

NEWMONT_0000562210

Case 1:17-cv-08065-RA-JLC   Document 84-1   Filed 11/09/18   Page 41 of 52

## Schedule 3 – Valuation of heap leach inventory

US$000s

| | | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Inventory gold | 000 oz | 41 | 89 | 83 | 83 | 69 | 69 | 62 | 55 | 48 | 41 | 17 |
| Pricing | | | | | | | | | | | | |
| Gold | US$/oz | 1,200.00 | 1,200.00 | 1,200.00 | 1,150.00 | 1,150.00 | 1,250.00 | 1,250.00 | 1,250.00 | 1,250.00 | 1,250.00 | 1,250.00 |
| Financials | | | | | | | | | | | | |
| Gold sales | $000s | 49,512 | 107,276 | 99,025 | 94,899 | 79,082 | 85,959 | 77,364 | 68,768 | 60,171 | 51,575 | 21,490 |
| | | | | | | | | | | | | |
| Costs to complete | | | | | | | | | | | | |
| Process costs | $000s | 7,757 | 17,611 | 24,674 | 25,912 | 22,281 | 24,412 | 24,137 | 14,854 | 13,863 | 13,162 | 6,034 |
| G&A Costs | $000s | 853 | 1,937 | 2,714 | 2,850 | 2,451 | 2,685 | 2,655 | 1,634 | 1,625 | 1,448 | 664 |
| Royalties | $000s | 782 | 1,896 | 1,665 | 1,499 | 1,249 | 1,358 | 1,222 | 1,087 | 951 | 815 | 340 |
| CO State Production Tax | $000s | 693 | 1,502 | 1,386 | 1,329 | 1,107 | 1,203 | 1,083 | 963 | 842 | 722 | 301 |
| Severance Tax | $000s | 198 | 429 | 396 | 380 | 316 | 344 | 309 | 275 | 241 | 206 | 86 |
| Sustaining capex | $000s | 1,827 | 4,175 | 3,854 | 3,854 | 3,211 | 3,211 | 2,890 | 2,566 | 2,248 | 1,927 | 803 |
| Silver credit | $000s | (155) | (335) | (309) | (309) | (256) | (256) | (232) | (206) | (181) | (155) | (64) |
| Total costs to complete | $000s | 12,056 | 27,014 | 34,279 | 35,514 | 30,358 | 32,957 | 32,066 | 21,175 | 19,590 | 18,125 | 8,163 |
| | | | | | | | | | | | | |
| Margin | $000s | 18.3% | 2,741 | 8,138 | 7,763 | 8,040 | 6,871 | 7,455 | 7,249 | 4,799 | 4,415 | 4,103 | 1,847 |
| Selling costs | $000s | | 62 | 134 | 124 | 124 | 103 | 103 | 93 | 83 | 72 | 62 | 26 |
| Total operating income | $000s | 34,654 | 73,991 | 56,859 | 51,222 | 41,760 | 45,444 | 37,956 | 42,711 | 36,196 | 29,285 | 11,495 |
| | | | | | | | | | | | | |
| Taxes | $000s | (8,214) | (17,539) | (13,478) | (12,142) | (9,898) | (10,772) | (8,997) | (10,124) | (8,580) | (6,942) | (2,715) |
| | | | | | | | | | | | | |
| Net operating profit after taxes | $000s | 26,439 | 56,452 | 43,381 | 39,080 | 31,853 | 34,672 | 28,959 | 32,587 | 27,615 | 22,344 | 8,739 |
| Discount factor | | 5.0% | 0.99 | 0.96 | 0.91 | 0.87 | 0.83 | 0.79 | 0.75 | 0.71 | 0.68 | 0.65 | 0.62 |
| Present value of after-tax cash flow | $000s | 290,794 | 26,176 | 53,998 | 39,519 | 33,906 | 26,320 | 27,286 | 21,704 | 23,260 | 18,772 | 14,466 | 5,389 |
| Less: Leach facility fixed assets | $000s | 72,915 | | | | | | | | | | | |
| Fair value of heap leach inventory | $000s | 217,879 | | | | | | | | | | | |
| | | | | | | | | | | | | |
| Current portion of fair value | $000s | 43,213 | | | | | | | | | | | |

NEWMONT_0000562211

## Schedule 4 – Valuation of mill ore stockpile

US$000s

| | | | 2015 | 2016 |
|---|---|---|---:|---:|
| Stockpile gold | 000 oz | | 39 | 39 |
| **Pricing** | | | | |
| Gold | US$/oz | | 1,200 | 1,200 |
| **Financials** | | | | |
| Revenue | $000s | | 47,371 | 47,371 |
| Costs to complete | | | | |
| Mill and leach costs | $000s | | 18,091 | 14,485 |
| G&A costs | $000s | | 1,990 | 1,593 |
| Royalties | $000s | | 443 | 443 |
| CO State Production Tax | $000s | | 663 | 663 |
| Severance Tax | $000s | | 189 | 189 |
| Sustaining capex | $000s | | 1,843 | 1,843 |
| Total costs to complete | $000s | | 23,221 | 19,217 |
| Margin | $000s | 18.3% | 5,212 | 4,313 |
| Selling costs | $000s | | 59 | 59 |
| Silver | $000s | | (148) | (148) |
| Total operating income | $000s | | 19,027 | 23,929 |
| Taxes | $000s | 23.7% | (4,510) | (5,672) |
| Net operating profit after taxes | $000s | | 14,517 | 18,257 |
| Discount factor | | | 0.99 | 0.96 |
| **Total stockpile value** | **$000s** | 31,836 | **14,372** | **17,464** |

NEWMONT_0000562212

## Schedule 5 – WACC

**Purchase price allocation of Cripple Creek & Victor Gold Mining Company, Inc.**

Weighted Average Cost of Capital
As at August 3, 2015

| Ticker | Guideline Companies | Total Book Value of Debt (1) | Total Book Value of Preferred (1) | Total Market Value of Equity (2) | Total Market Value of Capital | Debt to Capital | Equity to Capital | Historical Effective Tax Rate | Levered Equity Beta (3) | Historical Debt to Capital (4) | Unlevered Equity Beta |
|---|---|---|---|---|---|---|---|---|---|---|---|
| NYSE:AEM | Agnico Eagle Mines Limited | $ 1,212 | $ - | $ 4,592 | $ 5,804 | 20.9% | 79.1% | 59.2% | 0.50 | 13% | 0.47 |
| TSX:G | Goldcorp Inc | $ 3,544 | $ - | $ 11,024 | $ 14,568 | 24.3% | 75.7% | 225.9% | 0.37 | 15% | 0.43 |
| TSX:ABX | Barrick Gold Corporation | $ 12,824 | $ - | $ 8,202 | $ 21,025 | 61.0% | 39.0% | 32.8% | 0.45 | 40% | 0.31 |
| TSX:YRI | Yamana Gold, Inc. | $ 1,542 | $ - | $ 1,886 | $ 3,707 | 49.7% | 50.3% | 40.5% | 0.31 | 19% | 0.27 |
| ASX:NCM | Newcrest Mining Limited | $ 3,098 | $ - | $ 6,215 | $ 9,388 | 33.2% | 66.8% | 31.2% | 0.40 | 23% | 0.34 |
| NYSE:NEM | Newmont Mining Corporation | $ 6,383 | $ - | $ 8,587 | $ 15,070 | 42.4% | 57.6% | 38.8% | 0.51 | 29% | 0.48 |
| TSX:K | Kinross Gold Corporation | $ 2,030 | $ - | $ 2,094 | $ 4,124 | 49.2% | 50.8% | 25.1% | 0.38 | 25% | 0.30 |
| | | | | | Average | 40.1% | 59.9% | 63.9% | 0.43 | 23.0% | 0.37 |
| | | | | | Median | 42.4% | 57.6% | 38.8% | 0.40 | 23.5% | 0.34 |
| | | | | | Selected | 20.0% | 80.0% | | | | 0.37 |

| | Low | High | |
|---|---|---|---|
| Unlevered Equity Beta | 0.40 | 0.50 | Unlevered Equity Beta = Levered Equity Beta / [1 + (1 - Tax Rate) x Debt-to-Equity)] |
| Debt-to-Equity | 25.0% | 25.0% | |
| Selected Subject Tax Rate | 38.0% | 38.0% | Long-term substantively enacted tax rate as at the Valuation Date |
| Relevered Equity Beta | 0.46 | 0.58 | Levered Equity Beta = Unlevered Equity Beta x [1 + (1 - Tax Rate) x Debt-to-Equity] |
| | | | |
| Risk Free Rate | 2.55% | 2.55% | 20 year U.S. Treasury Constant Maturity Yields as of the Valuation Date. Source: U.S. Federal Reserve |
| Equity Risk Premium | 6.25% | 6.25% | Source: Deloitte Financial Advisory research. Adjusted Ibbotson ERP for Volatility and P/E to reflect 85 year trailing market fluctuations. |
| Levered Equity Beta | 0.46 | 0.58 | |
| Cost of Equity Capital | 5.44% | 6.16% | Cost of Equity Capital = Risk Free Rate + [Equity Beta x Equity Risk Premium] |
| Unsystematic Risk Factors: | | | |
| Size Premium | 2.15% | 2.15% | Source: 2015 Duff & Phelps Valuation Handbook |
| **Subject's Cost of Equity Capital** | 7.59% | 8.31% | |
| | | | |
| Subject's Estimated Pre-Tax Cost of Debt Capital | 4.40% | 4.40% | Yield on Company's long-term debt as at the Valuation Date |
| Tax Rate | 38.00% | 38.00% | Long-term substantively enacted tax rate as at the Valuation Date |
| After-Tax Cost of Debt | 2.73% | 2.73% | |
| | | | |
| Debt-to-Capital | 20.0% | 20.0% | |
| Equity-to-Capital | 80.0% | 80.0% | |
| **Weighted Average Cost of Capital** | 6.62% | 7.19% | WACC = [(Debt-to-Capital x Cost of Debt x (1 - Tax Rate)] + [(Equity-to-Capital X Cost of Equity Capital] |
| | | | |
| Inflation | 2.00% | 2.00% | Economist Intelligence Unit US long-term inflation forecast as at the Valuation Date |
| Weighted Average Cost of Capital (Real) | 4.53% | 5.09% | |
| | | | |
| **Selected Weighted Average Cost of Capital (Real)** | 4.50% | 5.00% | |

Notes:
(1) Book value of debt used as an approximation of market value. For purposes of calculating capital structure preferred equity, if any, was added to equity at book value.
(2) Represents current stock price times common shares outstanding.
(3) Adjusted beta based on 5-Year historical Weekly data per Capital IQ.
(4) Based on 5-Year Avg. debt to market value of invested capital as at Valuation Date

Source: Capital IQ.

NEWMONT_0000562213

# Appendix A – Sources of information

In forming our estimate of the fair value of certain tangible and identifiable intangible assets of CC&V as at August 3, 2015 on behalf of Newmont, we reviewed and relied on the following:

A1. AngloGold's audited financial statements for the year ended December 31, 2014;

A2. Various historical financial information for CC&V;

A3. CC&V's 2014 tax return;

A4. CC&V's trial balance as at the Valuation Date;

A5. Fixed asset register as at the Valuation Date;

A6. Life of mine model for the mineral property as provided by Management, both AngloGold and Newmont versions;

A7. Heap leach inventory working paper as provided by Management;

A8. Ore stockpile working paper as provided by Management;

A9. Asset retirement obligation calculation working paper as provided by Management;

A10. Other assets, liabilities and net working capital adjustment working paper as provided by Management;

A11. R&R statement for CC&V Mine as at December 2014 as provided by Management;

A12. Updated R&R information prepared by Newmont for CC&V Mine as at the Valuation Date as provided by Management;

A13. Project Waltz management presentation dated March 2015;

A14. Project Waltz confidential information memorandum dated February 7, 2015;

A15. Newmont acquisition of CC&V presentation dated June 9, 2015;

A16. Project Waltz board papers and presentations;

A17. Newmont's corporate website;

A18. SNL for information on the CC&V Mine mineral property as at the Valuation Date and other guideline companies;

A19. SNL database for historical gold property transactions;

A20. Bloomberg database for financial information and commodity market prices; Capital IQ database for financial information regarding guideline companies and investments;

A21. Thompson Reuters Gold Spot Prices from April 2009 to August 3, 2015;

A22. Consensus Economics gold price forecasts as at August 2015;

A23. Analyst reports of various gold mining companies on or around the Valuation Date;

A24. Canadian Institute of Mining ("CIM") standards on mineral resource and reserves, definitions and guidelines, adopted by the CIM Council on May 10, 2014;

A25. Current and historical fixed asset registers provided by Management;

A26. A physical inspection of the machinery and equipment at CC&V, Colorado;

A27. Discussions with various facility Management personnel including Ralph Gahtan, Margaret West (Newmont Manager Accounting and Finance) and Ryan Meany (Newmont mine manager);

A28. Greg Gibson (Newmont) who sourced equipment quotes from Wagner Equipment Co., Power Motive Corporation/Komatsu for various mobile plant assets;

---

NEWMONT_0000562214

A29.    Green Guide Equipment Watch;

A30.    Autotrader.com

A31.    Bureau of Labor Statistics website;

A32.    Marshall & Swift;

A33.    Other financial and operation information as provided by Management and/or as contained in our files; and

A34.    A letter of representation from Newmont wherein they confirmed certain representations and warranties made to us, including a general representation that they have no information or knowledge of any facts or material information not specifically noted in the valuation report which, in their view, would reasonably be expected to affect the valuation conclusions expressed in this report.

NEWMONT_0000562215

# Appendix B – Mining specific definitions

In this context, the mineral reserve and mineral resource have the following definitions as set forth by the Canadian Institute of Mining (as quoted directly from the Mining Task Force)[4]:

B1.     Mineral Resource is sub-divided, in order of increasing geological confidence, into inferred, indicated and measured categories. An inferred mineral resource has a lower level of confidence than that applied to an indicated mineral resource. An indicated mineral resource has a higher level of confidence than an inferred mineral resource, but has a lower level of confidence than a measured mineral resource.

B2.     Inferred Mineral Resource is that part of a mineral resource for which quantity, grade or quality can be estimated on the basis of geological evidence and limited sampling and reasonably assumed, but not verified, geological and grade continuity. The estimate is based on limited information and sampling gathered through appropriate techniques from locations such as outcrops, trenches, pits, workings and drill holes.

B3.     Indicated Mineral Resource is that part of a mineral resource for which quantity, grade or quality, densities, shape and physical characteristics can be estimated with a level of confidence sufficient to allow the appropriate application of technical and economic parameters, to support mine planning and evaluation of the economic viability of the deposit. The estimate is based on detailed and reliable exploration and testing information gathered through appropriate techniques from locations such as outcrops, trenches, pits, workings and drill holes that are spaced closely enough for geological and grade continuity to be reasonably assumed

B4.     Measured Mineral Resource is that part of a mineral resource for which quantity, grade or quality, densities, shape, physical characteristics are so well established that they can be estimated with confidence sufficient to allow the appropriate application of technical and economic parameters, to support production planning and evaluation of the economic viability of the deposit. The estimate is based on detailed and reliable exploration, sampling and testing information gathered through appropriate techniques from locations such as outcrops, trenches, pits, workings and drill holes that are spaced closely enough to confirm both geological and grade continuity.

B5.     Mineral Reserve is sub-divided in order of increasing confidence into probable mineral reserve and proven mineral reserve. A probable mineral reserve has a lower level of confidence than a proven mineral reserve. A mineral reserve is the economically mineable part of a measured or indicated mineral resource demonstrated by at least a Preliminary Feasibility Study. This Study must include adequate information on mining, processing, metallurgical, economic, and other relevant factors that demonstrate, at the time of reporting, that economic extraction can be justified. A mineral reserve includes diluting materials and allowances for losses that may occur when the material is mined.

B6.     Probable Mineral Reserve is the economically mineable part of an indicated, and in some circumstances a measured mineral resource demonstrated by at least a Preliminary Feasibility Study (the "Study"). This Study must include adequate information on mining, processing, metallurgical, economic, and other relevant factors that demonstrate, at the time of reporting, that economic extraction can be justified.

B7.     Proven Mineral Reserve is the economically mineable part of a measured mineral resource demonstrated by at least a Preliminary Feasibility Study. This Study must include adequate information on mining, processing, metallurgical, economic, and other relevant factors that demonstrate, at the time of reporting, that economic extraction is justified.

---

[4]  CIM Standards on Mineral Resource and Reserve, Definitions and Guidelines, Adopted by CIM Council May 10, 2014.

NEWMONT_0000562216

# Appendix C – Assumptions and limiting conditions

C1.     In accordance with the engagement letter, this valuation ("Valuation") has been provided for Newmont USA Limited ("Newmont" or "Client's") financial reporting purposes in order to comply with financial accounting standards relating to business combinations, and goodwill and intangible assets issued under US GAAP. We also understand that Newmont will be using the Valuation for purposes of making a 338(h) (10) tax election for US tax purposes.

C2.     Deloitte LLP ("Deloitte") has relied upon the completeness, accuracy, and fair presentation of all the financial and other information, data, advice, opinions or representations obtained by it from Management, and its consultants and advisors (collectively, the "Information").  The Valuation is conditional upon the completeness, accuracy, and fair presentation of such Information.  Except as expressly described herein, Deloitte has not attempted to verify independently the completeness, accuracy or fair presentation of the Information.  Our analysis is confined to consideration of information provided by Management and selected secondary market research.

C3.     Management has represented and warranted to Deloitte that, other than as specifically disclosed to us in writing or as contemplated in published financial statements, all information concerning CC&V provided to us, directly or indirectly, orally or in writing, by Newmont and/or its agents and advisors in connection with our engagement hereunder:

C3.1    was with respect to any portion of the forecasts: (a) prepared using reasonable assumptions, and (b) the senior officers of Newmont have no reason to believe are misleading in any material respect.

C4.     No opinion, counsel, or interpretation is intended in matters that require legal or other appropriate professional advice.  It is assumed that such opinion, counsel, or interpretations have been or will be obtained from the appropriate professional sources.  To the extent that there are legal issues relating to assets, properties, or business interests or issues relating to compliance with applicable laws, regulations, and policies, Deloitte assumes no responsibility therefore, and assumes, in connection with such matters, other than as specifically disclosed to us, that:

C4.1.   The title to all such assets, properties, or business interests purportedly owned by CC&V is good and marketable, and there are no adverse interests, encumbrances, engineering, environmental, zoning, planning or related issues associated with these interests, and that the subject assets, properties, or business interests are free and clear of any and all liens, encumbrances or encroachments;

C4.2.   There is full compliance with all applicable federal, local, provincial or state, and national regulations and laws, as well as the policies of all applicable regulators, and that all required licences, rights, consents, or legislative or administrative authority from any federal, local, provincial or national government, private entity, regulatory agency or organization have been or can be obtained or renewed for the operation of CC&V; and

C4.3.   There are no material legal proceedings regarding the business, assets, or affairs of CC&V other than as disclosed to us.

C5.     We have relied upon Management's representation that all assets and liabilities (actual or contingent) have been fully disclosed to us.

C6.     The Valuation is rendered on the basis of securities markets, economic, financial, and general business conditions prevailing as at the date hereof and the condition and prospects, financial and otherwise, of Elgin and its affiliates as they were reflected in the Information and as they have been represented to Deloitte in discussions with Management.  In the analyses and in preparing the Valuation, Deloitte made numerous

NEWMONT_0000562217

assumptions with respect to industry performance, general business, and economic conditions and other matters, many of which are beyond the control of Deloitte, including foreign exchange rates and metal prices.

C7.   This Valuation is not intended for general circulation or publication, nor is it to be reproduced or used for any purpose other than that outlined above without the express prior written consent of Deloitte in each specific instance.  Deloitte does not assume any responsibility or liability for losses incurred by any party as a result of the circulation, publication, reproduction or use of this report contrary to the provisions of this paragraph.

C8.   The Valuation is given as of August 3, 2015 ("Valuation Date") and Deloitte disclaims any undertaking or obligation to advise any person of any change in any fact or matter affecting the Valuation, which may come or be brought to Deloitte's attention after the date hereof.  Without limiting the foregoing, in the event that there is any material change in any fact or matter affecting the Valuation after the date hereof, Deloitte reserves the right to change, modify or withdraw the Valuation.

C9.   Deloitte believes that the Valuation must be considered as a whole and that selecting portions of the analyses or the factors considered by it, without considering all factors and analyses together, could create a misleading view of the process underlying the Valuation.  The preparation of a Valuation is a complex process and is not necessarily susceptible to partial analysis or summary description.  Any attempt to do so could lead to undue emphasis on any particular factor or analysis.

C10.   In arriving at our valuation, we have relied upon the following major assumptions:

C10.1.   CC&V's unaudited balance sheet as prepared by Management accurately reflects the financial position of CC&V as at the Valuation Date under US GAAP, including working capital balances;

C10.2.   CC&V had no material unusual or non-recurring expense or revenue items during the period reviewed other than as noted herein;

C10.3.   There were no significant non-arm's length transactions during the period under review which took place at other than fair value;

C10.4.   As at the Valuation Date, CC&V had no material contingent liabilities, known environmental issues, unusual contractual obligations, litigation pending or threatened, or substantial commitments other than as disclosed in this report or the audited financial statements;

C10.5.   The LOM plan incorporated into the Valuation has been prepared and reviewed by Management and represents Management's best estimate as at the Valuation Date.

C10.6.   As at the Valuation Date, the fair value of the assets and liabilities of CC&V were approximated by their reported book values, except where noted herein;

C10.7.   As at the Valuation Date, CC&V had no redundant assets or excessive liabilities except where noted herein; and

C10.8.   Other specific assumptions as set out in the body of this report.

C11.   Should any of the above major assumptions not be accurate or should any of the information provided to us not be factual or correct, our Valuation, as expressed in this report, could be significantly different.

NEWMONT_0000562218

# Appendix D – Weighted average cost of capital

D1.     The preparation of a DCF valuation requires free cash flows be discounted to present value using a discount rate reflecting the rate of return expected by an investor, and considering the risks and opportunities associated with the underlying projections.   The required return for CC&V was selected based on consideration of a weighted average cost of capital ("WACC"), which is the blended rate that both debt and equity holders could expect from investing in CC&V.

D2.     Our WACC analysis utilizes the capital asset pricing model ("CAPM") to calculate the cost of equity. Our WACC analysis is set out in Schedule 5.

D3.     The guideline companies considered in our WACC analysis include:

D3.1     Agnico Eagle Mines Limited;

D3.2     Goldcorp Inc.;

D3.3     Barrick Gold Corporation;

D3.4     Yamana Gold, Inc.;

D3.5     Newcrest Mining Limited;

D3.6     Newmont Mining Corporation; and

D3.7     Kinross Gold Corporation.

## Cost of equity

D4.     In order to estimate an appropriate equity rate of return for use in our analysis, we employed the CAPM, which is defined as follows:

$k_e = r_f + (\beta \times rp_m) + rp_c$

Where:

$k_e$ =     Required rate of return for equity.

$r_f$  =     Risk-free rate. The risk-free rate is the rate of return available in the market on an investment free of default risk.

The selected risk-free rate of return represents the 20-year yield to maturity of long-term US treasury bonds as of the Valuation Date as reported in the Federal Reserve Statistical Release.  The risk-free rate as of the Valuation Date was 2.55%.

$\beta$ =     Beta is a measure of systematic risk, which represents the covariance of the expected rate of return on an equity investment with the rate of return on the market.

The selected beta was estimated from the unlevered equity betas of the guideline companies by comparing the monthly returns of each stock to those of the corresponding listed index for the five year period preceding the Valuation Date. The unlevered beta was re-levered using the United States statutory tax rate and estimated target capital structure yielding a levered beta in the range of 0.46 to 0.58.

NEWMONT_0000562219

| $rp_m$ = | Market equity risk premium is the extra return that the overall stock market has historically provided over the risk-free rate as compensation for market risk. |
|---|---|
| | The equity risk premium is determined by the Deloitte Financial Advisory Practice. The market equity risk premium is the adjusted Ibbotson equity risk premium for volatility and price to earnings to reflect 85 year trailing market fluctuations.   The equity risk premium as of the Valuation Date was 6.25% based on Deloitte Financial Advisory research. |
| $rp_c$ = | Unsystematic risk factors.  This premium is an expansion to the traditional CAPM and considers the specific risk that may be attributable to a company vis-à-vis its peers as a result of size, geographic risks and diversification, forecast risk and other items specific to the mine operation. |
| | We have included a size premium of 2.15% based on the 2015 Duff & Phelps Valuation Handbook. |

D5.   Employing these assumptions, the CAPM yielded cost of equity equal to 7.59% to 8.31%.

## Cost of debt

D6.   The debt component of the WACC was 4.40% (pre-tax) based on a 10 year BBB corporate bond yield as at the Valuation Date.

## Capital structure

D7.   A weighting of 80% equity and 20.0% debt was based on the industry capital structure derived from an analysis of the guideline public companies.

## WACC

D8.   Based on the foregoing, we have selected a post-tax real WACC in a range of 4.50% to 5.00%. The high end of this range is consistent with the rate used by most large gold producers in North America, based on company filing information. Given that our beta selection was based on guideline public companies with multiple assets whereas CC&V is of a single asset, and market practice is the use of a 5% post-tax real WACC, we consider it appropriate to use the high end of the WACC range for the purposes of our valuation. We have therefore used a discount rate of 5% post-tax real.

NEWMONT_0000562220

# Appendix E – Valuation of PP&E

## Valuation date

E1.    The Valuation Date is August 3, 2015 (the "Valuation Date").

## Inspection date

E2.    The CC&V facility located at Victor, Colorado, 80860, was inspected on the following dates:

    August 12 and August 13 2015 by Stephen Kerridge ASA (M&TS).

## Currency of report

E3.    Unless otherwise noted, all monetary amounts shown are expressed in United States Dollars ("US$"). Translations of monetary amounts expressed in other currencies, if any, have been made at the rate of exchange prevailing as at the Valuation Date.

## Definition of value

E4.    For financial reporting purposes in accordance with US GAAP, the Net Assets acquired are recorded at fair value. Fair value, as defined in ASC 820, Fair Value Measurements and Disclosures, is:

    *The price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.*

## Highest and best use

E5.    In the appraisal of both real property (i.e., land and buildings) and personal property (i.e., machinery and equipment, office furniture and equipment and light vehicles), the highest and best use of the real property, and machinery and equipment must be addressed.

    Highest and best use is defined in the International Valuation Standards ("IVS"), Eighth Edition as the most probable use of a property which is physically possible, appropriately justified, legally permissible, financially feasible, and which results in the highest value of the property being valued[5].

    The above definition can be also considered as follows:

E5.1    The use contemplated must be legally permissible;

E5.2    The real and personal properties must be physically suitable or capable of being physically adapted to sustain the use being contemplated;

E5.3    The use contemplated must be economically feasible (i.e., there must be a demand in the marketplace for the contemplated use, such that the real property and the personal property reflect the most economically advantageous use of the property); and

E5.4    The real and personal property must be able to provide maximum profitability.

    If any of the above criteria cannot be met, then the highest and best use contemplated becomes invalid.

---

[5] Concepts Fundamental to GAVP 6.3.

NEWMONT_0000562221

Based upon the above, and with due consideration to the special nature and/or purpose built nature of the property, machinery and equipment, we have concluded that the current use represents the highest and best use of the assets.

## Common appraisal approaches

E6.  In the appraisal of machinery and equipment, consideration must be given to the three generally recognized appraisal approaches included in the IVS which are:

E6.1  sales comparison approach;

E6.2  income approach; and

E6.3  depreciated replacement cost approach.

## Sales comparison approach

E7.  The sales comparison approach considers prices recently paid for similar or identical equipment, with adjustments made to the indicated market prices, to reflect time, condition and utility of the appraised tangible assets relative to the market comparable. When appraising tangible assets using the sales comparison approach, estimates should be based upon the sale of identical tangible assets which have been exchanged in the marketplace. Unfortunately, it is rare to find exact market sales of identical tangible assets. In practice, the market investigation will probably reveal sales of similar tangible assets, and it is the analysis of similarity upon which the estimate of value is based.

## Income approach

E8.  The income approach determines the present worth of future benefits (income) of ownership of an asset being appraised.  In order to apply the income approach, the appraiser must determine the income and expenses (net cash flows) that can be directly related to a specific asset, as well as an applicable discount rate.

The income approach is not commonly adopted by machinery and equipment valuators due to the difficulties in separately identifying income streams directly attributable to individual assets.  It can, however, be used to value a group of assets that are utilised together to produce a marketable product.

## Depreciated replacement cost approach

E9.  The depreciated replacement cost approach considers the current cost to replace the tangible asset being appraised.  From this amount, a deduction is made for depreciation or obsolescence present, whether arising from physical, functional or economic causes.  The approach is an appraisal technique that uses the concept of replacement as a value indicator and relies on the principle of substitution and that a prudent investor would pay no more for the tangible assets than the cost to reproduce or replace the tangible assets new with an identical or similar unit of equal utility.  Replacement Cost New establishes the highest amount a prudent investor would pay for the tangible assets. To the extent that the tangible assets being appraised will provide less utility than new tangible assets, adjustments for losses in value due to causes of physical deterioration and obsolescence are applied.

The following are commonly used appraisal terms in estimating value using the depreciated replacement cost approach:

**Reproduction cost new** is the cost to create a virtual replica of an asset using identical or, if identical materials are not available, similar materials.

**Replacement cost new** is the current cost of substituting an asset with another asset having equivalent utility using current rates for materials and labour.

**Physical deterioration** is the loss in value or usefulness of an asset due to the using up or expiration of its useful life caused by wear and tear, deterioration, exposure to various elements and physical stresses.

**Functional obsolescence** is the loss in value or usefulness of an asset caused by inefficiencies or inadequacies of the asset itself, when compared to a more efficient or less costly replacement asset that new technology has developed.  Symptoms suggesting the presence of functional obsolescence are excess operating cost, excess construction cost, over capacity and lack of utility.

NEWMONT_0000562222