IBE8NEWC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  NEWMONT MINING CORPORATION,

4                    Plaintiff,

5            v.                              17 Cv. 8065 (RA)

6  ANGLOGOLD ASHANTI LIMITED,
   et al.,
7
                   Defendants.
8
   ------------------------------x
9
                                        November 14, 2018
10                                      4:00 p.m.

11 Before:

12                   HON. JAMES L. COTT,

13                                      Magistrate Judge

14                        APPEARANCES

15 BALLARD SPAHR LLP
        Attorneys for Plaintiff
16 BY:  GREGORY P. SZEWCZYK

17 CRAVATH, SWAINE & MOORE
        Attorneys for Defendants
18 BY:  LAUREN A. MOSKOWITZ

19

20

21

22

23

24

25

IBE8NEWC

1           (In chambers; phone conference)

2           THE COURT:  Good afternoon.  This is Judge Cott.

3           Could you please state your name for the record for

4     the court reporter.

5           MR. SZEWCZYK:  Greg Szewczyk, with Ballard Spahr, on

6     behalf of plaintiff, Newmont Mining Corporation.  Also in my

7     office with me is Nancy Lipson, who is in-house counsel for

8     Newmont Mining.

9           MS. MOSKOWITZ:  Good afternoon, your Honor.  This is

10    Lauren Moskowitz, from Cravath, Swaine & Moore, on behalf of

11    defendants.

12          THE COURT:  Good afternoon to all of you.

13          I think just to try and dispense with something

14    straightforward, with respect to the motion to seal the Exhibit

15    D issue, I have reviewed all of that, and it seems to me that

16    the defendants' proposed redactions to Exhibit D seem

17    appropriate at this moment in time, without prejudice to them

18    being unredacted in further submissions if there is a basis to

19    do so, but the redactions seem relatively modest and related to

20    matters at least not at the heart of things at the moment.  So

21    as to that, I would just ask that the plaintiff refile with the

22    redacted version of Exhibit D that the defendants have

23    submitted to the Court.  That seems like a straightforward

24    matter.

25          Does that raise any concerns for anybody?

IBE8NEWC

1          MR. SZEWCZYK:  No concerns for Newmont, your Honor,

2     and we will certainly refile with the redacted version.

3          THE COURT:  The next thing I wanted to ask, trying to

4     deal with what I will call low-hanging fruit, potentially,

5     before we get to the nub of the matter, is I know there was an

6     application for the issuance of letters rogatory that

7     defendants filed last week.

8          Do the plaintiffs have any opposition to that for any

9     reason?  I have seen nothing filed, but I just wanted to

10     confirm that there was none.

11          MR. SZEWCZYK:  Your Honor, I have not personally been

12     dealing with that.  I believe that Newmont does plan to file a

13     short opposition, but I can't say with 100 percent certainty.

14     If we will, would you like us to file by a date certain?

15          THE COURT:  How about Friday?

16          MR. SZEWCZYK:  That should not be a problem, your

17     Honor.

18          THE COURT:  Do you know what the nature of the

19     objection would be to it?

20          MR. SZEWCZYK:  I believe that it would have to deal

21     with the presumptive deposition limits, or the deposition

22     limits that we have already agreed to and the fact that we are

23     past those.  But again, I have not been personally involved in

24     that so I don't want to say anything definitively just yet.

25          THE COURT:  OK.  I am just trying to obviate the need

IBE8NEWC

1    for a further conference, but perhaps it's something I will be

2    able to deal with without having another conference.  We will

3    see what gets filed, and then depending on what gets filed, we

4    will figure out whether we need to have another conference or

5    whether I can resolve it on the papers.

6            I gather when you say the presumptive number of

7    depositions, meaning each said has agreed to and/or has already

8    taken ten fact depositions, is that what you mean by that?

9            MR. SZEWCZYK:  That's correct, your Honor.  I also

10   believe that Mr. Leland, who filed the application, and Ms.

11   Wallace from my office are planning to confer on Friday.  So

12   this may be something that resolves itself.  I am just not sure

13   yet.

14           THE COURT:  Well, I guess what would be helpful to me

15   is either file whatever opposition there is going to be or file

16   a letter indicating that there is no opposition by Friday.

17           MR. SZEWCZYK:  All right, your Honor.  We absolutely

18   will.

19           Ms. Moskowitz, I assume that this application was

20   served on the nonparty?

21           MS. MOSKOWITZ:  Your Honor, I am not aware of the

22   facts on that.  Cravath is unable to be adverse to the

23   counterparty there and Mr. Leland is handling that so I am not

24   familiar with the status.  I apologize.  I am happy to ask Mr.

25   Leland that and we can get back to your Honor promptly on that

1   in whatever manner you prefer.

2          THE COURT:  Well, I just want to make sure that if

3   there is no objection from the plaintiff, there isn't some

4   potentially separate issue that's going to be interposed here

5   with respect to the subject of the letters rogatory.  That's

6   all.  And this was submitted, I guess, last Thursday.  So I

7   don't know how much time, if they were going to interpose

8   something, they thought they would have to do so.  Obviously

9   nothing has been submitted.  It would be helpful if you could

10  have your colleague advise the Court by the end of the week

11  whether they know of any objection that's going to be

12  interposed by the nonparty.

13         MS. MOSKOWITZ:  I will do so, your Honor.

14         THE COURT:  So with those preliminaries out of the

15  way, why don't we then I guess take up the application that the

16  plaintiff has made.

17         So, Mr. Szewczyk, my threshold question is a timing

18  one, which is, at least from the record in front of the Court,

19  it appears that you all have had this information and the

20  redactions that the defendants have interposed for a long

21  period of time, months now.  Why was there such a delay in

22  bringing this to the Court's attention when it, I think, sort

23  of postdates some depositions that would, I gather, have to be

24  reopened in the best-case scenario for you?  Why wasn't this

25  something brought to the Court's attention sooner?

IBE8NEWC

1          MR. SZEWCZYK:  Your Honor, to answer that, it really

2     goes to the redacted notes of Mr. Chancellor, who we were not

3     sure, based on the redactions and the information we had,

4     exactly who was present at that meeting.  So it wasn't until

5     Mr. Chancellor's deposition that we learned that the other

6     attendees at that meeting included individuals who were

7     full-time CC&V operators, always located at the CC&V site.  And

8     since we knew that we might need to move on that, depending on

9     the nature of Mr. Chancellor's testimony, we didn't want to

10    raise the earlier issue, the issues related to the two CC&V

11    attorneys as we defined them, so that we can put everything

12    before the Court at one time.

13          THE COURT:  All right.  Moving to the merits then, why

14    are you referring to Ms. Martelon and Mr. Christensen as CC&V

15    attorneys?  It doesn't seem to me that that's a fair

16    characterization based on the record before the Court.

17          MR. SZEWCZYK:  Your Honor, from the evidence that we

18    have seen, both from the testimony and the documents, although

19    there has been some characterizations of them as doing various

20    services on behalf of AGA North America, everything we have

21    seen has been working to help CC&V comply with various

22    different tasks; from everything we have seen, it just appears

23    that they were working full time on behalf of CC&V to the point

24    where Mr. Christensen was paid severance when he was no longer

25    retained afterwards.

IBE8NEWC

1          So from our perspective, especially given the nature

2     of the entries that we pointed to, it looks like, at least with

3     respect to those entries, they had to have been working to some

4     extent on behalf of CC&V, your Honor.

5          THE COURT:  Well, my understanding is that anything

6     where these attorneys acted on behalf of or in the interest of

7     CC&V or AGA Colorado has been produced, or would be produced.

8     And the distinction, as I understand it, that the defendants

9     are making is that, where these attorneys worked on a matter

10    for AGA that related to AGA Colorado or CC&V, then they weren't

11    producing it, and that's the distinction they are making.  And

12    why isn't that a legitimate distinction to make here?

13         MR. SZEWCZYK:  Your Honor, we actually agree on that

14    distinction.  I think the difference of opinion is to whether

15    or not they were acting entirely on behalf of AngloGold North

16    America in these specific entries.  We did not challenge every

17    single entry that involved Mr. Christensen or Ms. Martelon

18    Evans.  We only selected ones where, based on the nature of the

19    description, it seemed like, at least to some extent, they were

20    necessarily acting on behalf of CC&V or AGA Colorado.

21         Specifically, with respect to the litigations, based

22    on the descriptions in the privilege log, these appear to be

23    talking about litigations where the only defendants or parties

24    were CC&V and AngloGold Colorado.  And so based on those

25    descriptions, to us it seems, at least to some extent, it's

IBE8NEWC

1    very likely that they were acting on behalf of those

2    subsidiaries as opposed to the parent companies, your Honor.

3            THE COURT:  What is it in the privilege log

4    descriptions that gives you that impression?  Because I don't

5    quite follow that, but it may just be that I am not

6    understanding.

7            MR. SZEWCZYK:  With respect to the litigation

8    specifically, there was no parent company who was a party to

9    any of those litigations.  And so when the descriptions talk

10   about draft summaries of litigation costs, or other specific

11   matters relating to the litigation, to Newmont that indicates

12   that at least to some degree they were acting on behalf of the

13   parties to that litigation, and, therefore, that would be a

14   privilege that would be owned, at least in part, by CC&V or AGA

15   Colorado, your Honor.

16           THE COURT:  Ms. Moskowitz, can you speak to that issue

17   a little bit for me?

18           MS. MOSKOWITZ:  Yes, I can.  Thank you, your Honor.

19           The fact that a parent was not a party to the

20   litigation does not mean that the advice to the parent and

21   parent company was not provided related to those litigations.

22   So at least one document I have in front of me is advice to the

23   parent about the litigation and not advice to CC&V about the

24   litigation.

25           THE COURT:  Well, is this a question a little bit of

IBE8NEWC

the description in the privilege log perhaps not being as

comprehensive as it could be in order for the plaintiff to

understand that?

          MS. MOSKOWITZ:  I don't think so, your Honor.  Because

the one example I just gave, which is AGA PRIV 3595, which is

on page 3 from the bottom of our Exhibit A, says "privileged

communication and attachment with inside counsel providing

legal advice regarding draft AGA executive management report

concerning Mill construction status."  So I think it's pretty

clear that that is advice in connection with the parent

executive management level.  So I don't think it's vague.

          THE COURT:  I mean, I don't really know at the end of

the day the best result here.  I think that you all agree to

the general overarching principle that I would be guided by

here, which is that, as I said, and Mr. Szewczyk you agreed

with this, that where these attorneys were acting on behalf of

or in the interest of AGA Colorado and CC&V they should be

produced, and I think indeed there has been production along

those lines, but where they worked on matters for AGA that

related to AGA Colorado or CC&V they need not be produced.  And

the question is you're questioning whether what is in the

privilege log falls into category B as opposed to category A,

if you will.

          I suppose I could look at these documents, but I am

not sure I am well versed enough to be able to totally make

IBE8NEWC

1    that judgment unless the documents to some extent speak for

2    themselves.  It may be that there is a certain amount of

3    context that's required to really understand that that goes

4    beyond.  I mean, my guiding principle would be that anything

5    that the defendants have in which these attorneys acted on

6    behalf of AGA Colorado or CC&V should be produced.

7          My understanding is they have done that.  Is that not

8    right, Ms. Moskowitz?

9          MS. MOSKOWITZ:  That is correct, your Honor.  That

10   certainly was our endeavor and the examples that were given to

11   your Honor in the motion we confirmed were not of that ilk.

12         THE COURT:  So, Mr. Szewczyk, if you want me to do an

13   in camera review of these 56, I can do it.  I don't know how

14   meaningfully that will be, frankly, because it seems to me this

15   is a somewhat nuanced set of documents related to very

16   fact-specific relationships that I think the Court would be

17   hard-pressed to really be able to assess.  But if you think

18   there is some possibility I can review these -- I mean, I might

19   have to review them and then have an ex parte conversation with

20   Ms. Moskowitz about some of them related to particular

21   individuals or questions that I might have.  I can envision

22   that.  I don't know.  What do you all think?

23         MR. SZEWCZYK:  Your Honor, we certainly don't want to

24   put you through the exercise of going through dozens of

25   documents if there is going to be nuances that you may not have

IBE8NEWC

1    enough background to appreciate, and I agree with you that

2    there are probably going to be some documents of that ilk.

3          I guess the only other point that may be worth

4    bringing up is Ms. Moskowitz pointed to one of these documents

5    that was listed as the CC&V operations versus the litigation.

6    I think so far we have been focusing on the litigation.  There

7    may be some legal issues to consider with respect to both the

8    ones that have been labeled as diligence and also operations.

9    Again, this is based on our review of the privilege log's

10   descriptions, and we obviously don't have the benefit of seeing

11   the documents.  But we think under some of the guidance from

12   cases such as *Teleglobe*, and then *Bass Public* and *Polycast*, all

13   of which were cited in the motions, there are situations where,

14   even if it is a parent company's disclosure obligation, if they

15   are seeking information from the various subsidiaries in order

16   to complete the necessary filings or disclosure, it forms a

17   joint representation with respect to making that disclosure or

18   filing.  So we think some of these entries demonstrate that

19   there could be a joint representation in such situations.

20         Then just the one further point to add on that is, all

21   of the AngloGold parties, including AngloGold Colorado, had at

22   least some obligations under the purchase agreement to make

23   sure that all matters were complied with in material respects

24   and all covenants required by the agreements were performed.

25   So even if it is an AngloGold North America disclosure being

IBE8NEWC

1     discussed, AngloGold Colorado also still had a contractual

2     interest in making sure that all representations, warranties

3     and disclosures were complete and accurate.  So there may be

4     somewhat more of a legal decision you can make on that point,

5     your Honor.

6          THE COURT:  Well, my concern is the following, which

7     defendants raised in their letter, which is I think what you're

8     suggesting would require a pretty expansive interpretation of

9     what the privilege agreement that you all entered into means.

10    I mean, when I look at it, and I look at paragraph 2(e), which

11    is what you're citing in your letter, it says that the parties

12    agree that the following principles apply to privileged

13    communications that occurred prior to Newmont's acquisition.

14    And the documents we are talking about now fall into this

15    category, correct?

16         MR. SZEWCZYK:  Yes, they do.

17         THE COURT:  So this says, for preacquisition

18    communications made, for the purpose of obtaining or providing

19    legal assistance to more than one entity, the privilege is held

20    and can be waived by each such entity.

21         What is the evidence in the privilege logs to suggest

22    that these communications were made for the purpose of

23    obtaining or providing legal assistance to more than one

24    entity?

25         MR. SZEWCZYK:  Your Honor, I think the answer to that

IBE8NEWC

1    is, to extent it is relating to disclosures that are required

2    under the purchase agreement or otherwise, all of the AngloGold

3    parties, including AngloGold Colorado, which is now a Newmont

4    company, had a contractual interest in ensuring that those

5    disclosures were correct and accurate.

6         And so if the sellers wished to obtain separate

7    counsel for the entity they were selling, or to designate

8    certain attorneys and wall them off when they needed to, that

9    was their prerogative.  But because they didn't, all of the

10   attorneys were, therefore, representing all of the AngloGold

11   parties at that time, which included AngloGold Colorado, and

12   were therefore providing legal advice for AngloGold Colorado.

13        THE COURT:  Well, Ms. Moskowitz says in her letter

14   that these 56 entries all involve communications -- and I am

15   quoting -- "relating to AGA's own separate legal interests."

16   And if that's true, then I don't see how you can prevail on

17   these arguments.  I think what you are arguing is that there is

18   some blurring between AGA's own separate legal interest and the

19   other AGA's interest, some of which are now your client's

20   companies.  That's what you're arguing.  But if in fact these

21   documents all do reflect communications relating to AGA's

22   separate legal interests, then I don't see how you overcome the

23   privilege invocation.

24        MR. SZEWCZYK:  I think you have the issue right.  It's

25   a question of whether or not the legal interests are blurred,

IBE8NEWC

1     in part based on the contractual obligations that are

2     attributed to AGA parties generally as opposed to just AGA

3     North America.

4              THE COURT:  How can a court make a determination as to

5     whether some e-mail or the equivalent involves a communication

6     that wouldn't relate simply to AGA's interest but related to

7     AGA's interest as well as an AGA's subsidiary's interest?  How

8     does a court make that distinction?  I don't know how to do

9     that.

10             MR. SZEWCZYK:  Your Honor, I think our position on

11    that is that in this case, with respect to the specific

12    language under the stock purchase agreement, and I am looking

13    at section 7.02(c), the contract itself created obligations by

14    all AGA parties, including AngloGold Colorado, to ensure that

15    all obligations and covenants have been met.  So in this case,

16    if it relates to a disclosure under the stock purchase

17    agreement by any AngloGold entity, all of the AngloGold

18    entities had an interest in ensuring that that was accurate and

19    correct.

20             THE COURT:  So any advice any in-house counsel for AGA

21    may have given AGA would, by definition, redound to the

22    benefit, if I can phrase it that way, to the AGA subsidiaries

23    as well?

24             MR. SZEWCZYK:  Your Honor, at least with respect to

25    the covenants and obligations that are referred to in that one

IBE8NEWC

1   provision which puts that onus on all of the AGA parties.

2           THE COURT:  Can I ask, were Mr. Christensen and Ms.

3   Martelon already deposed?

4           MR. SZEWCZYK:  No, your Honor, they have not been

5   deposed.

6           THE COURT:  Are you planning to depose them?

7           MR. SZEWCZYK:  At this time their depositions have not

8   been noticed.

9           THE COURT:  I am trying to get a sense of how

10  significant this all is in the grand scheme of things.

11  Obviously everything is significant on some level or you

12  wouldn't seek relief from a court if it wasn't significant, but

13  why is this something that is so important to your client that

14  we are focusing on it in this fashion?  What light will it shed

15  here beyond what the vast record already provides to the

16  parties?

17          MR. SZEWCZYK:  Your Honor, with respect to Mr.

18  Christensen and Ms. Martelon Evans, a lot of the documents

19  focused in on what was known and what was going on in the

20  underlying litigation, as I will call it, which was claims

21  against a contractor named FLS.  And a key part of Newmont's

22  claims is that during this time frame when these communications

23  are going on, especially in the July of 2015 time frame,

24  AngloGold became aware of several defects and did not disclose

25  those to Newmont before the closing, as they were obligated to

IBE8NEWC

1    do.  And so based on the timing and topics in the descriptions

2    that are listed here, these documents could go to some of the

3    key aspects of the case, your Honor.

4            THE COURT:  But if these lawyers were talking with

5    each other and their AGA clients, why would that ever be

6    something that wouldn't be privileged?

7            We are back to the discussion we were having a few

8    moments ago I guess.

9            MR. SZEWCZYK:  Your Honor, I think it goes back to the

10   blurred lines.  With respect to the litigation discussions with

11   outside counsel that represented CC&V and AngloGold Colorado,

12   discussions with the outside counsel for those subsidiaries,

13   there would be some sort of blurred lines even if there was

14   some sort of independent privilege or interest of the parent

15   companies.  And the same thing goes with respect to the

16   disclosures, because of AngloGold Colorado's independent

17   interest and obligations under the stock purchase agreement,

18   those lines get blurred again.

19           THE COURT:  Ms. Moskowitz, do you want to be further

20   heard on this subject?

21           Ms. Moskowitz, are you there?

22           MS. MOSKOWITZ:  I am.  I'm sorry.  I didn't hear your

23   Honor.  I might have cut out.

24           THE COURT:  My question was, I have been talking with

25   your colleague on the other side about this, but I wanted to

IBE8NEWC

1    ask if you wanted to be heard.

2         MS. MOSKOWITZ:  There has been a lot, your Honor.  On

3    the last point of discussion, I think that this blurred line

4    argument winds up blowing the rule for all the reasons we have

5    said in our letter.  The idea that AGA couldn't get advice

6    about this litigation simply because the litigation involves

7    the asset that ultimately was sold is on the category B, I

8    think is the category your Honor had for AGA's interest being

9    advised on and not a joint representation with the subsidiary

10   that ultimately was sold.

11        And just one other point just so that I don't let it

12   go unsaid.  The stock purchase agreement, the representations

13   and warranties made in that are not made by the AGA Colorado

14   entity.  The paragraph that was read by Newmont's counsel is

15   simply a reference to all the parties have to perform all the

16   things that the contract tells those parties to do.  It's the

17   standard performance of obligation provision.  And the reps and

18   warrants made and the obligations for those reps and warrants

19   are not made by AGA Colorado.  So I don't think that argument

20   lends any credence to this blurring argument that's being made.

21   I think the line is clear.  Everyone agrees with it.  And just

22   because the subject matter of the advice might be the CC&V

23   asset that was sold does not mean that that creates a joint

24   representation for every single thing that AGA was advised

25   about CC&V from its lawyers.

IBE8NEWC

1              THE COURT:  I guess where I come out, and I have spent

2     frankly the better part of today trying to puzzle through this

3     because I think it's quite complicated on some level, but I

4     think where I come out at the moment is essentially where I

5     started, which is that my view is that anything where these

6     attorneys acted on behalf of or in the interest of AGA Colorado

7     or CC&V should be produced, and anything where the attorneys

8     worked on a matter for AGA that related to these subsidiaries

9     should not be produced, at least without more.

10             And my view is that otherwise I think the privilege

11    gets swallowed up unnecessarily and improperly, because then

12    you would have what I think the defendants characterized as an

13    overly expansive interpretation of the joint privilege here,

14    and it would mean that any time a parent sells one of its

15    subsidiaries, it in some way is giving up its right to be the

16    recipient of legal advice from lawyers without that advice

17    being privileged, and I don't think that can be right.  And

18    that, it seems to me, cuts to sort of the heart of where these

19    issues are.

20             So I think, at least on the record as it's presented

21    and on my best reading of the privilege log as it's been

22    presented, I am not prepared to compel the defendants to

23    produce more than they have.  But I want to be very clear that

24    they have to be guided by the principle that, if these

25    individuals acted on behalf of the subsidiaries, any documents,

IBE8NEWC

1    including any that may be on this log, should be re-reviewed

2    and produced if they really properly fall into that category.

3            And I think, Ms. Moskowitz, in light of our

4    conference, I would direct you and your colleagues to review a

5    further time these 56 items and verify that they all fall into

6    the category of -- and you will represent in writing to your

7    adversary on further review -- that they all fall into the

8    category, what we have called category B, where they may be

9    related to but they are not on-behalf-of-type documents, if I

10   can use that shorthand.

11           MS. MOSKOWITZ:  We will do so, your Honor.

12           THE COURT:  I think that's how I am going to leave

13   that issue for today, mindful that I think it's a complex issue

14   and I think it's a difficult issue to frankly develop the

15   record further than it is, through no fault of the plaintiffs.

16   But I do think to some extent the plaintiff is, and this sounds

17   more pejorative than I mean it, but speculating to some extent,

18   as you have to when you review a privilege log, as to what a

19   document may entail, and I am just not satisfied that there is

20   a sufficient basis in the record for me to direct that these

21   documents be compelled.

22           Why don't we talk about Exhibit B, and I gather we are

23   really talking about three particular documents now, is that

24   right, or am I misunderstanding?

25           MR. SZEWCZYK:  I think that's correct, your Honor.

IBE8NEWC

1      THE COURT:  So one of them it seems to me isn't very

2  hard to understand, but the other two I think raise more

3  questions for me.  Let me just get my papers related to that in

4  front of me.

5      So the first one, which has been Bates stamped 706104,

6  which is Docket No. 73-2 at page 16 of the ECF numbering, this

7  appears to be an e-mail from Mr. Chancellor to Mr. Christensen

8  and Ms. Martelon, all of whom are AGA in-house counsel.  So

9  why, Mr. Szewczyk, would that be something not privileged?

10      MR. SZEWCZYK:  Your Honor, I think it gets back to the

11  discussion we just had relating to the blurred lines, but I am

12  not sure that there is a lot more to be said above and beyond

13  what we have already just discussed.

14      THE COURT:  OK.  That one strikes me not a hard call,

15  at least relative to what we have discussed, and I think that

16  should be privileged.

17      The other two raise more questions for me.  Why don't

18  we look at what has been Bates stamped 737992.

19      So these are e-mails -- well, why don't you tell me

20  what these are rather than my sort of postulating what they

21  are.

22      Ms. Moskowitz, why don't you tell me what this is, who

23  these people are, and why this is privileged.

24      I mean, this is the one that says, "I don't want to

25  send hares racing so let's keep it low key."  That is sort of

IBE8NEWC

1    provocative.  I don't know what this really entails this

2    correspondence here.

3            MS. MOSKOWITZ:  The portion that we redacted, as

4    indicated in the privilege log, and I am pulling it up right

5    now, but the portion that we redacted related to a request for

6    legal advice from outside counsel by AGA employees and inside

7    counsel about a potential joint venture structure for the

8    potential sale of CC&V.

9            THE COURT:  Who are the lawyers on these e-mails to

10   whom this request is being made?

11           MS. MOSKOWITZ:  Ms. R. Sanz is Ms. Ria Sanz, who is

12   the general counsel of AGA.  And there is an outside counsel

13   Honigman, who is the outside counsel from whom that was

14   directed.

15           THE COURT:  I don't see them on this document.  I see

16   the e-mail from Chris Coetzee to Paul Dennison, copying Paris

17   Aposporis and Warren Gordon Dingwall, and then a response with

18   those same parties.  I don't see the names you just mentioned.

19           MS. MOSKOWITZ:  One moment, your Honor, if you would.

20           The text of the e-mail is referencing the request.

21   It's not in the CC line.  It's a reference to a request that

22   would be made.

23           THE COURT:  So it's a request from AGA personnel for

24   legal advice to a lawyer?

25           MS. MOSKOWITZ:  Yes.  I believe it's reflecting that

IBE8NEWC

1    legal advice would be sought from that outside counsel as

2    opposed to it being the exact transmission of that request for

3    advice.

4              THE COURT:  I am not sure, Mr. Szewczyk, this is going

5    to rock your world one way or the other frankly.  But if that's

6    what it is, then it seems to me probably properly redacted.  Do

7    you want to argue otherwise?

8              MR. SZEWCZYK:  Your Honor, I think I agree that it

9    probably doesn't rock our world one way or the other.  I think

10   by the nature of the document it seems like it may be a bit

11   aggressive to have this level of redaction if all of this could

12   be questions or reflecting legal advice from Ms. Sanz just

13   based on the subject of the e-mail.

14             THE COURT:  You may be right about that.  On the other

15   hand, the amount of print that's been redacted is rather small.

16   So I am not even sure how illuminating, whatever it may be

17   beyond, we want to talk to you about this, or can you give me

18   advice about this, it's going to be even if it were unredacted.

19   So I think I am probably going to just leave this as it is.

20             The other one is 724252?

21             MS. MOSKOWITZ:  Yes, your Honor.  I am pulling that

22   one up as well.  I believe it's a similar situation where it's

23   reflecting the legal advice of outside counsel, including the

24   Honigman folks, same as the last one, as well as Cravath, as

25   indicated in the privilege log entry.  I am just pulling it up

IBE8NEWC

1    right now to see if I can give it any more color.

2           Yes, your Honor.  I just confirmed it's saying, based

3    upon the discussion with Cravath and Honigman.  I guess we

4    could have unredacted that one piece and then redacted the

5    rest, but I am representing that the beginning of what was

6    redacted says based upon the discussion with Cravath and

7    Honigman.

8           THE COURT:  OK.  Well, I mean, if that's in fact what

9    it is, then I am not going to overrule the redaction that's

10    been made there.

11           My law clerk is telling me this document is a

12    multipage document.  So I don't have it all in front of me

13    here.

14           MS. MOSKOWITZ:  Yes, your Honor.  And it's all part of

15    the same discussion.

16           THE COURT:  OK.

17           MS. MOSKOWITZ:  It's a very long e-mail that

18    summarizes that advice.

19           THE COURT:  Mr. Szewczyk, do you want to be heard

20    further?

21           MR. SZEWCZYK:  Your Honor, the other pages that you

22    indicated that you don't have in front of you, it's multiple

23    pages fully redacted, and it is written by Mr. Dennison.  So

24    unless it's verbatim reflecting everything that was from

25    Cravath and Honigman, it would seem like some of this should

IBE8NEWC

1    not be redacted, just based on the sheer volume of redaction

2    and otherwise the topic of the e-mail.

3         THE COURT:  Ms. Moskowitz, you have the document in

4    front of you unredacted.  Is the document such that it is

5    entirely a summary of legal advice provided by counsel, is that

6    literally what it is?

7         MS. MOSKOWITZ:  My reading of this, sitting here right

8    now, is that it is a very extensive chart with questions, and

9    then the answers were filled in based on that discussion.  So

10   that is my reading of this, is that it is a lengthy summary of

11   lawyers' answers to various questions in connection with the

12   deal, yes.

13        THE COURT:  Mr. Szewczyk, I take your point, and I

14   think there has been what it seems to me like very aggressive

15   redactions in this case, but at least as Ms. Moskowitz just

16   described that last document to me, I am not prepared to

17   overrule the redactions that have been made if it is exactly as

18   described, and as an officer of the court I will accept her

19   representation to that effect.

20        So what else, if anything, is there with respect to

21   Exhibit B that we need to discuss further?

22        MR. SZEWCZYK:  Your Honor, I think the only issue, to

23   the extent it would be separate from before, would be the notes

24   of Mr. Chancellor when he was at the meeting with the CC&V

25   operators discussing problems with the CC&V Mill, and

IBE8NEWC

potentially about the CC&V litigation.  Because I know while

there are blurred lines and it can be difficult, it seems at

least in that instance there would have to be some joint

privilege, whereas Mr. Chancellor would be acting at least in

part on behalf of CC&V or AngloGold Colorado in that context of

a discussion.

THE COURT:  Ms. Moskowitz, that sounds right to me.

Why is that not correct?

MS. MOSKOWITZ:  Your Honor, I apologize.  Are we

talking about the notes?

THE COURT:  Yes.

MS. MOSKOWITZ:  Your Honor, I don't see any difference

between the situation and the other lines that have been drawn

with respect to e-mails reflecting legal advice.  The

individuals who were taking the notes in this context were

acting on behalf of AGA and not on behalf of CC&V.  And simply

because either a CC&V employee was present or Newmont was

present certainly doesn't make their notes part of a joint

privilege that was being held, and the idea that AGA couldn't

be represented separately from what was going on in that

litigation I don't think follows from the fact that they took

notes from those meetings, any more than me taking notes from a

meet and confer with Newmont would entitle them to my notes.

THE COURT:  And that's the analogy you're drawing

here, that what Mr. Christensen was doing in the notes he was

IBE8NEWC

1   making were to serve the interest of AGA and not CC&V?

2          MS. MOSKOWITZ:  Correct.

3          THE COURT:  But technically the notes might well have

4   also served the interest of CC&V, no?

5          MS. MOSKOWITZ:  Certainly, hypothetically, yes, and I

6   think we did in fact produce unredacted versions of notes when

7   that applied, similar to the line we drew on the e-mail

8   correspondence, so that when that was true they got them, and

9   when it wasn't true we didn't produce them.  So I think we

10  attempted to apply the same principle to the handwritten notes

11  as we did to the other types of documents in the case.

12         THE COURT:  All right.  Well, I think for consistency

13  sake, if nothing else, I think I will stand by my prior

14  rulings, and the principles underlying them as discussed, and

15  apply that to the notes we are talking about now and not

16  require their production either for the same reasons.

17             I guess put another way, if I am wrong, I am wrong all

18  the way around in that regard.  But I think the line drawing

19  that was made is something that seems, to my way of thinking,

20  consistent with my understanding of the law as it would apply

21  to the facts in this relatively sophisticated complex context

22  here.

23             Anything else from counsel that we need to address on

24  this call?

25         MR. SZEWCZYK:  Nothing else from plaintiff.

IBE8NEWC

1          MS. MOSKOWITZ:  Nothing from defendants, your Honor.

2     Thank you.

3          THE COURT:  OK.  I want to keep you all on the line

4     for a minute, but I am going to go off the record and tell the

5     court reporter that she doesn't need to stay.  I just want to

6     talk to you all about something else.  So I am going to excuse

7     the court reporter with your permission.  OK?

8          MS. MOSKOWITZ:  Thank you, your Honor.

9          MR. SZEWCZYK:  Thank you, your Honor.

10         (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25