UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 3/18/2020

NEWMONT MINING CORPORATION,

Plaintiff,

v.

ANGLOGOLD ASHANTI LIMITED,
ANGLOGOLD ASHANTI NORTH
AMERICA, INC., ANGLOGOLD ASHANTI
USA INCORPORATED and WAYNE M.
CHANCELLOR,

Defendants.

No. 17-CV-8065 (RA)

OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

Newmont Mining Corporation filed this action against three related corporate entities, AngloGold Ashanti Limited, AngloGold Ashanti North America, Inc., and AngloGold Ashanti USA Incorporated (collectively "AGA") as well as Wayne Chancellor, AGA Americas' Vice President and General Counsel,[1] asserting breach of contract and fraud claims arising from Newmont's purchase of a gold mine in Colorado. Now before the Court are AGA's and Chancellor's motions for summary judgment. For the following reasons, Defendants' motions are granted.

---

[1] During the relevant time period, AngloGold Ashanti Americas Inc. ("AGA Americas") was a subsidiary of AngloGold Ashanti North America, Inc. *See* AGA-Ch. Resp. ¶ 449.

## A. CC&V and the Mill

This dispute arises from the 2015 sale of the Cripple Creek & Victor Gold Mining Company ("CC&V" or the "Mine"), a gold mine located in Teller County, Colorado, from AGA to Newmont. AGA acquired a two-thirds interest in CC&V in 1999, and the remaining one-third interest in 2008, thereafter owning 100% of CC&V until Newmont's 2015 purchase. AGA 56.1 ¶ 11; Newmont 56.1 ¶ 451. As detailed more below, Newmont acquired 100% of CC&V from AGA pursuant to the Stock Purchase Agreement ("SPA"), which was signed on June 8, 2015 ("Signing"). The transaction closed on August 3, 2015 ("Closing").

### 1. MLE2 Project

In 2008, CC&V sought and received regulatory approval for its first mine life extension ("MLE1"), which extended the mine life—i.e., the time period in which the Mine is able to produce gold—to approximately 2016. AGA 56.1 ¶¶ 15-16. In 2012, CC&V sought and received regulatory approval for a second mine life extension ("MLE2"), which was expected to extend the life of the Mine until at least 2026. AGA 56.1 ¶ 17. Among other things, the MLE2 project involved the construction of a new "high grade mill" at CC&V (the "Mill"), which was intended

---

[2] These facts are undisputed unless otherwise noted, and are drawn from the parties' submissions in connection with the motions for summary judgment, including AGA's Rule 56.1 Statement, Dkt. 110 ("AGA 56.1"); Chancellor's Rule 56.1 Statement, Dkt. 116 ("Ch. 56.1"); Newmont's Rule 56.1 Statement of Additional Facts, Dkt. 121 ("Newmont 56.1"); Newmont's Response to AGA's Rule 56.1 Statement, Dkt. 122 ("Newmont AGA Resp."); Newmont's Response to Chancellor's Rule 56.1 Statement, Dkt. 124 ("Newmont Ch. Resp."); Defendants' Response to Newmont's Rule 56.1 Statement of Additional Facts, Dkt. 132 ("AGA-Ch. Resp."); the exhibits attached to the Declarations of Lauren Moskowitz in connection with AGA's motion, Dkt. 111 ("AGA Ex."), Dkt. 133 ("AGA Reply Ex."); the exhibits attached to the Declaration of Thomas Leland in connection with Chancellor's motion, Dkt. 117 ("Ch. Ex."); and the exhibits attached to the Declaration of Gregory Szewczyk in connection with Newmont's opposition to both motions, Dkt. 138 ("Newmont Ex."). Where only one party's Rule 56.1 statement is cited, the other party does not dispute the fact asserted, has offered no admissible evidence to refute the fact, or merely objects to inferences drawn from the fact. Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and denied only with a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts to be true. *See* S.D.N.Y. Local Rule 56.1(c)-(d).

to "treat higher grade ore containing relatively more gold per ton." AGA 56.1 ¶ 18; Newmont 56.1 ¶ 453.

AGA conducted a review of the MLE2 project prior to implementing it, and prepared a document known as the "Feasibility Study," dated February 2012, which set forth the "technical, engineering, and financial rationales" for the MLE2 project. AGA 56.1 ¶ 19. In particular, the Feasibility Study set out plans for the Mill's process circuit,[3] which included a "grinding circuit," a "flotation circuit," and a "leach circuit." AGA-Ch. Resp. ¶ 455; *see also* AGA 56.1 ¶ 21 ("The Mill was designed to operate as a linear 'process circuit' in which two consecutive processes primarily facilitate gold recovery: a 'flotation circuit' and 'leach circuit.'").[4] CC&V documented its progress regarding the MLE2 project in monthly "project progress reports" ("MLE2 Reports"), which included status updates on the construction and commissioning of the Mill. AGA 56.1 ¶ 46.

### 2. Design and Construction of the Mill

The Mill and its process circuit were designed by FLSmidth ("FLS"), a third-party contractor. AGA 56.1 ¶ 47. Throughout the diligence period, Newmont was aware that FLS designed the Mill. AGA 56.1 ¶ 47.

Construction on the Mill began in July 2013. AGA 56.1 ¶ 48. In September 2014, Jeff Winterton, a CC&V employee, was transferred to the Mine to work as its Process Production

---

[3] The term "process circuit" in this context refers to the "particular combination of equipment and processing methods selected for inclusion in the Mill and the sequence in which they operate." AGA 56.1 ¶ 21.

[4] Broadly speaking, the Mill's process circuit was designed to operate as follows: first, the ore body is ground into a "slurry," which is pumped through the "flotation circuit," where "chemicals cause gold-bearing slurry to float and 'tailings' slurry to sink." Newmont 56.1 ¶ 456. Next, the "gold-bearing slurry" is reground and sent to the "leach circuit," where cyanide is added as the slurry moves through six leach tanks. Newmont 56.1 ¶¶ 457, 459. That slurry is then sent to "CIP" tanks, where "gold separates from the slurry and attaches to carbon particles." Newmont 56.1 ¶ 459. The gold-bearing carbon is then "collected, washed, and processed at a refinery, while the slurry is put through another filter press." Newmont 56.1 ¶ 459. While the gold-bearing slurry is moving through the leach circuit, the "tailings slurry" is sent to a filter press, which removes water for reuse in the Mill and sends the tailings to the leach pads. Newmont 56.1 ¶¶ 457-58; *see also* AGA 56.1 ¶¶ 38-41, 44.

Manager, whereby he was "in charge of process operations and involved in the commissioning of the [Mill], which included supervising the expansion of the metallurgical test work related to the Mill." Newmont Ex. 101 ("Winterton Decl.") ¶¶ 3-4. As of September 2014, construction of the Mill was approximately 80% completed. Newmont 56.1 ¶ 469. In the fall of 2014, Winterton directed his team at CC&V to conduct additional test work for the Mill (the "Fall Test Work"). AGA-Ch. Resp. ¶ 472. As part of this additional testing, CC&V ran several types of ore and ore blends—including "Cresson Pipe," an ore named after the area of the mine from which it was drilled—through the "pilot plant," which was a "miniature version of the Mill's grinding and flotation circuits." Newmont 56.1 ¶ 477; AGA-Ch. Resp. ¶ 474.

Construction on the Mill was completed in February 2015, although "certain remediation efforts related to the Mill building structure continued thereafter." AGA 56.1 ¶ 49. The Mill's "full plant commissioning process," i.e., the "process of troubleshooting and getting the Mill up and running," began by February 2015. AGA 56.1 ¶ 61.

### 3. Estimates Regarding the Mill

"Throughput" and "recovery" are two common metrics in the gold mining industry. The term "throughput" refers to a measurement of the "rate at which a mill processes ore," which is "measured in terms of the tons of ore that can be processed through the mill during a given time increment." AGA 56.1 ¶ 20. The Feasibility Study noted that the Mill's throughput was expected to be 250 short tons per hour ("stph"). *See* AGA Ex. 70 at -8343 ("As part of MLE2, CC&V is designing and planning to construct a HG Mill to process 2.0 Mt per year at 250 tons per hour[.]"). The term "recovery" refers to a "metric that measures gold extracted from ore as a percentage of the gold contained in the ore fed into the Mill." AGA 56.1 ¶ 22. The Feasibility Study noted that

the overall projected Mill recovery was 76.5%, *see* AGA 56.1 ¶ 31, which was rounded to 76% in the text of the Study, *see* AGA Ex. 70 at -8282.

The parties' estimates differ as to the percentage of gold that would be processed from the Mill in comparison to the entire Mine. Newmont asserts that AGA had calculated that Mill processing would account for "over 55% of the total recovered gold from the Mine." Newmont 56.1 ¶ 492. AGA, however, maintains that it had calculated that "Mill processing would account for approximately 44% of the total recovered gold from the Mine, not 55%." AGA-Ch. Resp. ¶ 492. Based on the financial model that Newmont created during the diligence process, "the ore at CC&V that was intended to be fed to the Mill at the time of the CC&V Transaction constituted only 7.9% of the total ore expected to be mined at CC&V overall." AGA 56.1 ¶ 190.[5]

## B. The Sale of CC&V to Newmont

### 1. Project Waltz

In late 2014, AGA began exploring the possibility of selling CC&V, either through an outright sale or a joint venture. AGA 56.1 ¶ 68. To assist in the potential marketing and sale of the Mine, AGA hired Bank of Montreal ("BMO") as a financial adviser. Newmont 56.1 ¶ 505. Separately, in November 2014, Newmont contacted AGA to express its interest "in either a partnership, or even an outright sale" of CC&V. AGA 56.1 ¶ 74. In response, AGA informed Newmont that it was not yet in a position to discuss CC&V, but that BMO would be in contact regarding Newmont's interest. AGA 56.1 ¶ 75. According to Newmont, AGA's "core deal team" for the sale of CC&V consisted of Chancellor (Vice President and General Counsel for AGA Americas), Paul Dennison (Senior Vice President of Strategy and Business Development for AGA

---

[5] Newmont admits that AGA's characterization in Paragraph 190 is "true of tonnage," but asserts that "the contained ounces and recoverable ounces (and economic value) were much more significant," and that, according to the cited document, "the Mill represented 45.6% of the total recovered gold for the entire mine." Newmont AGA Resp. ¶ 190.

Ltd.), Charles Carter (Executive Vice President of Strategy and Business Development for AGA Ltd.), and Ria Sanz (General Counsel for AGA Ltd.). Newmont 56.1 ¶ 499.[6]

AGA's exploration of "strategic alternatives" regarding CC&V was code-named "Project Waltz," and was structured as a two-phase process. AGA 56.1 ¶¶ 68-69, 73. During the first phase, AGA sought conditional bids from a broad range of prequalified parties. Newmont 56.1 ¶ 507. Specifically, AGA, through BMO, contacted sixteen potentially interested counterparties, including Newmont, to "solicit their participation in Project Waltz" and to "gauge their interest in either a joint venture or an outright purchase of CC&V." AGA 56.1 ¶ 76. In order to participate in Project Waltz, potential counterparties were required to execute confidentiality agreements. AGA 56.1 ¶ 77. Fourteen of the sixteen potential counterparties, including Newmont, executed confidentiality agreements and entered Phase I. AGA 56.1 ¶ 78.[7] AGA also provided these fourteen parties with a document entitled "Confidential Information Memorandum" (the "CIM"), dated February 7, 2015. *See* AGA Ex. 65; *see also* AGA-Ch. Resp. ¶ 515. Newmont executed the Confidentiality Agreement on February 5, 2015 and shortly thereafter received the CIM. AGA 56.1 ¶¶ 79, 81. Among other things, the CIM indicated that construction of the Mill was expected to be completed by late January 2015 and that production from the Mill was expected to reach full capacity in September 2015. *See* AGA Ex. 65 at -2848, -2851. The CIM also stated that the "[o]verall gold recovery" from the Mill is "expected to be 76.5%," *id.* at -2890, and that the Mill is "designed to process up to 2 million tons per annum at a nominal design rate of 250 tons of ore per hour," *id.* at -2889.

---

[6] Defendants take issue with the term "core deal team." *See* AGA-Ch. Resp. ¶¶ 499-500.
[7] Newmont was represented by transactional counsel from Davis Graham & Stubbs LLP, and was advised by Citigroup Global Markets Inc., in connection with Project Waltz. AGA 56.1 ¶¶ 71-72.

At the end of Phase I, twelve parties, including Newmont, submitted non-binding bids for all of CC&V, an interest in CC&V, or both. AGA 56.1 ¶ 123. AGA and BMO then invited five of the Phase I parties, including Newmont, to participate in Phase II. AGA 56.1 ¶ 124. During Phase II, the parties were given access to additional documents through the data room, and were provided the opportunity to conduct site visits at CC&V and to submit additional due diligence requests to AGA and BMO. AGA 56.1 ¶¶ 92, 125; Newmont 56.1 ¶ 508; AGA-Ch. Resp. ¶ 509.

The data room made available to the parties in Phase II contained "thousands of documents," including the Feasibility Study, two "preliminary draft versions of the transaction agreement, one reflecting a 50% acquisition and joint venture structure . . . and one reflecting a complete 100% sale of CC&V," and all MLE2 Reports that existed prior to Closing (except for the June 2015 MLE2 Report, which was emailed to Newmont on July 28, 2015). AGA 56.1 ¶¶ 94-95, 98, 103-05. The data room was also supplemented with additional documents throughout this period. AGA 56.1 ¶ 94. Newmont, however, claims that several documents were not uploaded to the data room, including an April 2015 report authored by Rikki Mususumeli, a metallurgist participating in the AGA Young Leaders internship program from February to April 2015, a report prepared by the Advanced Mineral Technology Laboratory, Ltd. regarding two specific ore types at CC&V, and a memorandum that Jeff Winterton wrote with respect to certain challenges at the Mill. *See* Newmont 56.1 ¶¶ 583, 671, 716.

In March 2015, AGA invited the remaining Phase II parties to CC&V for a site visit. Newmont 56.1 ¶ 519. Newmont conducted its site visit on March 17 and 18, 2015. AGA 56.1 ¶ 127. During the first day of the site visit, AGA distributed to Newmont a "Management Presentation," Newmont 56.1 ¶ 529, and following the presentation, CC&V personnel led a general

tour of the site, Newmont 56.1 ¶ 533.  On the second day of the site visit, CC&V personnel led "breakout sessions" for various substantive groups.  Newmont 56.1 ¶ 535.

### 2. Newmont's Due Diligence

During Project Waltz, Newmont also conducted its own due diligence on CC&V, including by analyzing "all issues that are likely to impact the success and cost of the . . . acquisition." Newmont AGA Resp. ¶ 109.  In particular, Newmont personnel analyzed different subject matter areas with respect to CC&V, and summarized their results in "functional reports."  AGA 56.1 ¶ 109.  For instance, during Phase I, Jim Orlich, a metallurgist at Newmont, reviewed and analyzed the available test work uploaded to the data room in order to perform an "independent analysis of the Mill's design recovery and throughput," and subsequently prepared a functional report on metallurgy and processing.  Newmont 56.1 ¶ 545; AGA 56.1 ¶ 110.  His report was dated February 24, 2015, *see* AGA Ex. 25, and subsequently updated on April 12, 2015, *see* Newmont Ex. 93. Newmont's "functional representatives" also prepared "final Phase II reports on their subject matter areas," AGA 56.1 ¶ 152, all of which were combined into a Project Waltz Due Diligence Report (the "Newmont Diligence Report"), dated April 16, 2015. *See* AGA Ex. 26.  The Newmont Diligence Report indicated, based on Orlich's recovery calculations, that the "projected overall Mill recovery in Newmont's diligence model varied year-over-year and averaged 75.6%—not the 76.5% projected by AGA and CC&V—over the life of the mine." AGA 56.1 ¶ 165.  Additionally, during this period, Newmont's "Value Assurance Team" (the "VAT") created "a financial analysis for the purpose of assessing the acquisition of CC&V."  Newmont 56.1 ¶ 561.  The VAT reviewed Newmont's Mill recovery assumptions and "built a scholastic model of Mill recovery that estimated an average Mill recovery of 73.7%," i.e., "below the diligence team's 75.6% estimate."

AGA 56.1 ¶ 177; *see also* Newmont 56.1 ¶ 561 (noting that the VAT used a 73.7% recovery rate in its financial modeling).

### 3. Bottlenecks at the Mill

The parties dispute the extent to which Newmont had knowledge of certain issues and "bottlenecks" that the Mill was experiencing during the diligence period. During the March 2015 site visit, Jim Dodd (Newmont's Senior Director of Process Development) and David McLaren (Newmont's Group Executive of Processing & Metallurgy) met with Winterton for a breakout session on "processing and metallurgical matters, which included an in-office portion and a walk-through of the Mill." AGA 56.1 ¶¶ 129, 132. During this session, Winterton discussed certain "issues and bottlenecks the Mill was experiencing" as of the March 2015 site visit. AGA-Ch. Resp. ¶ 542. According to AGA, the two main "bottlenecks" during the period leading up to Closing were the filter presses and the concentrate pumps. AGA 56.1 ¶¶ 64-65.[8] AGA asserts that the filter press and the concentrate pump bottlenecks "were plainly disclosed to Newmont during due diligence," including during the March 2015 site visit. AGA-Ch. Resp. ¶¶ 709. At his deposition, Winterton testified that he had discussed the issues regarding both "filter press operations" and "concentrate pump issues" during the site visit, *see* AGA Ex. 4 (Winterton Tr.) at 57:3-10, 152:5-14, and described these issues as the "main challenges" facing CC&V at that time, *id.* at 56:10-57:2. Winterton testified further that these two issues—the filter presses and the

---

[8] *See also* Newmont Ex. 89 ("Winterton Memo") at -8071, -8073 (describing the concentrate pumps as the "principal bottlenecks limiting overall throughput through the mill" and describing the filter presses as "one of the foremost bottlenecks in the mill"); AGA Ex. 4 (Winterton Tr.) at 25:17-20 (testifying that the filtration bottleneck occurred "throughout the commissioning process" and "was a problem always"); *id.* at 149:13-18 (testifying that the "filter presses were the primary bottleneck" on the Mill's throughput). During this time, "the filter presses were unable to complete a filtration cycle within six minutes (which was the cycle time required to allow the mill to attain its full throughput capacity of 250 short tons per hour)," and instead, "cycle times were approximately 10 minutes through and after closing." AGA 56.1 ¶ 63. As to the concentrate pumps, which move material through the process circuit, the bottleneck occurred "because the pumps initially were undersized" and therefore the "concentrate pumps also acted as a bottleneck on throughput during the commissioning process." AGA 56.1 ¶ 65.

concentrate pumps—were the "primary bottlenecks" preventing the Mill from reaching nameplate capacity at the time of Closing and thereafter. *Id.* at 128:23-129:19. Winterton also testified that he had discussed with Newmont during its site visit the fact that the 76.5% recovery projection "was going to be a challenge." AGA Reply Ex. 137 (Winterton Tr.) at 166:1-167:1.

Newmont admits that Winterton told its personnel "of his knowledge of certain issues or bottlenecks as of March 2015," but asserts that, "at that point, CC&V still expected the operational problems would be remedied through the commissioning process." Newmont 56.1 ¶ 542. Newmont asserts further that, although the Mill was "barely up and running" at the time of the site visit and was "not expected to be running at design throughput or recovery due to the early stage of commissioning," mills nonetheless typically "ramp up" over several months before reaching design capacity. Newmont 56.1 ¶¶ 521-22; *see also* Winterton Decl. ¶ 5 (explaining that "[d]uring the commissioning phase, it is normal to encounter issues with new equipment," but "[t]hese commissioning issues are often not indicative of design defects and are commonly encountered in the normal course of commissioning"); *id.* ¶ 7 ("It is also common during commissioning for a mill to run at lower than design throughput and achieve less than design recovery rates.").[9] Newmont maintains that "de-bottlenecking challenges are not indicative of design defects, but, rather, are simply an on-going process during commissioning and the greater life of any Mill." Newmont 56.1 ¶ 543; *see also* Newmont Ex. 10 (Guenther Tr.) at 128:23-129:14 (explaining "de-bottlenecking" as an ongoing process that would continue even after the commissioning phase). AGA nevertheless asserts that, although de-bottlenecking is an ongoing process, it does not follow

_____

[9] In his declaration, Winterton also states that "low recovery and throughput rates alone during commissioning would not result in Newmont knowing that AGA built the wrong type of mill for the ore body at CC&V." Winterton Decl. ¶ 8

that "any bottleneck on throughput that exists *necessarily* is routine and not indicative of design deficiencies." AGA-Ch. Resp. ¶ 543.

### 4. Bidding Process

On April 30, 2015, at the conclusion of Phase II, four of the five remaining participants, including Newmont, submitted binding bids for all of CC&V, an interest in CC&V, or both. AGA 56.1 ¶ 191. Newmont's initial binding bid was to acquire 100% of CC&V for $800 million, plus a 2% "net smelter royalty" ("NSR") on the potential future underground resources and price participation for AGA on revenue generated above a "$1,400 an ounce gold price," with "the two capped at $100 million." Newmont 56.1 ¶ 584. Newmont contends that on May 1, 2015, Srinivasan Venkatakrishnan ("Venkat"), AGA's Chief Executive Officer, "reached out to Newmont" and verbally "indicated he would prefer a higher bid." Newmont 56.1 ¶ 585. On May 8, 2015, AGA, through BMO, formally "requested that Newmont alter its bid by increasing the cash consideration component to $875 million, removing the cap on the royalty component and expanding the royalty component from underground production to all production." AGA 56.1 ¶ 193.

On May 16, 2015, Newmont submitted a revised bid. AGA 56.1 ¶ 194. In its revised binding bid, which was "conditioned on exclusivity," Newmont increased its cash component to $820 million, uncapped and increased the percentage of the royalty, and removed the price participation component. AGA 56.1 ¶ 194. According to Newmont, at the time it submitted its revised bid, its average net present value ("NPV") for CC&V was $790 million. Newmont 56.1 ¶ 593. Newmont's "potential fair value" estimate of CC&V, however, was $890 million, which included $100 million in potential upside that Newmont had identified associated with cost and

efficiency improvements ($70 million), mine plan optimization ($10 million), and improved mill recoveries ($20 million). Newmont 56.1 ¶ 593.[10]

On May 22, 2015, AGA accepted Newmont's revised bid, and the parties began negotiating "the remaining aspects of the definitive agreement." AGA 56.1 ¶ 195.

### 5. Execution of the SPA

On June 8, 2015, AGA and Newmont executed the SPA. *See* AGA Ex. 1 ("SPA"); *see also* AGA 56.1 ¶ 215.[11] Broadly speaking, and as relevant to the instant motions, Article IV contains a list of representations and warranties that AGA made to Newmont, and Article VI contains certain covenants. Among other things, AGA made the following representations and warranties in Article VI:

- That, except as set out in Schedule 4.14, no "Company Material Adverse Effect," as defined in Section 10.05, had occurred since December 31, 2014. *See* SPA § 4.14.

- That Schedule 4.12 set forth a "true and complete list of each . . . threatened material Proceeding," either pending or known to AGA, brought by or against CC&V. *See* SPA § 4.12. Schedule 4.12, in turn, listed four proceedings, including that two subcontractors, Ames Construction, Inc. and Northern Electric, Inc., had "threatened litigation related to [their] role[s] in connection with the High Grade Mill Project," and that "CC&V ha[d] threatened litigation against [FLS] related to its role in connection with the High Grade Mill Project." *See* AGA Ex. 2 (Disclosure Schedule) at 4.[12]

In Article VI, the parties agreed to the following covenants:

- AGA agreed to "promptly advise" Newmont in writing if, among other things, "(iii) any material Proceeding [was] commenced or threatened against it . . . [that] could reasonably be expected to have a Seller Material Adverse Effect or Company Material Adverse Effect, (iv) [there was] any failure . . . to comply with or satisfy in all material respects any covenant, condition or agreement to be complied with

---

[10] This $100 million in potential upside did not include potential value associated with the possibility of shipping concentrates to Newmont's facility in Nevada. Newmont 56.1 ¶ 594.

[11] Chancellor did not sign the SPA. Ch. 56.1 ¶ 368.

[12] Section 9.02(a)(i) provides, in relevant part, that AGA shall indemnify Newmont for any losses and claims arising from "any representation or warranty" of AGA "contained in [the SPA] not being true and correct when made or at the Closing." *See* SPA § 9.02(a)(i).

or satisfied under [the SPA], [or] (v) . . . any matter or event that is material to the business, condition (financial or otherwise), working capital, or results of operations" occurred with respect to the Mine.  *See* SPA § 6.01(b)(iii)-(v).

- AGA agreed to afford Newmont "reasonable access, upon reasonable notice during normal business hours during the period prior to the Closing, . . . to the personnel[,] properties, books, contracts, commitments, Tax Returns and records of or pertaining to [the Mine]" and to "furnish promptly to [Newmont] any information concerning [the Mine]" that Newmont "may reasonably request" prior to Closing, "provided, however, that such access does not unreasonably disrupt the normal operations of the [the Mine]."  *See* SPA § 6.02.[13]

Section 7.02 provides that Newmont's obligation to purchase CC&V would be subject to the satisfaction of certain conditions, on or prior to Closing, including (1) that the "representations and warranties" that AGA made in Article IV, including in Section 4.14(a), were "true and correct as of the Closing Date as though made on the Closing Date," SPA § 7.02(b)(i); and (2) that AGA had "performed or complied in all material respects with all obligations and covenants required by [the SPA] to be performed or complied with . . . by the time of the Closing," SPA § 7.02(c).  Section 7.02(c) also provides that Newmont would receive a "certificate signed by an authorized officer of [AGA] to such effect."  *Id.*

The SPA does not, however, contain any "covenants, representations, warranties or guarantees" concerning the performance of the MLE2 Project, the Mill itself, any equipment within the Mill, the Mill's throughput, the Mill's recovery, or the status of the Mill commissioning. AGA 56.1 ¶¶ 246-48, 251.  Moreover, the SPA "contains no contractual guarantee that the Mill will perform at a specific or minimum throughput rate," or that "the Mill will have a specific or minimum recovery rate."  AGA 56.1 ¶¶ 249-50.

---

[13] Notwithstanding the indemnification provisions set forth in Section 9.02, Section 9.02(b)(vi) provides that AGA is not required to indemnify Newmont for, and does not have any liability with respect to, any breach of Sections 6.01(b) or 6.02.  *See* SPA § 9.02(b)(vi).

On July 28, 2015, after the SPA was executed, Doug Livermore, Newmont's Regional Project Director of North America, emailed other Newmont personnel about his calculations for "possible impacts to 2016 CC&V production based on reduced throughput for the Mill." AGA Ex. 57 at -0534. In the handwritten notes attached to his email, Livermore wrote that the "Mill is currently achieving 70-80% of nameplate capacity," and it was "[e]stimate[d] [that] it will take [the] first half of 2016 to correct." *Id.* at -0535.

On July 30, 2015, AGA and Newmont entered into the Amendment to the Stock Purchase Agreement ("SPA Amendment"), which amended and restated several sections and schedules of the original SPA signed on June 8, 2015. Newmont 56.1 ¶ 743. The SPA Amendment did not amend Schedule 4.14 to disclose any Material Adverse Effects. Newmont 56.1 ¶ 744.

### 6. Closing

On August 3, 2015, the CC&V transaction between AGA and Newmont closed. AGA 56.1 ¶ 286. Chancellor attended the Closing in New York. Newmont 56.1 ¶ 746. At Closing, AGA provided Newmont with a "compliance certificate," signed by Ben Guenther, AGA-NA's President, Newmont 56.1 ¶¶ 747, 749, in which AGA certified that the representations and warranties it had made in various sections of the SPA, including Section 4.14(a), were "true and correct" as of Closing, and that AGA had "performed and complied in all material respects with all obligations and covenants required" by the SPA "to be performed or complied with" by Closing. *See* Newmont Ex. 103 at -4264.

At the time of Closing, Mill commissioning was not yet complete, and the Mill was not achieving 250 stph throughput. AGA 56.1 ¶ 67.

### C. Key Reports Prepared During and After the Diligence Period

#### 1. Mususumeli Report

In April 2015, Rikki Mususumeli, a metallurgist participating in AGA's Young Leaders internship program from February to April 2015, completed a report that analyzed the recovery characteristics of Cresson Pipe ore, one type of ore at the Mine, and investigated "gold recovery in ore from the Cresson Pipe formation." Newmont 56.1 ¶ 573; AGA-Ch. Resp. ¶ 573. On April 23, 2015, Mususumeli submitted his report (the "Mususumeli Report"), to Winterton, Lowe Billingsley (CC&V's General Manager at the time), and Kevin Riley (CC&V's Operational Manager at the time). Newmont 56.1 ¶ 575; *see* Newmont Ex. 25 (Mususumeli Report). On April 27, 2015, Winterton summarized the "import of the Mususumeli Report" in a memo sent to Billingsley and Riley. Newmont 56.1 ¶ 580. The following day, Billingsley distributed the Mususumeli Report and Winterton's summary to Helcio Guerra (who Newmont states was Senior Vice President of Operations for AGA Americas) and Ron Largent (AGA's COO). Newmont 56.1 ¶ 581; *see* Newmont Ex. 25 at -6955. In his cover email, Billingsley noted that "[t]he material impact to CC&V is believed to be very low[.]" Newmont Ex. 25 at -6955.

AGA did not upload the Mususumeli Report or Winterton's summary to the data room or otherwise provide it to Newmont before Closing. Newmont 56.1 ¶ 583. The parties dispute whether AGA was obligated or required to do so. Newmont asserts that the Mususumeli Report was "responsive to [its] request for test work, more detailed and or frequent reports with regard to the status and progress of [the] Mill [s]tart up," as well as for "all available geo-chemistry information" related to the ore planned to be fed into the Mill. Newmont 56.1 ¶ 582. AGA asserts that the existence of the Mususumeli Report was "repeatedly disclosed in four consecutive monthly MLE2 reports," which stated that "an 'AGA Young Leader' candidate was working on a project

focused on 'improving recovery in Cresson Pipe,'" and that if Newmont believed the Mususumeli Report was responsive to any of its requests, or that Cresson Pipe was relevant to its assessment of CC&V, Newmont would have specifically asked for that report.  AGA-Ch. Resp. ¶ 582.  AGA also maintains that the Mususumeli Report "merely confirmed the findings previously made available to Newmont in the Fall Test Work that Cresson Pipe ore exhibited poor recovery in the leach circuit."  AGA-Ch. Resp. ¶ 573.  AGA states that Cresson Pipe represents "only a miniscule portion of the relevant ore body" at the Mine.  AGA-Ch. Resp. ¶ 573.  For instance, J. Todd Harvey, one of Newmont's experts, estimated that Cresson Pipe constituted no more than 3.9% of the ore expected to be fed to the Mill at the time of the transaction, *see* AGA Reply Ex. 155 (Harvey Rebuttal Report) at 29 n.6, and Winterton testified at his deposition that Cresson Pipe constituted "less than 1 percent" of the overall ore body at CC&V.  *See* AGA Reply Ex. 137 (Winterton Tr.) at 193:7-12.

### 2.  AMTEL Report

AGA also engaged a third party, the Advanced Mineral Technology Laboratory, Ltd. ("AMTEL") to perform a study of two specific ore bodies at CC&V: Cresson Pipe and Dante.  Newmont 56.1 ¶ 659; AGA-Ch. Resp. ¶ 659.  AMTEL's analysis culminated in a report, dated June 17, 2015, entitled "AMTEL Deportment of Gold in Cripple Creek & Victor Future Feeds Report" (the "AMTEL Report").  Newmont 56.1 ¶ 659; *see* Newmont Ex. 49 (AMTEL Report). In particular, the AMTEL Report analyzed how these two different ore types, Cresson Pipe and Dante, "would respond to either direct cyanidation or flotation recovery of gold."  Newmont 56.1 ¶ 660.

The AMTEL Report concluded that the ideal "indicated processing route" for the Cresson Pipe and Dante ore samples that it tested would include a "pressure oxidation process" after the

flotation circuit, meaning that the "indicating processing route" would include a "pressure oxidation process" step between the flotation and leach circuits. Newmont 56.1 ¶ 664; AGA-Ch. Resp. ¶ 664. But the Mill, as constructed, "did not have a pressure oxidation process to convert sulfide to oxide for the flotation concentrate." Newmont 56.1 ¶ 665. AGA states that the 2012 Feasibility Study specifically noted that "an autoclave pressure oxidation process would be cost prohibitive, both in terms of the capital cost to build it and the ongoing operating costs to run it." AGA-Ch. Resp. ¶ 455; *see* AGA Ex. 70 at -8235 ("The capital and operating costs for an autoclave were far higher than vat leaching, so the autoclave approach was rejected.").

The parties attach different significance to the AMTEL Report. According to Newmont, the AMTEL Report concluded that Cresson Pipe had low cyanide leach recovery, and that Cresson Pipe had "similar characteristics to Dante and other ores at CC&V." Newmont 56.1 ¶ 661. AGA maintains that the AMTEL Report did not conclude that Cresson Pipe and Dante shared "similar characteristics" or that Cresson Pipe ore "had similar 'characteristics' to 'other ores at CC&V,'" as it did not test such "other ores." AGA-Ch. Resp. ¶ 661. According to AGA, the AMTEL Report noted only that the "rock mineralogy" of the Cresson Pipe ore sample was "broadly 'similar' to that of the Dante ore sample." AGA-Ch. Resp. ¶ 661. AGA also contends that, like the Mususumeli Report, the AMTEL Report "merely confirmed the findings previously made available to Newmont in the Fall Test Work that Cresson Pipe ore exhibited poor recovery in the leach circuit." AGA-Ch. Resp. ¶ 661; *see also* AGA-Ch. Resp. ¶ 663 (stating that both the Mususumeli Report and the AMTEL Report "merely confirmed the low leach recovery for Cresson Pipe" that had been determined in prior test work). In a June 23, 2015 email, Winterton wrote that the results of the AMTEL Report "pretty much confirm that the Cresson Pipe is a waste unless [they] can do something else with it." *See* Newmont Ex. 55 at -4359. Winterton also stated that

his opinion was that "[t]here is no way to grind [Cresson Pipe ore] fine enough to liberate" the gold. *Id.*

AGA did not upload the AMTEL Report to the data room or otherwise provide it to Newmont prior to Closing. Newmont 56.1 ¶ 671. Similar to the Mususumeli Report, the parties dispute whether AGA was obligated or required to provide Newmont with the AMTEL Report prior to Closing. Newmont asserts that the AMTEL Report was responsive to its "outstanding diligence request" for "all available geo-chemistry information" related to the ore planned to be fed into the Mill. Newmont 56.1 ¶ 670. AGA disputes that the AMTEL Report was responsive to the request cited by Newmont, and maintains that the existence of the AMTEL Report was "disclosed in two consecutive monthly MLE2 reports." AGA-Ch. Resp. ¶ 670. AGA also maintains that if Newmont believed the AMTEL Report was responsive to any of its requests, it would have specifically asked for the report. AGA-Ch. Resp. ¶ 670. Instead, AGA contends, Newmont "did not bother to ask AGA for the AMTEL Report or otherwise exhibit any interest in it." AGA-Ch. Resp. ¶ 670.

### 3. Winterton Memo

Ben Guenther visited CC&V on June 16, 2015. Newmont 56.1 ¶¶ 679-80. Shortly thereafter, he instructed the CC&V management team to create a "ramp up implementation plan" for the Mill. Newmont 56.1 ¶ 683. CC&V personnel subsequently prepared a "draft ramp up plan" following a template that Guenther had provided. Newmont 56.1 ¶¶ 684-85. On July 16, 2015, Guenther requested an updated draft of the ramp up plan. Newmont 56.1 ¶ 701. The following day, Ryan Miles, AGA's Principal Advisor for Integrated Planning, sent Guenther a revised draft of the plan, which was now entitled "Mill Ramp-Up Plan Progress Summary and Execution Plan." Newmont 56.1 ¶¶ 702-03; *see* Newmont Ex. 62. The draft sent to Guenther on

July 17, 2015 had been "primarily revised" by Winterton and included "several pages of substantive discussion of the Mill's current status and performance." Newmont 56.1 ¶ 704.

The ramp up plan was finalized in July 2015; the final version is referred to as the "Winterton Memo." Newmont 56.1 ¶ 708; *see* Newmont Ex. 89 ("Winterton Memo"). The Winterton Memo detailed problems that had arisen in the Mill, including various defects with the Mill's gravity circuit, flotation circuit, concentrate pumps, leach circuit, filter presses, and chutes and conveyers. Newmont 56.1 ¶ 710; *see also* Winterton Decl. ¶ 11 ("I drafted the status report on the Mill ramp-up which included a substantive discussion of the numerous problems that had arisen in the Mill and CC&V's conclusions on the import of those problems.").[14] The first page of the Winterton Memo, for instance, stated: "Throughput through May 2015 met targets, but has since waned because of significant challenges faced in key areas of the plant. The maximum sustainable throughput that can be regularly achieved and controlled is just over 200 stph; 20% below nameplate design." Winterton Memo at -8067. As to recovery, the Winterton Memo noted that the "[b]udget production estimates are based on a blanket overall recovery of 76.5%," but that "[s]ubsequent laboratory testing, as well as operational data[,] shows that this assumption is not valid." *Id.* at -8075. The Winterton Memo also described the concentrate pumps and the filter presses as the "principal bottlenecks limiting overall throughput through the mill" and "one of the foremost bottlenecks in the mill." *Id.* at -8071, -8073.

In his declaration filed in connection with Newmont's opposition briefs (the "Winterton Declaration"), Jeff Winterton states that the Winterton Memo concluded that, "based on the totality

---

[14] Among other things, the Winterton Memo reflected that (1) the Mill faced "significant challenges" in "key areas of the plant," (2) a problem with the leach circuit "will only get worse as throughput is increased," (3) the "CIP feed pumps" still could not "meet current throughput" and the "likelihood of the pumps meeting designed throughput [was] very low," (4) it was "uncertain if [the 1200 filter presses] will be able to achieve design throughput" and "[a]dditional work" would be necessary to "fully characterize/optimize the 1200 presses," and (5) the "blanket overall recovery" assumption of 76.5% was "not valid." Newmont 56.1 ¶ 709; AGA-Ch. Resp. ¶ 709.

of problems and CC&V's attempts to fix those problems, the Mill—as a total unit—suffered from such severe deficiencies that it would never be capable of reaching design recovery or throughput without significant modifications." Winterton Decl. ¶ 15. He asserts that this conclusion was based on "the Mill's operational data and results through July 2015, CC&V's months-long attempts to fix the various problems, and test work presented in April and June of 2015 (including the reports by Rikki Mususumeli and AMTEL)." *Id.* ¶ 16.

On August 4, 2015, the day after Closing, Winterton sent a copy of the Winterton Memo to members of Newmont's metallurgic team. Newmont 56.1 ¶ 751. AGA did not provide a copy of the Winterton Memo to Newmont prior to Closing. Newmont 56.1 ¶ 716. According to Winterton, he did not provide this document to Newmont until after the transaction closed because he "was instructed by AGA at the outset of the sales process not to provide any additional test work, reports, or operational data directly to other parties unless specifically asked to." Winterton Decl. ¶ 14. Moreover, Winterton asserts that he "included extensive details regarding the multitude of problems with the Mill" in the report because he wanted his new employer, Newmont, "to know that [they] understood the extent of the problems and were anxious to try to start remedying them." *Id.* ¶ 12.

### 4. June MLE2 Report

On July 7, 2015, Terry Briggs, a Newmont employee, emailed Korey Christensen, AGA's in-house counsel, to follow up on Newmont's request for the MLE2 Report for June 2015, among other things. Newmont 56.1 ¶ 717. On July 9, 2015, Christensen responded, copying Chancellor, and stated that the June MLE2 report was not yet ready, but that they would pass it along when it was. Newmont 56.1 ¶ 718. According to AGA, drafts of the MLE2 reports were circulated internally among AGA-NA and CC&V personnel around the middle of the succeeding month.

AGA-Ch. Resp. ¶ 719. Newmont states that these reports were typically sent by Jose Barron, AGA's Project Manager, or Douglas Nespoli, on behalf of Barron. Newmont 56.1 ¶ 719. Nespoli sent the June MLE2 Report to Chancellor and various others on July 15, 2015. *See* Newmont Ex. 45. Nespoli's email did not indicate whether the attached June MLE2 report was completed or was still a draft. Newmont 56.1 ¶ 721.

On July 23, 2015, Briggs asked Chancellor for a copy of the June MLE2 report. *See* Newmont Ex. 46 at -5438. Chancellor responded that same day, stating that he "checked yesterday while at CC&V and the report is not completed." *Id.* Briggs asked for a copy of the report again on July 24, 2015, noting that Newmont would accept a "Project report" rather than the "full site report" if necessary. *See* Newmont Ex. 41 at -5141. On that same day, Chancellor forwarded Briggs' email to Billingsley, asking him to help secure the report, and Billingsley responded by attaching the June MLE2 report. *See* Newmont Ex. 108 at -4327. The report that Chancellor received from Billingsley on July 24, 2015 was exactly the same as the report that Nespoli circulated on July 15, 2015. Newmont 56.1 ¶ 727.[15]

Before sending the report to Newmont, on July 27, 2015, Chancellor responded to Billingsley's July 24, 2015 email, stating that he did not see "any reference to the various equipment issues being addressed by Kevin [Riley] and his team (e.g. Jeff Winterton)," and asking whether he had "miss[ed] it," and if not, whether there should be "some reference to the issues in terms of potential design concerns, inadequate specs, etc." *See* Newmont Ex. 41 at -5141. Billingsley responded that Chancellor was correct; the report did not reference these "various equipment issues." *See id.* at -5140. As to these issues, Billingsley also stated, "I don't believe that Newmont can claim not being on notice – Ron [Largent (AGA's COO)] has spoken with

---

[15] Although Paragraph 727 states that Nespoli's email was circulated on "June 15, 2015," and the statement is undisputed, the Court assumes that the parties intended to write "July 15, 2015." *See* Newmont Ex. 45.

[Newmont's] COO about the major challenges (ore body model and mill filters). I (and Kevin [Riley] spoke at length and toured with Jack Henris through the plant and discussed all of the major challenges. I am certain that Doug Livermore will also hear of the mill challenges when he is on site Thursday." *Id.*[16] When Chancellor asked whether Billingsley therefore recommended "not to add anything to the report," Billingsley responded "not necessarily," and asked Chancellor how he thought they could add language that would "capture what is material and appropriately address it, without it becoming a 'mega' publication getting into all of the details." *Id.* Chancellor suggested adding the following language to the end of Section 4.1.2 in the June MLE2 Report: "Operational adjustments to system performance continue, to include addressing certain equipment deficiencies associated with design parameters, vendor specifications, and/or installment anomalies." *Id.* This language was ultimately added to Section 4.1.2 of the June MLE2 Report, and on July 28, 2015, Chancellor sent Briggs a copy of the report. Newmont 56.1 ¶ 739; Ch. 56.1 ¶ 417.

### D. Potential Claims Involving CC&V

#### 1. Description of the Claims

In late 2014 and early 2015, several potential claims arose involving CC&V and the contractors and subcontractors involved in the design and construction of the Mill, including FLS. In November 2014, CC&V learned that there were certain structural defects with the Mill, and suspended activities at the Mill from November 15, 2014 to November 21, 2014. Newmont 56.1 ¶ 481; AGA-Ch. Resp. ¶ 483. Specifically, "flaws were discovered in the design of the Mill building structure that prevented the Mill from being operated in certain weather conditions," such as "high winds" or "certain snow loads." AGA 56.1 ¶ 50; Newmont 56.1 ¶ 482. At this point,

---

[16] Newmont claims that Chancellor "did not take any actions to investigate" whether these statements were accurate. *See* Newmont 56.1 ¶ 730.

FLS admitted that there was an error in the Mill's design, Ch. 56.1 ¶ 376, and began working to "retrofit" the building to ensure that "it would safely withstand snow, wind, and other loads and forces." Newmont 56.1 ¶ 485. In December 2014, the Mill was "temporarily configured to allow operation of the grinding and gravity circuits with the aim of producing 'first gold,'" but approximately four hours into the run, "the trunnion bearing on the discharge end of the rod mill spun out of the base leading to a complete failure of the rod mill bearings and trunnions." Newmont 56.1 ¶¶ 494-95. Following this incident, CC&V worked with FLS and other third parties to "repair and resurface the Mill trunnions, replace the bearings, and upgrade the high and low pressure lube systems," Newmont 56.1 ¶ 496, which took six weeks to complete, AGA-Ch. Resp. ¶ 497. On January 26, 2015, Chancellor informed AGA's outside counsel and Meghan Martelon, an AGA-NA attorney, that he needed to "stay abreast of matters as they develop with FLS." *See* Newmont Ex. 32 at -9961.

Separately, in December 2014, two of the Mill's subcontractors, Ames Construction, Inc. and Northern Electric, Inc., asserted claims against CC&V arising out of "alleged delays and increased costs of performance incurred as a result of allegedly improper, deficient or late design work." Ch. 56.1 ¶ 378; AGA 56.1 ¶ 211.

In addition to the claims described above, by June 2015, CC&V also began exploring "claims against FLS relating to certain aspects of the Mill's equipment, which also had been designed by FLS." Ch. 56.1 ¶ 380. According to Newmont, in June 2015, the Mill's process circuit suffered "various failures," and AGA thus began "investigating its rights" to recover damages from FLS related to the "faulty design of the Mill structure and equipment." Newmont 56.1 ¶ 686. AGA retained Davis Graham & Stubbs ("DGS") in connection with CC&V's potential claims against FLS. *See* Ch. Ex. 119.

## 2. "Designated Matters" Provision

Prior to signing the SPA, Newmont became aware that AGA "was considering a potential claim against FLS that related to the problems with the structure of the Mill in that it could not withstand snow and high winds," as well as "two other claims that subcontractors were asserting against CC&V for delay damages." Newmont 56.1 ¶¶ 619-20.[17] Accordingly, prior to Signing, the parties discussed how to allocate obligations and liabilities between them with respect to potential claims asserted by or against CC&V by contractors or subcontractors involved in the construction of the Mill, including FLS. AGA 56.1 ¶ 210. Venkat and Gary Goldberg, Newmont's CEO, negotiated directly with one another regarding these "contractor claims." AGA 56.1 ¶ 212; Newmont 56.1 ¶ 621. After Venkat and Goldberg agreed in principle as to the allocation of these claims, the parties negotiated the specific language to be included in Section 9.10 of the SPA. AGA 56.1 ¶ 214.

During this time, Newmont also received and marked up a draft of the SPA disclosure schedules, which reflected the claims brought against CC&V by Ames Construction, Inc. and Northern Electric, Inc. and the claim that CC&V had threatened against FLS related to its role in connection with the Mill. AGA 56.1 ¶ 211. Newmont asserts that its discussion with AGA regarding the contractor claims was limited to only these three claims: i.e., "an affirmative claim AGA was considering against FLS that related to the structure of the Mill" and "two other claims subcontractors were asserting against CC&V." Newmont AGA Resp. ¶ 210.

Ultimately, in Section 9.10 of the SPA, the parties agreed that AGA would indemnify Newmont for "all Designated Matters Losses" and that AGA would be entitled to "all Designated Matters Recoveries." SPA § 9.10(a). "Designated Matters" is defined as "all legal causes of action

---

[17] By the time of Newmont's March 2015 site visit, the fact that the rod mill had experienced a failure in December 2014 had also been disclosed to Newmont. Ch. 56.1 ¶ 360.

and Proceedings arising out of the construction of the High Grade Mill,[18] including those arising out of the Designated Matters Contracts,[19] or any contractor or subcontractor under the Designated Matters Contracts, . . . to the extent arising out of actions and occurrences prior to June 8, 2015." SPA § 9.10(i). Section 9.10(h) provides that the parties "shall use their reasonable best efforts and act in good faith to fully cooperate and coordinate in the prosecution and defense of, and to reach effective resolutions of, all Designated Matters." SPA § 9.10(h).

During the diligence period, Newmont submitted various due diligence requests, including a request for a status update on "potential litigation by CC&V against [FLS] over performance/warranty issues associate[d] with the [Mill]." *See* AGA Ex. 62 at 1; AGA 56.1 ¶ 273. In response to this request, AGA stated that "AGA Legal will meet with Newmont reps and provide general overview of the status and plan forward," but noted that "[s]pecific documents will not be provided until post-closing." *See* AGA Ex. 85 at page 1 of 2. Newmont nonetheless contends that "the only potential litigation against FLS that [it] was aware of [during the diligence period] was specific to the structure of the mill and the rod/ball mill," Newmont AGA Resp. ¶ 273, and that "at no point during the discussion[s] [regarding how to allocate costs and recoveries associated with potential claims] did AGA inform Newmont that it was considering pursuing affirmative claims against FLS related to the equipment circuits in the Mill." Newmont AGA Resp. ¶ 210.

### 3. July 16, 2015 Meeting

On June 24, 2015, AGA's in-house counsel and representatives from DGS met with various members of CC&V's management team, including Winterton. Newmont 56.1 ¶ 687. In a memorandum dated July 7, 2015 (the "July 7 Memo"), DGS recommended that AGA send a letter

---

[18] "High Grade Mill" is defined in the SPA as "the ore processing operation at CC&V comprising a mill including a Carbon in Pulp circuit, originally commissioned in 2015." *See* SPA § 9.10(i).

[19] "Designated Matters Contracts" is defined to include the relevant Services Agreements with FLS, Ames Construction, Inc., and Northern Electric, Inc. *See* SPA § 9.10(i).

to FLS notifying them of CC&V's claims related to "defective Work in designing and/or constructing the [Mill], and installing equipment for the Mill." *See* Newmont Ex. 38 (July 7 Memo) at -1098. The July 7 Memo contained a list of 14 bullet points, including one bullet point labeled "client action item," under "Other FLS equipment issues," identifying specific components of the Mill's process circuit that had suffered defects. *Id.* at -1099-1100. In a subsequent formal memorandum dated July 15, 2015, and updated July 22, 2015 (the "DGS Memo"), DGS detailed the "specific issues" with the Mill's structure and equipment as of those dates, including issues that arose after the signing of the SPA and, Newmont claims, "numerous defects noted as developing after due diligence and initial commissioning." Newmont 56.1 ¶ 692; *see* Newmont Ex. 40 (DGS Memo).

On July 16, 2015, Chancellor and Ria Sanz, AGA's General Counsel, met with Newmont's in-house counsel, including Terry Briggs, Nancy Lipson (Newmont's Deputy General Counsel), and Gavin Janguard (Newmont's Regional General Counsel), Newmont 56.1 ¶ 693; Ch. 56.1 ¶ 410, to "discuss potential and threatened litigation by and against CC&V and certain contractors involved in the construction of the Mill." AGA 56.1 ¶ 276.[20] At the July 16, 2015 meeting, AGA provided Newmont with an agenda for the meeting (the "July 16 Agenda"), which included information regarding the "Potential Claims Against FLSmidth USA Inc. ('FLS')." *See* AGA Ex. 67 (July 16 Agenda) at -1536. AGA did not provide copies of the July 7 Memo or the DGS Memo at this meeting. Newmont 56.1 ¶ 695. Newmont asserts that the July 16 Agenda contained only "one bullet point identifying a potential claim against FLS for '[b]reach of contract/warranty related to other equipment designed, specified, or provided by AGA,'" Newmont 56.1 ¶ 696, and that "AGA did not disclose that it intended to bring claims against FLS for defects with the Process

---

[20] Prior to this meeting, Chancellor also met with Sanz and Charles Carter to discuss "legal strategy for the potential contractor claims." Ch. 56.1 ¶ 408.

Circuit of the high grade mill at CC&V, nor was there any mention or discussion of any defects with the Process Circuit of the Mill" at the meeting. Newmont 56.1 ¶ 698. AGA, however, states that "process circuit" is "just a technical term for the equipment configured at the Mill," which is the "same equipment clearly referenced in the [July 16 Agenda]." AGA-Ch. Resp. ¶ 698.

In an email that Chancellor sent Carter following the meeting, he stated that AGA "did disclose the new claim for equipment issues created by [FLS]," but noted that the parties "did not dwell on it," and that it "was not a point of discussion" with Newmont. *See* AGA Ex. 67 at -1531. Carter replied "Great" to that email. *Id.*

### E. Chancellor's Role in the CC&V Transaction

During Project Waltz, Chancellor reviewed draft copies of transaction-related documents when requested to do so by AGA personnel. Ch. 56.1 ¶ 353. Chancellor, along with Marcelo Ortiz (Senior Vice President of Finance for AGA Americas) and Tim Thompson (Senior Vice President of Exploration and Ground Fields Developments for AGA Americas), was also tasked with overseeing uploads to the data room, and had responsibility for specific subject matters. AGA-Ch. Resp. ¶ 499; Newmont 56.1 ¶ 512.[21] Chancellor was present for "some, but not all, of the site visits to CC&V and meetings with CC&V personnel by potential counterparties." Ch. 56.1 ¶ 361.

---

[21] Newmont contends that Chancellor instructed CC&V personnel that he, Ortiz, and Thompson "would be CC&V's 'principal point of contact' for overseeing and approving the uploading of documents to the data room that prospective buyers would have access to," meaning that they would have "ultimate accountability for ensuring that the data items are timely uploaded into the data room." Newmont Ch. Resp. ¶ 369; *see* Newmont Ex. 107 at -7995. Chancellor asserts, however, that he was only involved in populating the data room "in a limited capacity." Ch. 56.1 ¶ 369. In particular, his involvement was limited to "subject matters involving land and legal issues," as well as to providing "limited administrative assistance in gathering materials for addition to the data room in the environmental, permitting, community affairs and public relations areas." Ch. 56.1 ¶¶ 371-72. Chancellor asserts further that he played no role in determining what materials should or should not be included in the data room outside of these subject matters. Ch. 56.1 ¶ 373; *see also* AGA-Ch. Resp. ¶ 513 ("[Chancellor, Ortiz, and Thompson] ensured that incoming requests from bidders were routed to the appropriate CC&V subject matter experts to answer those requests and identify responsive documents, which were then routed back to [these three individuals] to be uploaded to the data room.").

Chancellor asserts that he was not involved in the initial drafting of the SPA or the initial discussions with Newmont regarding the terms and conditions of the SPA, and that he did not have the authority to agree to or approve any terms of the SPA. Ch. 56.1 ¶¶ 362, 367. While the SPA was being negotiated, Chancellor had "some limited opportunities to review and provide input on the terms of the SPA from the perspective of a U.S. lawyer familiar with the operations at CC&V." Ch. 56.1 ¶ 366. Newmont, however, disputes Chancellor's characterization of his involvement as "limited." Newmont Ch. Resp. ¶ 366. Newmont maintains that Chancellor was "a member of AGA's four-person 'core team,'" "the only member physically located in North America,"[22] "AGA's top lawyer in the United States," and "the only American lawyer on the core deal team." Newmont Ch. Resp. ¶ 362. Chancellor also attended, and participated in to some degree, a two-day negotiation session in New York in which the SPA was discussed. Ch. 56.1 ¶¶ 363-64.

After the SPA was signed, Chancellor was tasked with "facilitating the exchange of information for integration purposes leading up to closing," and in doing so, his point of contact at Newmont was Terry Briggs. Ch. 56.1 ¶¶ 391-92. Chancellor and Briggs met periodically in person and corresponded via email to discuss Newmont's integration-related requests. Ch. 56.1 ¶ 398. They also maintained a chart, which they periodically updated, to track Newmont's requests and AGA's responses. Ch. 56.1 ¶¶ 399, 403. Chancellor responded directly to Newmont's requests related to "land or legal issues," but distributed any other request to the "relevant functional or subject matter group within AGA or CC&V" and was not involved in determining the substance of those responses. Ch. 56.1 ¶¶ 400-02.

---

[22] Defendants dispute this assertion, stating that Carter lived in Colorado during the transaction, and that the four individuals Newmont has labeled as the "core deal team" were "'physically located in North America' at various points during the CC&V Transaction." AGA-Ch. Resp. ¶ 500.

On June 15, 2015, Chancellor emailed AGA personnel, including AGA senior executives and members of the "core deal team," stating that he was "beginning to receive requests from Newmont to access people, site, and information" as they entered the pre-Closing phase of the transaction. *See* Newmont Ex. 27 at -3809. Chancellor stated that "some access under controlled circumstances . . . is fine (and perhaps appropriate)," but that he believed allowing Newmont personnel "to review and copy files so they can run title prior to closing" would "go too far" and "may be a 'recipe' for disaster." *See id.*

On June 17, 2015, Chancellor sent Briggs an email entitled "Rules of Engagement," in which he explained that the AGA management team responsible for the "handoff of CC&V" met to discuss the "'rules of engagement' regarding Newmont's access to people, property, and information (records, etc.) during the period between signing and closing." *See* Newmont Ex. 28 at -8340. In this email, Chancellor conveyed to Briggs "the AGA management team's proposed terms for Newmont's pre-closing access to CC&V, its employees and its records." Ch. 56.1 ¶ 394. Chancellor explained that, as both parties "want the site to continue to function as efficiently and productively as possible" and therefore must "do everything possible to minimize disruptions and any corresponding impact on productivity," Newmont's "[a]ccess to people, property, or information . . . should be the exception rather than the rule, and should focus on those things that must be accomplished prior to closing, such as pre-closing conditions, compliance with covenants of the agreement, and matters that are truly time-sensitive[.]" *See* Newmont Ex. 28 at -8340. Newmont contends that these "rules of engagement" terms were "unilaterally imposed by AGA after Signing without any negotiation with Newmont nor reference to the SPA's governing covenants or obligations." Newmont Ch. Resp. ¶ 394.

### F. Newmont's Post-Investment Reviews

Since Closing, CC&V has operated as a wholly owned subsidiary of Newmont. AGA 56.1 ¶ 286. After acquiring CC&V, Newmont conducted two "post-investment reviews" ("PIRs") of the Mine. AGA 56.1 ¶ 292. In its first PIR, submitted on September 20, 2016, Newmont valued CC&V at $831 million on an NPV basis. AGA 56.1 ¶¶ 295-96; Newmont 56.1 ¶ 775.[23] Newmont's VAT submitted its review of the first PIR on November 17, 2016, in which it noted that the value of CC&V had increased by approximately $68 million when compared against the $820 million purchase price. AGA 56.1 ¶¶ 297-98.

In Newmont's second PIR, submitted on April 6, 2018, it valued CC&V at $842 million on an NPV basis. AGA 56.1 ¶¶ 299-300; Newmont 56.1 ¶ 777.[24] The VAT reviewed the second PIR, which it submitted on April 19, 2018, and stated that CC&V was "on track to deliver approximately $11 million in incremental NPV and an approximate 8% [internal rate of return]." AGA 56.1 ¶¶ 302-03.

### G. Procedural History

On December 21, 2016, Newmont sent a letter to AGA entitled "Notice of Breach of Representation and Warranty under the [SPA] / Notice of Obligation for Indemnity and Continued Demand for Purchase Price Adjustment" (the "Notice of Breach"). *See* Newmont Ex. 136. In the Notice of Breach, Newmont asserted that "AGA failed to disclose the [Mill] defects which constitutes a breach of warranty set out in Section 4.14 of the SPA, entitling Newmont to indemnification and other damages. Such facts also give rise to other forms of misrepresentation

---

[23] Newmont asserts that this $831 valuation includes the "realized upside," Newmont 56.1 ¶ 775, and that it "incurred nearly $30 million assessing and executing a plan to modify the Process Circuit and ship gold concentrate to a Newmont plant in Nevada," Newmont 56.1 ¶ 776.

[24] Newmont states that this $842 valuation is "based primarily on upside from mine optimization and concentrate shipping," Newmont 56.1 ¶ 777, and that "[e]xcluding the concentrate shipping project and ongoing work to capture expected upside, the estimated NPV in April 2018 was $646 million," Newmont 56.1 ¶ 778.

claims sounding in tort and carrying additional categories of damages." *See id.* at -9948. The Notice of Breach specifically referenced the Mill's "250 tpd nameplate capacity," which Newmont claimed AGA had represented would be reached by September 2015. *See id.* at -9947. The Notice of Breach did not, however, mention "the Mill's recovery rate, the 76.5% recovery projection or the characteristics of the ore at CC&V." AGA 56.1 ¶ 306.

Newmont filed this action on October 20, 2017. Dkt. 7. On September 30, 2018, the Court granted AGA's motion to compel arbitration as to one part of the case, granted Defendants' motion to dismiss another aspect of it, and denied Chancellor's motion to dismiss for lack of personal jurisdiction. *See* Dkt. 65. Following the close of discovery, AGA and Chancellor each moved for summary judgment. *See* Dkts. 108, 114. The Court held oral argument on January 9, 2020. *See* Dkt. 141 ("Tr.").

## LEGAL STANDARD

To prevail on a motion for summary judgment, the movant must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and it is "genuinely in dispute" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (citations omitted). "When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading; rather his response, by affidavits or otherwise as provided in the Rule, must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). On a motion for summary judgment, the Court must "construe the facts in the light most favorable to

the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (citation omitted).

## DISCUSSION

### I.  AGA's Motion for Summary Judgment on Newmont's Breach of Contract Claims

To prevail on a claim for breach of contract under New York law,[25] the plaintiff must prove "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *Terwilliger v. Terwilliger*, 206 F.3d 240, 245-46 (2d Cir. 2000) (quoting *First Invs. Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir. 1998)).  Newmont's breach of contract claims are premised on AGA's alleged breach of Section 4.14 of the SPA—i.e., AGA's alleged failure to disclose that a Company Material Adverse Effect ("Company MAE") occurred between December 31, 2014 and August 3, 2015 (the "MAE Period").  *See* Tr. at 5-6; Opp'n to AGA Mot. ("Opp'n"), Dkt. 123, at 24-35.  Accordingly, Newmont's contract claims hinge entirely on whether a Company MAE occurred during the MAE Period.

### A.  Company MAE Provisions in the SPA

Pursuant to Section 4.14, AGA represented that, "[e]xcept as set forth in Schedule 4.14 or as expressly required or permitted by [the SPA], since December 31, 2014, (a) there has not been any Company Material Adverse Effect within the meaning of [the definition set forth in Section 10.05(b)(ii)], (b) the business and operations of the JV Entities[26] and the Mine have been conducted in the ordinary course and in substantially the same manner as previously conducted and (c) no JV Entity or AGA Subsidiary has taken any action that, if taken after the date of this Agreement, would constitute a breach of any of the covenants set forth in Section 6.01(a)(i)-(xv)."  SPA § 4.14.  Schedule 4.14, in turn, lists "None" under "Changes or Events."  *See* AGA Ex. 2 at

---

[25] New York law applies to the Court's interpretation and construction of the SPA.  *See* SPA § 10.10.
[26] The term "JV Entities" is generally defined as "AGA-CO and its subsidiaries."  *See* AGA 56.1 ¶ 216.

6.

"Company Material Adverse Effect" is defined in Section 10.05(b), in relevant part, as "any change, effect, event, occurrence, circumstance or state of facts that . . . (ii) is or would reasonably be expected to be materially adverse to the business, results of operations, condition (financial or otherwise) of . . . the Mine." SPA § 10.05(b). The SPA also expressly lists certain exceptions to the definition of a Company MAE, including "any change, effect, event, occurrence, circumstance or state of facts" relating to "the failure to meet any projections or forecasts (it being understood that that [sic] the facts or causes underlying or contributing to such failure may be considered in determining whether a Company Material Adverse Effect has occurred unless otherwise excluded pursuant to any of the other clauses of this definition)." *Id.*

## B. Whether a Company MAE Occurred During the MAE Period

### 1. Newmont's Alleged MAEs

Newmont contends that the following three "circumstances" or "state[s] of facts" constitute Company MAEs within the meaning of the SPA: (1) that during the MAE Period, "AGA received the Mususumeli and AMTEL Reports, which established that AGA built the wrong type of mill" (the "First Alleged MAE"); (2) that during the MAE Period, "severe design defects arose that would prevent the Mill from ever reaching design throughput" (the "Second Alleged MAE"); and (3) that during the MAE Period, "AGA determined in the Winterton Memo that the Mill, in its entirety, suffered from critical deficiencies that would prevent it from ever reaching design throughput and recovery" (the "Third Alleged MAE"). *See* Opp'n at 39-40. For the reasons discussed below, the Court concludes that none of these circumstances rise to the level of a Company MAE within the meaning of the SPA.s

### 2. Interpretation of Section 4.14 and the Company MAE Definition

MAE provisions are "a common feature of many contracts, and are subject to the same rules of interpretation as any other contract provision." *In re Lyondell Chem. Co.*, 567 B.R. 55, 122 (Bankr. S.D.N.Y. 2017). Under New York law, "a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed." *Terwilliger*, 206 F.3d at 245. In interpreting the SPA, the Court "bears in mind that, 'when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms'—particularly when, as here, the contract 'was negotiated between sophisticated business people at arm's length.'" *Newmont Mining Corp. v. AngloGold Ashanti Ltd.*, 344 F. Supp. 3d 724, 747 (S.D.N.Y. 2018) (quoting *Skanska USA Bldg. Inc. v. Atl. Yards B2 Owner, LLC*, 98 N.E.3d 720, 723 (N.Y. 2018)).

The SPA's definition of a Company MAE must be analyzed in the context of the SPA as a whole and construed in accordance with the parties' intent. *See In re Lyondell*, 567 B.R. at 122 ("District courts in the Southern District of New York have emphasized, . . . in the summary judgment context, that a [material adverse effect] clause must be read in conjunction with other contemporaneous evidence of the parties' intent."); *see also* AGA Mot., Dkt. 109, at 31; Opp'n at 21. Indeed, New York courts interpret MAE provisions "in the context of the entire agreement, and in conjunction with other evidence of the parties' intent," including separately executed and/or contemporaneous other documents. *In re Lyondell*, 567 B.R. at 123; *see In re JC's East, Inc.*, No. 95 Civ. 1870 (MGC), 1995 WL 555765, at *3 (S.D.N.Y. Sept. 19, 1995), *aff'd,* 84 F.3d 527 (2d Cir. 1996) (interpreting MAE provision in light of buyer's "explicit waiver of reliance upon any warranties or representations" by seller). Courts also consider "whether the alleged material adverse change was within the contemplation of the parties at the time they executed the

agreement, whether it was within the control of the parties, and the magnitude of the impact on the relevant party's business." *In re Lyondell*, 567 B.R. at 123. Moreover, because merger and acquisition agreements are "heavily negotiated and cover a large number of specific risks explicitly," an MAE provision—even where it is "broadly written"—is "best read as a backstop protecting the acquiror from the occurrence of unknown events that substantially threaten the overall earnings potential of the target in a durationally-significant manner." *In re IBP, Inc. Shareholders Litig.*, 789 A.2d 14, 68 (Del. Ch. 2001) (applying New York law). In other words, "[a] short-term hiccup in earnings should not suffice; rather the Material Adverse Effect should be material when viewed from the longer-term perspective of a reasonable acquiror." *Id.*

Based on the plain language of the SPA, as well as applicable New York law, the Court determines that no Company MAE occurred during the MAE period. First, the plain language of the Company MAE definition excludes "the failure to meet any projections or forecasts" from serving as the basis of a Company MAE. SPA § 10.05. Second, the Company MAE definition refers to the Mine as a whole, and not just the Mill. To constitute a Company MAE, the adverse effect must therefore be materially adverse to the entire Mine, which Newmont has not established. Third, in light of the disclaimers contained in the SPA, the Alleged MAEs cannot constitute a Company MAE under New York law. And finally, the evidence in the record demonstrates that no Company MAE occurred during the relevant time period.

### i. "Missed Projections" Exclusion

All three Alleged MAEs are expressly excluded from the SPA's contractual definition of a Company MAE because they fall within the exception for missed projections or forecasts. *See* SPA § 10.05(b). As an initial matter, the Second and Third Alleged MAEs essentially boil down to the same underlying contention: that certain deficiencies and defects affected the Mill's ability

to achieve a "design throughput" of 250 stph and/or a "design recovery" of 76.5%.[27]  Throughput and recovery are two metrics used to measure gold processing in the gold mining industry.  *See* Tr. at 17 ("The two ways you make gold is how fast you put it through the mill and whatever recovery percentage for every chunk you put through, how much gold you get out of it.  Those are the two, only two, metrics that you actually get to gold from rock.").  The 250 stph throughput and the 76.5% recovery figures were both *targets* that CC&V hoped to achieve in the future, not guarantees or requirements.  Thus, the failure to achieve either target—which is the premise of the Second and Third Alleged MAEs—falls within the missed projection exception.

Although it is a closer question, the First Alleged MAE is also based on an assertion about missed projections, and therefore excluded from the Company MAE definition as well.  The First Alleged MAE is premised on the Mill's "failure to reach design recovery rates."  *See* Opp'n at 24. While Newmont asserts that this Alleged MAE occurred when AGA apparently determined, based on several reports received during the diligence period, that it had built the "wrong type of mill for the ore body at CC&V," the crux of its argument is nonetheless that the Mill could not produce gold at the recovery rates that had been previously estimated.  *See id.*

The Court is not persuaded by Newmont's argument that its Alleged MAEs are premised

---

[27] AGA argues that Newmont's contract claim—as to an alleged failure to achieve the projected recovery rate—is time-barred because the Notice of Breach did not reference "recovery."  *See* AGA Mot. at 47-49.  The Court rejects such a narrow reading.  Under Section 9.05, Newmont's right to contractual indemnification expired on December 31, 2016, except for claims for which Newmont had previously delivered a written notice, "stating in reasonable detail the basis of such claim."  SPA § 9.05.  Newmont was not required to list every aspect of its claim or every potential theory related to that claim, as long as it provided "reasonable detail."  While it is true that the Notice of Breach expressly references the failure to achieve "250 tpd nameplate capacity by September 2015," *see* Newmont Ex. 136 at -9947, and does not similarly reference the failure to achieve the 76.5% recovery rate, AGA was nevertheless on notice that Newmont's claim, which related to AGA's alleged "fail[ure] to disclose the [Mill] defects," not only constitutes a breach of Section 4.14, but also "give[s] rise to other forms of misrepresentation claims sounding in tort and carrying additional categories of damages," *id.* at -9948.  This is unlike Newmont's claim related to the MS 9282 plot, which the Court previously dismissed because Newmont had "failed to provide timely notice of its claim as to the Plot."  *See Newmont Mining Corp.*, 344 F. Supp. 3d at 749.  In short, the Notice of Breach can reasonably be read to include a claim related to the Mill's failure to reach its projected recovery, as well as its failure to reach its projected throughput.

on the "underlying causes" of these "missed projections," and not the missed projections themselves. *See id.* at 2. Newmont seems to suggest that, as long as it can point to an underlying cause for the failed projections, its Alleged MAEs are exempt from the "missed projections" exception. *See id.* at 23. In doing so, Newmont relies on the parenthetical that immediately follows the exception, which states that "the facts or causes underlying or contributing to such failure [to meet any projections or forecasts] may be considered in determining whether a Company Material Adverse Effect has occurred unless otherwise excluded pursuant to any of the other clauses of this definition." SPA § 10.05(b). Newmont, in the Court's view, misreads this language. Newmont's interpretation would transform an otherwise narrow carve-out into an exception that swallows the rule, as it would allow virtually any set of circumstances to constitute a Company MAE as long as it could identify a purported underlying cause for a failure to meet projections or forecasts. The Court agrees with AGA that this "caveat" was "clearly intended to avoid an absurd result whereby a true Company MAE could be excluded because it happened to impact projections, among other things." AGA Reply, Dkt. 130, at 4. To allow Newmont to proceed on its theory "would read the missed projections or forecasts exclusion out of existence since it is difficult to fathom a scenario in which a buyer would not be able to identify some underlying cause for a missed projection." *Id.* at 5. Based on the text of the SPA, the Court determines that the parties' intent in including the parenthetical was to clarify that, where an underlying cause or set of facts fits within the Company MAE definition but also results in a failure to meet a projection, that underlying cause or set of facts may still be asserted as a Company MAE even though it contributed to a missed projection. In other words, where a materially adverse event occurs that plainly would constitute a Company MAE "because [it] is catastrophic in and of itself," such as an "arsonist raz[ing] the Mill and all other mine equipment to the ground," that event is not excluded from the SPA's

definition of Company MAE simply because it also resulted in the Mine missing forecasts or projections. *See id.* at 4.

The terminology that Newmont's own personnel and experts used to describe throughput and recovery confirms that both figures are "projections" within the meaning of the SPA. *See, e.g.*, AGA Ex. 26 (Newmont Diligence Report) at -0536 (referring to "flotation recovery projections"); AGA Ex. 75 (Reeves Rebuttal Report) at 15 (referring to both the "250 tons/hour" and the "76.5% overall gold recovery" figures as "projections," around which there is "an expectation of some variance"); *id.* at 30 (asserting that among the Mill's problems were its "failure to meet recovery and throughput projections"); AGA Ex. 76 (Rigby Rebuttal Report) ¶ 56 (referring to the "failure to meet throughput and recovery projections"); *id.* ¶¶ 112, 114, 118 (referring to the Mill's "recovery projections"); Newmont Ex. 151 (Harvey Report) at 4 (explaining that "design criteria" provides "details as to the expected performance of the mill in both throughput and gold recovery"). Newmont's characterizations of the Alleged MAEs further demonstrate that they are based on the Mill's failure to achieve its design throughput and recovery, and not on any "underlying causes" of such failures. *See* Opp'n at 24 (explaining that, as to the First Alleged MAE, AGA's receipt of certain "new reports," namely the Mususumeli Report and the AMTEL Report, established that "AGA built the wrong type of mill for the ore body at CC&V," which caused the Mill to fail to reach its "design recovery rates"); *id.* at 29 (explaining that, as to the Second Alleged MAE, certain "design defects" arose starting in June 2015, which prevented the Mill from ever reaching "design throughput"); *id.* at 34 (explaining that, as to the Third MAE, AGA determined in the Winterton Memo that "the Mill, in its entirety, suffered from underlying deficiencies that would prevent it from ever achieving throughput or recovery"). The Mill's failure to meet certain throughput and recovery targets thus cannot serve as a basis for a

Company MAE.

### ii. Company MAE Must Affect the Mine as a Whole

Additionally, the Company MAE definition evinces the parties' intent to only include within the definition of Company MAE a "change, effect, event, occurrence, circumstance or state of facts" that is or would be "materially adverse" to *the Mine*. SPA § 10.05(b). It therefore follows that any given Alleged MAE must have a materially adverse effect on the Mine as a whole, and not just on the Mill. At the time of the transaction, CC&V was undergoing an expansion—the MLE2 project—and as part of that expansion, was in the process of constructing a high grade mill that was intended to "treat higher grade ore containing relatively more gold per ton." *See* AGA 56.1 ¶ 18; Newmont 56.1 ¶ 453. But the construction of the Mill was not the only component of the MLE2 project. *See, e.g.*, AGA Ex. 65 at -2848 (explaining that the MLE2 project involved, among other things, construction of three new facilities: the Mill, a new valley leach facility, and a new adsorption, desorption and recovery facility). Moreover, Newmont bought the entire Mine, not just the one Mill, and was aware that the Mill was still being commissioned at the time the transaction closed. *See* AGA 56.1 ¶ 67.

Newmont does not dispute that "Company MAE" in the SPA is defined in terms of the entire Mine, and not just the Mill. *See* Tr. at 62. Yet all three of the Alleged MAEs are described in terms of the *Mill*'s failure to reach its throughput and recovery projections. Newmont has premised its Alleged MAEs on merely one part of CC&V—which, it asserts, failed to achieve the targets that had been set. If Newmont wanted the Company MAE definition to include materially adverse effects measured in terms of the *Mill*, it should have bargained for such a definition. Notwithstanding Newmont's assertion that the Mill was a "hugely important piece of the [M]ine," Tr. at 40, and that it was the "centerpiece" and "jewel" of the CC&V transaction, Tr. at 62, under

the plain language of the SPA, Newmont must demonstrate that its Alleged MAEs had a materially adverse effect on the *Mine as a whole*.

Although the parties dispute the percentage of gold that was intended to be recovered from the Mill, as compared to the Mine as a whole, the Mill's gold production was never expected to account for the entirety of CC&V's gold production. Based on an except from the "Waltz Model" —the draft financial model created during Project Waltz, which was distributed to potential counterparties, including Newmont, *see* AGA 56.1 ¶¶ 86, 104—Newmont asserts that AGA had calculated that "Mill processing would account for over 55% of the total recovered gold from the Mine." *See* Newmont 56.1 ¶ 492. AGA, on the other hand, maintains that it had calculated that "Mill processing would account for approximately 44% of the total recovered gold from the Mine, not 55%." *See* AGA-Ch. Resp. ¶ 492.[28] Even assuming that the Mill accounts for as much as 55% of the Mine's total gold production, Newmont has not demonstrated that the Mill is incapable of producing *any* gold. Rather, the evidence in the record establishes that, although the Mill may not be reaching design throughput or design recovery, it is nevertheless producing gold. While the percentage of gold expected to be recovered from Mill processing is not insignificant, and there may well be circumstances where an event involving the Mill does in fact constitute a materially adverse effect to the Mine as a whole, such circumstances are not present here. In short, Newmont has not established that any of the Alleged MAEs resulted in materially adverse effects to the Mine as a whole.

---

[28] Newmont asserts that the 55% figure is calculated based on the "Heap Leach Ore Recoverable Gold" amount, which is listed in the Waltz Model as 2,239,000 ounces, and the "Mill Gold Recovered" amount, which is listed in the Waltz Model as 2,761,000 ounces. *See* Newmont 56.1 ¶ 492; Newmont Ex. 119 at page 2; *see also* AGA Ex. 89 at page 2. It is not clear, however, how Newmont calculates 55% based on these two numbers. Indeed, AGA asserts that Newmont uses "the wrong line item [in the Waltz Model] to calculate the 'total recovered gold from the mine,'" and that the correct calculation instead divides the "Mill Gold Recovered" amount—i.e., 2,761,000 ounces—by the "Total Gold Produced" amount, which is listed in the Waltz Model as 6,293,000 ounces. *See* AGA-Ch. Resp. ¶ 492; Newmont Ex. 119 at page 2-3. Thus, according to AGA, the result of the "correct calculation" is 43.87%. AGA-Ch. Resp. ¶ 492.

### iii.    Disclaimers in the SPA

As the Court "consider[s] the entirety of the agreement . . . , rather than reading the [materially adverse effect] clause in isolation" when discerning the parties' intent, it is also mindful that the SPA contains a number of express disclaimers.  *See In re Lyondell*, 567 B.R. at 150. Section 1.08, for instance, provides that Newmont's acquisition of CC&V would be "without any representation or warranty as to merchantability or fitness for any particular purpose, in an 'as is' condition and on a 'where is' basis, except as otherwise expressly set forth" in the SPA and related documents.  SPA § 1.08.  Additionally, in Section 9.08, Newmont made certain acknowledgements and express disclaimers of reliance, including that it had been "permitted full and complete access to the books and records, facilities, equipment, Tax Returns . . . , contracts, insurance policies . . . and other properties . . . that [it had] requested to see or review," and that it had "had a full opportunity to meet with the officers and employees of the JV Entities to discuss the business of the JV Entities."  SPA § 9.08.  Newmont also expressly acknowledged that AGA had not "made any representation or warranty, express or implied, as to any JV Entity or the accuracy or completeness of any information regarding the JV Entities furnished or made available to [it], except as expressly set forth in [the SPA], the other Transaction Documents or the Schedules," and that it had "not relied on any representation or warranty or any other statement" from AGA in deciding to execute the SPA, "except for the representations and warranties expressly set forth in [the SPA] and the other Transaction Documents."  SPA § 9.08(i)-(ii).  Newmont further acknowledged that AGA would not be liable for any information or documents distributed to Newmont during the diligence period, such as the Confidential Information Memorandum and "any information, documents or material made available to [Newmont] in any 'data rooms',

management presentations or in any other form in expectation of the Transactions." SPA § 9.08(iii).[29]

Section 4.14 and the Company MAE definition in Section 10.05 must be interpreted in light of Newmont's explicit disclaimers of reliance and liability on the part of AGA. *See In re Lyondell*, 567 B.R. at 123 (noting that courts "read the MAC clause in the context of the entire agreement, and in conjunction with other evidence of the parties' intent," such as "a separately executed but integrated agreement" or "a contemporaneous affidavit") (citations omitted); *In re IBP*, 789 A.2d at 67 (stating that the contractual language of an MAE provision "must be read in the larger context in which the parties were transacting"). As was the case in *In re JC's East, Inc.*, in light of Newmont's repeated waivers and disclaimers, "the scope of the material and adverse change clause must be limited by at least two considerations": first, "the clause must be limited to events that were outside the contemplation of the parties at the time of the transaction," and second, the clause "must be limited to events outside [the buyer's] control." *JC's East*, 1995 WL 555765, at *3.

Analyzing the Company MAE definition under these principles, the Court finds that it would "conflict with [the disclaimers in the SPA] if it included events which were foreseeable at the time of the transaction since . . . [Newmont] expressly assumed the risk that such events might occur," *JC's East*, 1995 WL 555765, at *3, particularly since Newmont entered into the transaction on an "as is" and "where is" basis, *see* SPA § 1.08. The Mill's throughput and recovery rates were undoubtedly within the contemplation of the parties at the time of the transaction. During Phase

_____

[29] Similarly, the Confidentiality Agreement that was executed upon entering Phase I of Project Waltz, and was expressly incorporated into the SPA, *see* SPA § 10.07, stated that AGA made no representations or warranties as to the "accuracy or completeness" of the materials provided during the diligence period, and that "[o]nly those representations or warranties that are made" in the subsequent executed transaction agreement would have "any legal effect." AGA Ex. 105 at -4422.

I, for instance, Jim Orlich reviewed and analyzed the available test work uploaded to the data room in order to perform an independent analysis of the Mill's throughput and recovery estimates, and subsequently prepared a functional report on metallurgy and processing. *See* AGA Ex. 25 (Orlich Functional Report) at -4808 (discussing CC&V's metallurgical recovery data); *id.* at -4811 (discussing throughput and recovery projections); AGA Ex. 26 (Newmont Diligence Report) at -0535-0536 (discussing throughput and recovery projections); AGA 56.1 ¶ 165 ("As a result of Mr. Orlich's recovery calculations, the projected overall Mill recovery in Newmont's diligence model varied year-over-year and averaged 75.6%—not the 76.5% projected by AGA and CC&V—over the life of the mine."). In addition, the fact that the Mill was "not attaining 250 stph throughput was repeatedly disclosed to Newmont in the MLE2 Project Progress Reports," and Newmont was aware of this both when the SPA was signed and when the transaction closed. AGA 56.1 ¶¶ 259-60; *see* AGA Ex. 59 (March 2015 MLE2 Report) at -4948 ("The primary objective was to stabilize operations at 180 stph."); AGA Ex. 35 (April 2015 MLE2 Report) at -7455 (same); AGA Ex. 36 (May 2015 MLE2 Report) at -2379 ("Overall average throughput rate was 180 stph. Rates of 200 stph were achieved for extended periods."); AGA Ex. 37 (June 2015 MLE2 Report) at -4039 (same). The March, April, and May 2015 MLE2 Progress Reports also indicated that the overall Mill recovery at those times was low as compared to the budgeted recovery of 76.5%. *See* AGA Ex. 59 (March 2015 MLE2 Report) at -4948 (5.9% recovery); AGA Ex. 35 (April 2015 MLE2 Report) at -7455 (49.6% recovery); AGA Ex. 36 (May 2015 MLE2 Report) at -2379 (54.2% recovery).

Not only did Newmont specifically consider throughput and recovery during the diligence period, but it was aware that there was a risk these targets may not be reached. *See, e.g.*, AGA Ex. 26 (Newmont Diligence Report) at -0544 (noting that "there are some possible deficiencies in

recovery projections and overall plant design that will likely need to be addressed"); *id.* at -0585 (noting "operating problems are expected anticipated [sic] resulting in increased risk to throughput, costs, and ultimately overall recovery in the heap" among the processing "weaknesses"); *id.* at -0590 (listing "[a]bility to maintain projected throughput at given ore grade to mill from open pit and underground ores may be difficult and could result in higher percentage of mill ore tons from the pit at lower grade (as well as lower mill recovery)" among the potential processing "threats"). Newmont also recognized these challenges in the period between Signing and Closing, yet never sought to include any representations as to throughput or recovery in the SPA. *See, e.g.*, AGA Ex. 44 at -2176 (Dodd states that the Mill was "at a throughput rate of about 200 tph" and that "apparently they are struggling to get up to design"); AGA Ex. 60 at -9035 (Orlich states that "[d]esign throughput is 250tph," but that the "last numbers [he] saw from April was an average of about 150," and his understanding was that "throughput is being limited by tailings thickening/filtration"); AGA Ex. 55 at -0627 (Livermore notes indicate that the "[c]urrent average is 200tph versus 250tph design" and that the "tails filtration is bottleneck"); AGA Ex. 46 at -1380 (McLaren states to Orlich and Dodd, "Your mill recovery sucks [smiley face], no pressure!"); AGA Ex. 57 at -0535 (Livermore notes indicate that the Mill was "currently achieving 70-80% of nameplate capacity," and that it was estimated to "take [the] first half of 2016 to correct").

Even if it is true that Newmont was not aware of the *specific* design defects disclosed after Closing in reports such as the Winterton Memo, it cannot be said that Newmont was unaware of the risk that the Mill's throughput and recovery projections would not be met over time. Newmont could have protected against such an occurrence by contracting for a specific representation or warranty as to those targets in the SPA. Indeed, if Newmont wanted to rely on any representations or warranties with respect to the Mill's performance, including its ability to meet certain

throughput or recovery targets, it should have bargained for such language to be included in the SPA. *See JC's East*, 1995 WL 555765, at *3 (finding that the departures of key employees were not covered by the MAE provision because "the need to retain key employees (or at least, to mitigate the consequences of their departure) was something which [the buyers] could have anticipated and done something about"); *In re Lyondell*, 567 B.R. at 149-50 (rejecting argument that impending Chapter 11 filing constituted an alleged MAE and explaining that, as the "parties were clearly capable of drafting a solvency requirement," the court would not "infer a solvency requirement where none was drafted by the parties"). By failing to negotiate for specific representations related to the Mill's performance, and given the express disclaimers contained in the SPA, Newmont assumed the foreseeable risks associated with the Mill. *See JC's East*, 1995 WL 555765, at *3 ("In light of an explicit waiver of warranties, a foreseeable occurrence does not become a 'material and adverse change' simply because it would require the expenditure of money to remedy or ameliorate. . . . Accordingly, such an event could not be within the scope of the material and adverse change clause."); *In re Lyondell*, 567 B.R. at 150 ("The parties had the opportunity to include an ongoing solvency provision in the [Agreement] when it was drafted and executed . . . , but they did not. The Defendants cannot now stretch the MAC clause to include it.").

That the parties did not include in the SPA any representations as to throughput or recovery evinces their intent that no such guarantees or minimum requirements would apply. *See In re Lyondell*, 567 B.R. at 150. This is particularly true since the parties specifically allocated certain risks, liabilities, and rewards in other parts of the SPA, and therefore knew how to do so when they intended to. *See, e.g.*, SPA § 1.01(d) (allocating a royalty for "net smelter returns"); SPA § 9.10 (allocating liabilities and recoveries for potential litigation related to the construction of the Mill).

The Court will not rewrite the SPA to provide for greater protection than that which Newmont bargained for. *See Goodman Mfg. Co. L.P. v. Raytheon Co.*, No. 98 Civ. 2774 (LAP), 1999 WL 681382, at *14 (S.D.N.Y. Aug. 31, 1999).[30]

### iv. The Record Does Not Support the Alleged MAEs

Even putting aside the conclusion that all three Alleged MAEs fall within the "missed projection" exclusion and are precluded from serving as the basis for a Company MAE under the SPA and New York law, based on the undisputed facts in the record, Newmont still fails to assert any "change, effect, event, occurrence, circumstance or state of facts" that rises to the level of a Company MAE.

The First Alleged MAE is based on AGA's alleged discovery, during the MAE Period, that it had built the "wrong type of mill for the ore body at CC&V," which resulted in the Mill's "failure to reach design recovery rates." *See* Opp'n at 24. Newmont relies heavily on the Mususumeli Report, Newmont Ex. 25, and the AMTEL Report, Newmont Ex. 49, to support this Alleged MAE. *See* Opp'n at 24-25.[31] But neither report actually concluded that AGA built the "wrong type of

---

[30] Although the MAE provision analyzed in *Akorn, Inc. v. Fresenius Kabi AG*, C.A. No. 2018-0300-JTL, 2018 WL 4719347 (Del. Ch. Oct. 1, 2018) is similar to the one at issue here, the Court nonetheless finds that Newmont's reliance on *Akorn* is misplaced. Not only was *Akorn* decided under Delaware law, which differs from the New York authority discussed above, but the factual circumstances differed as well. Unlike in *Akorn*, where the target experienced significant year-over-year declines in performance, *see* 2018 WL 4719347 at *54-55, causing the Delaware Chancery Court to note that its business performance "fell off a cliff," *id.* at *1, 60, Newmont has not adduced evidence to show that the *Mine as a whole* suffered from a materially adverse effect—let alone an adverse effect that impacted the entire business to the extent that the MAE did in *Akorn*.

[31] Although it is undisputed that AGA did not provide the Mususumeli Report or the AMTEL Report to Newmont prior to Closing, the record demonstrates that Newmont was aware of both reports and the testing being conducted in connection with these reports through, at the very least, the monthly MLE2 Reports it was provided. *See, e.g.*, AGA Ex. 34 (January 2015 MLE2 Report) at -7486 (noting that in January 2015, AGA identified the "project work and scope for the visiting member of the AGA Young Leader Program," and that the "[f]ocus will be improving recovery in Cresson Pipe material"); AGA Ex. 88 (February 2015 MLE2 Report) at -7395 (noting that the "AGA Young Leader candidate began work on Cresson Pipe Recovery Improvement Project"); *id.* at -7399 (explaining that "Mill ore characterization samples are being drilled in ore types identified and placed in storage," and that these "samples will be sent to AMTEL," where they "will be assayed and mineralogical analysis completed to identify gold deportment (what minerals the gold is associated with and size) for flotation and CN leaching characteristics"); AGA Ex. 59 (March 2015 MLE2 Report) at -4948 (noting that the "AGA Young Leader candidate continued work on Cresson Pipe Recovery Improvement Project"); *id.* at -4952 (explaining again that "Two Cresson samples have been sent to AMTEL" to be "assayed" and for "mineralogical analysis" to be completed to identify particular gold deportment);

46

mill." In fact, when asked at oral argument where in the record there is evidence that AGA ever concluded or had a basis to conclude that it had built the wrong type of Mill, Newmont pointed to the Winterton Memo as the "clearest example of that." *See* Tr. at 53. It noted that the Winterton Memo contains a discussion "specifically about ore recovery where it . . . references both the Mususumeli and the AMTEL reports" and "discusses that certain types of mill [sic] just will not respond to this type of leaching." *See id.* While the Winterton Memo addressed certain defects and challenges that the Mill faced at the time, and did indeed reference the Mususumeli Report and the AMTEL Report, it in no way determined that AGA had built the "wrong type of mill" or that the Mill would never achieve the type of gold production for which it was intended.

It is undisputed, moreover, that the Mususumeli Report analyzed only one type of ore at CC&V—Cresson Pipe—and that the AMTEL Report analyzed only Cresson Pipe and one other ore type, Dante ore. *See* Newmont 56.1 ¶¶ 573, 660; AGA-Ch. Resp. ¶¶ 573, 659-61. The record shows that neither ore type constituted a significant percentage of the ore body at CC&V. Dr. Harvey, Newmont's metallurgical expert, concluded that Cresson Pipe constituted only 3.9% of the total ore expected to be fed to the Mill at the time, *see* AGA Reply Ex. 155 at 29 n.6, and Winterton testified that Cresson Pipe constituted "less than 1 percent" of the overall ore body at CC&V, *see* AGA Reply Ex. 137 (Winterton Tr.) at 193:7-12. The prevalence of Dante ore was also relatively insignificant when compared to the ore body at CC&V, as Winterton admitted that it was "roughly the same order as Cresson [P]ipe." *See* AGA Reply Ex. 137 (Winterton Tr.) at

---

AGA Ex. 35 (April 2015 MLE2 Report) at -7456 (noting that the "AGA Young Leader candidate completed work on Cresson Pipe Recovery Improvement Project" and that the results were "presented to CC&V management"); *see also* AGA Ex. 58 at -1052 (Orlich states to McLaren and Dodd that there was "a more recently monthly report" in the data room indicating that "additional mill ore type samples were generated and sent for gold deportment characterization"); AGA Reply Ex. 144 (Orlich Tr.) at 51:5-52:16 (testifying that he did not ask any follow-up questions to AGA or CC&V about the "Two Cresson samples" that were sent to AMTEL for analysis, or why the samples were being analyzed). The fact that Newmont did not specifically request either report bolsters the finding that neither Cresson Pipe nor Dante ore were significant factors in Newmont's analysis during the MAE Period, or in its determination in whether to proceed with the transaction.

200:20-201:2.

In attempting to demonstrate the significance of Cresson Pipe and Dante ore, Newmont points to a June 2015 email sent from Jose Augusto Dumont, a metallurgist at AGA, to Helcio Guerra, in which Dumont summarized the AMTEL Report and stated that it was his understanding that the "technical solution for this ore," presumably referring to Cresson Pipe, would "be of large proportions in what will be fed to the crusher" in the Mill. *See* Newmont Ex. 50 at -1188. This single email, reflecting one employee's view, does not support Newmont's claim that, upon receipt of the AMTEL Report, "AGA immediately recognized that contrary to its earlier belief, 'crushing will not be effective' for these types of ore, which AGA knew would 'be of large proportions in what will be fed to' the Mill." *See* Opp'n at 25. Furthermore, even if it was true that Cresson Pipe or Dante ore were intended to "be of large proportions in what will be fed to" the Mill, as Newmont claims, a Company MAE must be analyzed in the context of the Mine as a whole, and not just the Mill. These two reports—about only two ore types, comprising a relatively small percentage of the ore to be processed at the Mine—cannot serve as the basis for any conclusion about the Mine, or even the Mill, as a whole. Given these circumstances, the conclusions in the Mususumeli Report and the AMTEL Report do not show that a Company MAE occurred.[32]

The Second Alleged MAE is premised on the Mill's inability to achieve its throughput target. *See* Opp'n at 29. Newmont argues that certain "design defects that would prevent the Mill from ever reaching design throughput" constitute a Company MAE, *id.*, and that AGA was aware that the Mill would not reach the throughput target based on, at a minimum, the July 7 Memo and the DGS Memo, *see id.* at 30. As AGA points out, however, "Newmont's suggestion that the Mill

---

[32] Further supporting the notion that Cresson Pipe and Dante ore comprise relatively immaterial portions of the ore body at CC&V is the fact that Newmont did not mention either ore type, or the Mususumeli Report or AMTEL Report, in either its Notice of Breach or in the Complaint filed in this action.

would never achieve its 250 stph throughput projection is refuted by the fact that it subsequently achieved throughput rates in excess of 250 stph." AGA-Ch. Resp. ¶ 712. In a March 2017 email, for instance, Winterton noted that "[t]hings are starting to come together with the mill here," in part because the Mill's "feed rate is now 255 stph with near 100% utilization up from 185 stph with 60%." AGA Reply Ex. 156 at -4010; *see also* AGA Reply Ex. 153 at -2381 (Henris states that the Mill "is currently running at 255 tpoh, 35 tpoh higher than BP17").

There is also no evidence in the record that AGA concluded that the 250 stph throughput target was unachievable. Although it is true that the July 7 Memo and the DGS Memo identified specific design defects that could justify litigation against the Mill's designer, neither memo concluded that the Mill would never reach a throughput of 250 stph. *See generally* Newmont Ex 38; Newmont Ex. 40. Nor did the Winterton Memo reach such a conclusion. *See generally* Newmont Ex. 89. Rather, the Winterton Declaration states only that, in Jeff Winterton's view, the Mill would "never be capable of reaching design recovery or throughput *without significant modifications*." Winterton Decl. ¶ 15 (emphasis added). In fact, Dr. Reeves, one of Newmont's experts, also admitted at his deposition that the Winterton Memo did not actually contain the conclusion that the Mill could *never* achieve 250 stph throughput. *See* AGA Reply Ex. 148 (Reeves Tr.) at 112:7-114:16.

The Third Alleged MAE overlaps with the Second Alleged MAE to a significant degree, but is premised not only on the alleged conclusion that the Mill would never reach its design throughput, but also that it would never reach its design recovery rate of 76.5%. *See* Opp'n at 34 (arguing that, based on the findings set forth in the Winterton Memo, AGA had "determined that the Mill, in its entirety, suffered from underlying deficiencies that would prevent it from achieving design throughput or recovery"). The Winterton Memo, however, does not contain any conclusion

that the Mill would *never* achieve a recovery of 76.5%. *See generally* Newmont Ex. 89. The Winterton Declaration, again, only states that the Mill would not be able to achieve 76.5% recovery "without significant modifications," not that it would never be able to do so. Winterton Decl. ¶ 15.[33] Winterton similarly testified at his deposition that, while he believed that reaching the 76.5% target would be a challenge, he did not believe it to be unachievable. *See* AGA Reply Ex. 137 (Winterton Tr.) at 162:9-167:3. And, as to the statement in the Winterton Memo about the invalidity of the assumption regarding a "blanket overall recovery of 76.5%," *see* Winterton Memo at -8075, Winterton testified that he meant that different ores would recover at different rates— i.e., higher or lower than the 76.5% projected average—not that the 76.5% target could *never* be achieved as an average over the entire life of the mine. *See* AGA Reply Ex. 137 (Winterton Tr.) at 170:19-24, 179:11-180:20, 181:12-24.

In sum, there is simply nothing in the record to support Newmont's claim that the Mill would never reach its throughput or recovery targets. When pressed at oral argument to point to evidence supporting these claims, Newmont cited the Winterton Memo, "combined with the knowledge that was gained both from operationally and in the DGS [Memo]." *See* Tr. at 54-55. As discussed above, however, none of these documents supports Newmont's claims about throughput or recovery.

Newmont's own behavior during the diligence period and after the transaction closed confirms that no Company MAE occurred during the MAE Period. As already discussed, Newmont was aware during the diligence period that the Mill was not achieving its throughput and recovery targets, and that there was a possibility that these targets would not be reached. In

---

[33] The fact that Winterton specifically concluded that significant work was required to allow the Mill to reach its throughput and recovery projections further undermines the contention that the Mill could *never* reach such projections, or that AGA ever concluded as much.

now arguing that Company MAEs occurred during the MAE Period, Newmont places great weight on the Winterton Memo. It is undisputed, however, that Newmont received the Winterton Memo on August 4, 2015, the day after the CC&V transaction closed, and that upon receipt of this report, Newmont did not express concern about the conclusions or discussion set forth therein. *See* Newmont Ex. 89 at -8064. Indeed, there is nothing in the record to show that, at the time it received the Winterton Memo, Newmont believed the report contained any information indicating that a materially adverse effect had occurred. To the contrary, Winterton testified at his deposition that neither McLaren nor Dodd expressed "any concern that they were surprised about the contents of [the Winterton Memo]" when they subsequently came to CC&V for a site visit, and that they did not convey to Winterton during that meeting or at any other time that "they had no idea that there were going to be this many issues when they took over." *See* AGA Reply Ex. 137 (Winterton Tr.) at 211:13-212:23. These circumstances lend support to AGA's argument that the Winterton Memo merely set forth information that Newmont already knew about prior to Closing.

Newmont's analyses in the post-transaction period also undermine its argument that a Company MAE occurred. In the context of an M&A transaction, an MAE provision is generally intended to protect the buyer "from the occurrence of unknown events that substantially threaten the overall earnings potential of the target in a durationally-significant manner." *In re IBP*, 789 A.2d at 68. In other words, to constitute a Company MAE, the Alleged MAE "should be material when viewed from the longer-term perspective of a reasonable acquiror." *Id.* Here, however, Newmont's post-transaction analyses demonstrate that no "durationally-significant" material adverse effect occurred. Just two months after the transaction closed, in an October 2015 report comparing estimates from the diligence period to Newmont's 2016 budget, Newmont noted that it expected CC&V, as a whole, to produce more gold than it had estimated during due diligence. *See*

AGA Ex. 27 at -9692; *see also* AGA 56.1 ¶¶ 289-90.[34]

Newmont's two PIRs also demonstrate that, in the post-Closing period, the value of CC&V increased from Newmont's valuation at the time of the transaction. In the first PIR, submitted in September 2016, Newmont valued CC&V at $831 million on an NPV basis. *See* Newmont Ex. 83 at -5955. The review of the first PIR that Newmont's VAT submitted in November 2016 noted that the "value of the CC&V asset" had increased by approximately $68 million "when compared against the $820 million purchase price." *See* AGA Ex. 21 at -6365. In the second PIR, submitted in April 2018, Newmont valued CC&V at $842 million on an NPV basis. *See* Newmont Ex. 84 at -8818. The VAT's review of the second PIR, also submitted in April 2018, stated that CC&V was "on track to deliver approximately $11 million in incremental NPV." *See* AGA Ex. 23 at -2001. It bears repeating that, in determining whether a Company MAE occurred during the MAE Period, the Mine must be analyzed as a whole. Thus, even if it is true that the Mill was struggling to reach its design throughput or recovery, Newmont's PIRs show that CC&V as a whole did not suffer a materially adverse effect.

Because Newmont's three Alleged MAEs do not fall within the Company MAE definition, and because the record shows, in any event, that they do not rise to the level of a Company MAE within the meaning of the SPA, AGA is entitled to summary judgment on Newmont's breach of contract claims.

## II. AGA's Motion for Summary Judgment on Newmont's Fraud Claims

Newmont asserts fraud claims based on (1) AGA's representation in the SPA, and restated

---

[34] In particular, this October 2015 report indicated that the estimated total ounces of gold produced for the period of 2016-2018 according to Newmont's 2016 budget was 1,180,000 ounces, as compared to the diligence period's estimate of 1,177,000 ounces, and that the estimated total ounces of gold produced for the period of 2019 to the end of the life of the Mine according to its 2016 budget was 2,529,000, as compared to the diligence period's estimate of 2,510,000. *See* AGA Ex. 27 at -9692.

at Closing, that no Company MAE had occurred during the MAE Period, and (2) AGA's representation in the SPA, and confirmed through the Compliance Certificate provided at Closing, that it had complied with its obligations and covenants under Sections 6.01(b), 6.02, and 9.10 of the SPA between Signing and Closing. *See* Opp'n at 39; Tr. at 4-5.[35]

Newmont's first set of fraud claims—those premised on Section 4.14 and the representation that no Company MAE had occurred—fail for the same reasons discussed above. Based on the evidence in the record, Newmont has failed to establish that a Company MAE did in fact occur within the MAE Period, let alone that AGA knew, believed, or recklessly disregarded that fact and intentionally or recklessly represented otherwise.

Newmont's second set of fraud claims—those regarding certain obligations and covenants, as confirmed through the Compliance Certificate provided at Closing—is premised on three specific provisions of the SPA. Pursuant to Section 7.02 of the SPA, Newmont received a Compliance Certificate at Closing, signed by Guenther, representing that certain "representations and warranties" made in the SPA, including those made in Section 4.14(a), were "true and correct as of the Closing Date as though made on the Closing Date," and that AGA had "performed or complied in all material respects with all obligations and covenants required by the Agreement to be performed or complied with by the AGA Parties by the time of the Closing." *See* Newmont Ex. 103 at -4264; *see also* SPA § 7.02(b)-(c); Newmont 56.1 ¶ 747. As an initial matter, the representations made in the Compliance Certificate are statements of present fact, which—if established to be materially false or misleading and made with the requisite scienter—may serve

---

[35] Newmont asserts fraud claims under the federal securities law, Colorado state securities law, and common law. The parties do not dispute that Newmont's federal securities fraud claims are governed by federal law, as interpreted by the Second Circuit, *see, e.g.*, *Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*, No. 02 Civ. 0767 LBS, 2002 WL 31819207, at *3-9 (S.D.N.Y. Oct. 10, 2002), and its Colorado state securities fraud and common law fraudulent inducement claims are governed by Colorado law, *see, e.g.*, *Telecom Int'l Am., Ltd. v. AT&T Corp.*, 67 F. Supp. 2d 189, 207 n.16 (S.D.N.Y. 1999).

as the basis for a fraud claim. *See VTech Holdings Ltd. v. Lucent Techs. Inc.*, 172 F. Supp. 2d 435, 440 (S.D.N.Y. 2001). Newmont has not, however, demonstrated that any of the statements contained in Sections 6.01(b), 6.02, and 9.10—or, in turn, in the Compliance Certificate—were fraudulent, or that AGA acted with the requisite scienter in certifying its compliance with those provisions at Closing.

First, Section 6.01(b)(v) provides, in relevant part, that AGA "shall promptly advise [Newmont] in writing of . . . the occurrence of any matter or event that is material to the business, condition (financial or otherwise), working capital, or results of operations of . . . the Mine." SPA § 6.01(b)(v); *see also* Opp'n at 10. Newmont argues that AGA induced it to close by falsely representing that AGA had "disclosed in writing any matters or events material to CC&V" because "AGA failed to disclose numerous matters and events between Signing and Closing that were indisputably material to CC&V's business." Opp'n at 50. Newmont points to the same reports and information that underlie its contract claim: the AMTEL Report, which it asserts "revealed that AGA had built the wrong type of mill for the ore body at CC&V," the fact that the Mill's "Process Circuit was defectively designed and constructed," and the Winterton Memo, which it argues determined that "the Mill, as a total unit, suffered from deficiencies that would prevent it from ever reaching design recovery or throughput." *See id.* As the Court has discussed at length, however, there is nothing in the AMTEL Report, the Winterton Memo, or any other document in the record that shows that AGA concluded that it had built the wrong type of mill or that the Mill would never reach its target throughput or recovery rates. It is for these reasons, and those articulated above, that the Court has determined that, under Sections 4.14 and 10.05, no Company MAE occurred during the MAE Period. Contrary to Newmont's suggestion, the obligation in Section 6.01(b)(v) is narrower than that of the MAE provision and Company MAE definition.

While the Company MAE definition provides that "any change, effect, event, occurrence, circumstance or state of facts" that either "is" *or* "would reasonably be expected to be materially adverse" to the Mine could constitute a Company MAE, *see* SPA § 10.05(b), the language in Section 6.01(b)(v) provides disclosure obligations only as to "the occurrence of any matter or event" that "*is* material" to the Mine, *see* SPA § 6.01(b)(v) (emphasis added).[36]

Next, Section 6.02 provides, in relevant part, that Newmont shall have "reasonable access, upon reasonable notice during normal business hours during the period prior to the Closing, . . . to the personnel[,] properties, books, contracts, commitments, Tax Returns and records of or pertaining to [the Mine]," and that during this period, AGA "shall furnish promptly to [Newmont] any information concerning [the Mine] as [Newmont] may reasonably request; provided, however, that such access does not unreasonably disrupt the normal operations of [the Mine]." SPA § 6.02; *see also* Opp'n at 10. Newmont argues that AGA falsely represented that it had provided "reasonable access to CC&V information, personnel, and property," particularly since it failed to provide it with "the AMTEL Report, the design defects discussed in the DGS Memo, and the Winterton Memo," and that, between Signing and Closing, Newmont had "no choice but to trust that AGA was providing it with information concerning CC&V." *See* Opp'n at 50-51.

Newmont points specifically to a June 15, 2015 email from Chancellor to various AGA and CC&V personnel, *see* Newmont Ex. 27, as well as a June 17, 2015 email from Chancellor to Briggs, *see* Newmont Ex. 28, to support its contention that AGA knew it was not providing "reasonable access" in the period between Signing and Closing. Neither email supports

---

[36] Additionally, it is undisputed that Section 6.01(b)(v) only applied in the period between Signing and Closing, *see* Tr. at 65; AGA Reply at 20, and that Newmont therefore could not bring a breach of contract claim premised on that provision. As Section 9.02(b)(vi) of the SPA specifically excludes Section 6.01(b) from giving rise to a claim for indemnification or damages, it would make little sense for Newmont to be able to circumvent that clear contractual language by merely characterizing its Section 6.01(b)(v) claim as one for fraud.

Newmont's claim. First, in his June 15th email, Chancellor explained that he was "beginning to receive requests from Newmont to access people, site, and information" at CC&V, and stated his view that, while "some access under controlled circumstances . . . is fine (and perhaps appropriate)," allowing Newmont "to review and copy files so they can run title prior to closing, on the other hand, seems . . . to go too far, and may be a 'recipe' for disaster." Newmont Ex. 27 at -3809. Chancellor then proposed recommendations for how to proceed, noting that he wanted to discuss the matter further with the team. *Id.* at -3809-3810. This email does not demonstrate that AGA was intentionally hiding information or knew or believed that the access it was providing to Newmont was unreasonable.

The June 17th "Rules of Engagement" email that Chancellor sent to Briggs confirms that AGA was primarily concerned with balancing the parties' "wish to maximize the likelihood that the transaction will close and that there is as smooth a transition post-closing as possible" with "what is necessary—as opposed to what would be 'nice to have'—over the next few weeks, as well as with what is best for the efficient, continued operation of the [M]ine." *See* Newmont Ex. 28 at -8342. This email does not establish that AGA knew or believed its proposed terms regarding Newmont's access to people, property, or information during this period were unreasonable. Indeed, the Rules of Engagement email was framed by the mutual understanding that both AGA and Newmont "want the site to continue to function as efficiently and productively as possible, and thus . . . must do everything possible to minimize disruptions and any corresponding impact on productivity." *Id.* at -8340. It was for this reason that Chancellor suggested that "[a]ccess to people, property, or information by Newmont . . . should be the exception rather than the rule, and should focus on those things that must be accomplished prior to closing." *Id.* Chancellor nonetheless proceeded to outline his proposed "rules of engagement," providing terms by which

Newmont had access to CC&V, while remaining mindful of the overall goal that the Mine operate with as few disruptions as possible. *See id.* at -8340-8342.[37] In any event, there is again no evidence that AGA knew or believed that the level of access it was providing to Newmont was unreasonable. Newmont, as a sophisticated party in the transaction, was also capable of assessing the level of access it was provided, and should have raised the issue prior to Closing if it believed it had not been afforded "reasonable access" under the SPA.[38]

Finally, Section 9.10 provides, among other things, that the "parties shall use their reasonable best efforts and act in good faith to fully cooperate and coordinate in the prosecution and defense of, and to reach effective resolutions of, all Designated Matters." *See* SPA § 9.10(h)(i); *see also* Opp'n at 51. Newmont asserts that AGA did not "us[e] its reasonable best efforts to fully cooperate," but rather, "made a calculated decision to withhold from Newmont both the fact that severe defects had occurred [in connection with the Mill] and the nature of the claims AGA was considering against FLS." Opp'n at 51. Newmont points primarily to the documents and circumstances surrounding the July 16, 2015 meeting between AGA's counsel and Newmont's counsel, such as the July 7 Memo and the DGS Memo, to support its contention that AGA falsely represented at Closing that it had "fully cooperated in good faith in prosecuting" the Designated

---

[37] *See also, e.g.*, AGA Ex. 7 (Robinson Tr.) at 159:15-20 (agreeing with the statement that "as between the desire of a buyer to get information and the desire of a seller to continue to run a mine, it's necessary to strike a balance between those competing interests"); AGA Ex. 3 (Largent Tr.) at 241:20-243:4 (testifying that "any time you get people on-site it's disruptive" and that therefore "[s]ite access is very tightly controlled," and citing, for example, that an on-site visit by Newmont's HR group "cost [them] 16 hours of [total production time]"); Ch. Ex. 113 (Dennison Tr.) at 213:15-215:4 (explaining that "access to a site, an operating mine where you as the seller are still responsible for the mine . . . it's something that is obviously controlled," particularly since the seller is responsible for the "risk and reward in respect of that mine up until closing and only once closing happens does that pass to the buyer").

[38] Newmont's suggestion that Robinson's email to Largent, in response to Chancellor's "Rules of Engagement" email, indicated that "AGA's 'rules of engagement' were problematic and out of line with industry custom," *see* Opp'n at 51; Newmont 56.1 ¶ 657, mischaracterizes that email. To the contrary, in this email, Robinson stated that he wanted to "discuss the process for engagement going forward" and that he believed "there are other factors that support a more reasonable approach to the transition," especially "[g]iven this is a single site and the process we're discussing is for only a month or so." *See* Newmont Ex. 29 at -8869. Furthermore, Robinson referenced Newmont's own prior "large acquisitions" and recent "site divestitures," but did not mention any particular "industry customs." *See id.*

Matters.  *Id.*  There is again, however, no evidence in the record that AGA knew or believed that its level of cooperation was unreasonable or that it was not using its best efforts to cooperate with respect to the potential contractor claims.

While it is true that AGA did not provide Newmont with the July 7 Memo or the DGS Memo—documents drafted by its outside counsel and clearly labeled "legally privileged & confidential"—Newmont has not established that AGA had any obligation, under Section 9.10 or otherwise, to do so.  There is also nothing in either Memo, or in the July 16 Agenda, evincing an intent, on the part of AGA, to hide from Newmont the fact that there were design defects at the Mill or that CC&V was contemplating claims against FLS.  In fact, the July 16 Agenda contained several bullet points describing CC&V's "potential claims against [FLS]," including not only "[b]reach of contract/warranty related to other equipment designed, specified, or provided by FLS," but also "[b]reach of contract related to design failures" and "[p]rofessional negligence related to design failures."  *See* AGA Ex. 67 at -1536.  Newmont makes much of the fact that the July 16 Agenda did not include the words "process circuit," but as Newmont acknowledges, "the term 'process circuit' generally describes the particular combination of equipment and processing methods selected for inclusion in the Mill and the sequence in which they operate," *see* AGA 56.1 ¶ 21; Newmont AGA Resp. ¶ 21, and the July 16 Agenda indisputably *did* reference such equipment.  That Charles Carter replied "Great" to Chancellor's update following the July 16, 2015 meeting, *see* AGA Ex. 67 at -1531, does not evince any nefarious intent on AGA's part.  In Chancellor's email, he informed Carter that AGA "*did* disclose the new claim for equipment issues created by [FLS]," and merely noted that "[the parties] did not dwell on it" and that "[i]t was not a point of discussion with [Newmont]."  *Id.* (emphasis added).  If Newmont believed that AGA was not cooperating within the meaning of Section 9.10, or that it was not receiving sufficient

information about the FLS claims in particular, it should have raised the issue prior to Closing. But the record before the Court does not show that AGA knew or believed that it was not using its reasonable best efforts or cooperating in good faith, or that it was affirmatively withholding information about the potential contractor claims from Newmont.

Even if Newmont could show that AGA falsely certified that it had complied with its obligations in Sections 6.01(b)(v), 6.02, or 9.10—which it cannot—there is also nothing in the record demonstrating that anyone at AGA did so with the requisite scienter. Accordingly, AGA is entitled to summary judgment on Newmont's fraud claims.

### III.    Chancellor's Motion for Summary Judgment

Newmont asserts claims of fraudulent inducement and aiding and abetting in violation of the Colorado Securities Act against Chancellor.[39] As an initial matter, Chancellor is entitled to summary judgment on Newmont's aiding and abetting claim because Newmont cannot establish that AGA is liable for any underlying violation of the Colorado Securities Act. *See Bellman v. I3Carbon, LLC*, No. 12-cv-00655–RBJ, 2015 WL 3948100, at *6 (D. Colo. June 26, 2015) ("The statute 'is intended to limit aiding and abetting claims to those instances where the plaintiff can demonstrate that the defendant had knowledge of the primary violation.'") (quoting *Stat-Tech Liquidating Tr. v. Fenster*, 981 F. Supp. 1325, 1339 (D. Colo. 1997)).

Chancellor is also entitled to summary judgment on Newmont's fraudulent inducement claim. To prevail on a claim for fraudulent inducement, a plaintiff must establish that "(1) the defendant made a fraudulent misrepresentation of fact or knowingly failed to disclose a fact that defendant had a duty to disclose; (2) the fact was material; (3) the plaintiff relied on the misrepresentation or failure to disclose; (4) the plaintiff's reliance was justified; and (5) the

---

[39] The parties do not dispute that the claims against Chancellor are governed by Colorado law. *See* Ch. Mot., Dkt. 115, at 2-3; Opp'n to Ch. Mot., Dkt. 125, at 2 n.1; *see also Telecom Int'l Am*, 67 F. Supp. 2d at 207 n.16.

reliance resulted in damage to the plaintiff." *Granite Southlands Town Ctr., LLC v. Provost*, 445 F. App'x 72, 75 (10th Cir. 2011) (citing *M.D.C./Wood, Inc. v. Mortimer*, 866 P.2d 1380, 1382 (Colo. 1994) and *Nielson v. Scott*, 53 P.3d 777, 779 (Colo. App. 2002)). In its opposition brief and at oral argument, Newmont clarified that, as to Chancellor, its fraud claim is premised on Chancellor's alleged misstatements and omissions from two circumstances in the pre-Closing period: first, the July 16, 2015 meeting between AGA's counsel and Newmont's counsel, and second, the language added to Section 4.1.2 of the June MLE2 Report. *See* Opp'n to Ch. Mot. at 5-11; Tr. at 88-94. Although Newmont asserts that Chancellor both made affirmative misrepresentations *and* failed to disclose material information for which he had a duty to disclose, the record before the Court makes clear that, in reality, Newmont's fraud claim against Chancellor involves only alleged omissions. Indeed, when pressed at oral argument, Newmont was unable to articulate any *affirmative* material misstatements or misrepresentations that Chancellor made to Newmont. *See, e.g.*, Tr. at 90, 92-93. Thus, to succeed on its fraudulent inducement claim, Newmont must establish that Chancellor "knowingly failed to disclose a fact that [he] had a duty to disclose." *Granite Southlands Town Ctr.*, 445 F. App'x at 75; *see also Mallon Oil Co. v. Bowen/Edwards Assocs., Inc.*, 965 P.2d 105, 111 (Colo. 1998) (en banc) ("To succeed on a claim for fraudulent concealment or non-disclosure, a plaintiff must show that the defendant had a duty to disclose material information.") (citing *Smith v. Boyett*, 908 P.2d 508, 512 (Colo. 1995)).

Under Colorado law, a "defendant has a duty to disclose to a plaintiff with whom he or she deals material facts that 'in equity or good conscience' should be disclosed." *Mallon Oil*, 965 P.2d at 111 (quoting *Smith*, 908 P.2d at 512). To determine whether the circumstances of a particular case give rise to a duty to disclose "in equity or good conscience," Colorado courts look to the Restatement (Second) of Torts § 551(2) for "helpful guidance." *Id.* Section 551(2) sets forth five

circumstances in which a party to a transaction has a duty to disclose certain information to the other party. *See European Motorcars of Littleton, Inc. v. Mercedes-Benz USA, LLC*, No. 17-cv-00051-MEH, 2017 WL 2629133, at *9 (D. Colo. June 19, 2017). "One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated," for example, "matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading," *see* § 551(2)(b); "subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so," *see* § 551(2)(c); and/or "facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts," *see* § 551(2)(e).

Here, however, neither the circumstances of the CC&V transaction nor the relationship between Chancellor and Newmont created a duty to disclose on the part of Chancellor. Newmont was not in a "fiduciary or trust relationship" with either Chancellor or AGA. *See Poly Trucking, Inc. v. Concentra Health Servs., Inc.*, 93 P.3d 561, 565 (Colo. App. 2004). "[N]or was there any expectation that either party or its counsel would act to protect the other party's interests." *Id.* To the contrary, AGA and Newmont were "dealing at arm's length," each represented by its own counsel, and "in an adversarial relationship where each party was expected to act on behalf of itself only . . . [and] had a duty to his or her client to protect the client's interests." *Id.* "In such an adversarial relationship, concealment by mere silence is not enough to constitute fraud." *Id.* There must instead be "some trick or contrivance intended to exclude suspicion and prevent inquiry." *Vickery v. Evelyn V. Trumble Living Tr.*, 277 P.3d 864, 871 (Colo. App. 2011) (quoting *Poly Trucking*, 93 P.3d at 565). Moreover, "unless the seller is in a fiduciary relationship with the buyer

or a duty is imposed by statute, a seller has no duty to disclose material facts to a buyer." *Carillo v. Nielsen*, No. 2015 CV 30390, 2017 WL 9771805, at *3 (D. Colo. Jan. 5, 2017); *see also Leprino Foods Co. v. DCI, Inc.*, 727 F. App'x 464, 476 (10th Cir. 2018) (noting that a seller is "not under a duty to disclose every possible [fact]" to a buyer). Because Chancellor owed no duty to Newmont as a matter of law, Newmont's fraud claim as to Chancellor fails. *See European Motorcars*, 2017 WL 2629133, at *11; *Vickery*, 277 P.3d at 871.

## CONCLUSION

For the foregoing reasons, Defendants' motions for summary judgment are granted. The Clerk of Court is respectfully directed to terminate the motions pending at Dkts. 108 and 114, and close the case.

SO ORDERED.

Dated:     March 18, 2020
           New York, New York

_____
Ronnie Abrams
United States District Judge